U.S. DISTRICT COURT – N.D. OF N.Y.

**FILED**

**Mar 22 - 2025**

John M. Domurad, Clerk

1    UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF NEW YORK

3

| | |
|---|---|
| **Stanley Zhong, Nan Zhong,** and **SWORD (Students Who Oppose Racial Discrimination)**, | Case No. ___3:25-CV-0365 (ECC/ML)___ |
| Plaintiffs, | |
| v. | COMPLAINT |
| **The Trustees of Cornell University,** in their official capacity as the governing body of Cornell University; **Michael Kotlikoff,** in their official capacity as the President of Cornell University, | JURY TRIAL DEMANDED |
| Defendant. | |

4    **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND**

5    **DAMAGES**

6 **I. INTRODUCTION**

7    1.  Plaintiffs Stanley Zhong ("Stanley"), Nan Zhong ("Nan"), and Students

8        Who Oppose Racial Discrimination ("SWORD"), represented by Nan

9        Zhong on behalf of its members and all others similarly situated,

10       collectively referred to as "Plaintiffs," bring this civil rights action against

11       Cornell University ("Cornell", "Defendant") for engaging in racially

discriminatory admissions practices that disadvantage highly qualified Asian-American applicants, including Stanley and members of SWORD.

2. Despite Stanley's exceptional academic achievements and remarkable professional accomplishments at a young age, his application to the undergraduate program at Cornell University was rejected. This result stands in stark contrast to his receipt of a full-time job offer from Google for a position requiring a Ph.D. degree or equivalent practical experience.

3. Stanley's experience is emblematic of a broader pattern of racial discrimination against highly qualified Asian-American applicants at Cornell. These admissions practices violate the Fourteenth Amendment to the United States Constitution, and Title VI of the Civil Rights Act of 1964.

**II. JURISDICTION AND VENUE**

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this action arises under the Constitution and laws of the United States, including Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

5. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## III. PARTIES

### A. Plaintiffs

### A1. Co-plaintiff Stanley Zhong

6. Co-plaintiff Stanley Zhong, born in 2005, is an Asian American residing in California. Stanley's parents are first-generation immigrants to the United States from China. Stanley Zhong is a US citizen.

7. As a self-taught programmer, Stanley has distinguished himself in various coding contests, ranking highly enough to receive an invitation from Google for a full-time job interview in 2019, without Google realizing he was only 13 years old. Upon disclosure of his age, the interview was canceled due to Google's policy against hiring minors (See Exhibit 1 for email exchanges with a Google recruiter).

8. Competing against top professionals from around the world, Stanley advanced to the Google Code Jam Coding Contest semi-final in 2021 (See Exhibit 2).

9. Competing against top professionals from around the world, Stanley advanced to the Meta (Facebook) Hacker Cup semi-final in 2023 (See Exhibit 3).

10. Stanley won the 2nd place in MIT (Massachusetts Institute of Technology) Battlecode's global high school division twice (2nd place and 1st place in

the US, respectively) (See Exhibit 4). He was invited to MIT with expenses paid.

11. Stanley won the 2nd Place in CMU (Carnegie Mellon University) cybersecurity competition picoCTF (See Exhibit 5). He was invited to CMU with expenses paid.

12. Stanley won the 6th place in Stanford ProCo (See Exhibit 6).

13. Stanley advanced to the USA Computing Olympiad (USACO) Platinum Division (See Exhibit 7).

14. In April 2020, after seeing an NPR news story that the unemployment office's system programmed in COBOL was not keeping up with the workload caused by COVID (See Exhibit 8), Stanley taught himself COBOL, sent his sample code on GitHub (See Exhibit 9) to COBOL Cowboys featured in the news story, and volunteered to help. Mr. Bill Hinshaw, COBOL Cowboys CEO, graciously called Stanley and offered encouraging words (although he did mention putting a 14-year-old in front of his clients would probably freak them out). (See Exhibit 10 for the email exchange with Mr. Bill Hinshaw to set up the call.)

15. After the attempt to volunteer for COBOL Cowboys fell through, Stanley saw news reports about surging demand for e-signing services caused by the COVID lockdown. Stanley was unhappy that DocuSign didn't provide

any relief. So, he launched an unlimited free e-signing service named RabbitSign in 2021 (See Exhibit 11).

16. Built on Amazon Web Services (AWS), RabbitSign was designed and implemented so well that AWS's Well-Architected Review concluded that it was "one of the most efficient and secure accounts" they'd ever reviewed (See Exhibit 12).

17. To showcase RabbitSign's exemplary use of AWS Serverless and compliance services, AWS decided to feature it in a case study—a prestigious recognition that is notoriously difficult to attain, even for seasoned professionals (See Exhibit 13).

18. Shortly before Stanley turned 18, five randomly selected full-time Google engineers, who were specifically trained and qualified to evaluate candidates, devoted no less than ten hours collectively to evaluating Stanley's skills, including his technical expertise and soft skills, such as teamwork. Based solely on their assessments, without any external influence, these Google engineers concluded that Google should hire Stanley for an L4 position, which requires a Ph.D. degree or equivalent practical experience. Consequently, Google made an offer for a full-time L4 position to Stanley in September 2023, shortly after Stanley turned 18 (See Exhibit 14).

19. Google's compensation structure is tied to the level of its employees' positions, creating a natural disincentive to over-assess an employee's qualifications.

20. Mr. Dan Bloomberg, a longtime Google employee who served on the hiring committees for 18 years, has agreed to testify regarding Google's interview process when this lawsuit proceeds to trial.

21. In January 2025, Stanley received his performance evaluation as a Google employee for the entirety of 2024, with a rating and manager assessment indicating that he fully met the expectations for his position at Google and demonstrated a strong growth trajectory.

22. Because of his groundbreaking work to provide the world's only unlimited free HIPAA-compliant e-signing service to help lower America's healthcare cost, Stanley received an inbound interview request from *Viewpoint with Dennis Quaid*, a series of short documentaries on innovations aired on CNBC, Fox Business, Bloomberg, and public TV stations across the US. Their past guests included President George H.W. Bush, Secretary Colin Powell, and Fortune 500 CEOs. (See Exhibit 15 for the industry news coverage for RabbitSign's free HIPAA-compliant e-signing. See Exhibit 16 for the episode of *Viewpoint with Dennis Quaid* featuring RabbitSign and Stanley.)

23. Stanley's high school grade point average was 3.97 (unweighted) and 4.42 (weighted) (See Exhibit 17).

24. Although Stanley's high school does not publish individual student rankings based on grade point average, he is confirmed to be at least within the top 9% of his class, as he qualified for the University of California's ("UC") "Eligibility in the Local Context" (ELC). (See Exhibit 18 for Stanley's ELC qualification.) ELC guarantees admission to a UC campus for California high school students who rank in the top 9% of their class, as determined by their GPA in UC-approved coursework completed in the 10th and 11th grades.

25. U.S. News and World Report ranks Stanley's high school (Henry Gunn High School) #14 in California and #135 nationally (See Exhibit 19).

26. Niche ranks Stanley's high school (Henry Gunn High School) #1 best public high school in San Francisco Bay Area and  #4 best public high school in California (See Exhibit 20).

27. Stanley achieved a maximum PSAT score without any preparation (See Exhibit 21).

28. Stanley scored 1590 (out of 1600) on the SAT with only a few nights of self study without any paid test prep (See Exhibit 21 as well). He took the SAT only once.

29. Stanley was a National Merit Scholarship finalist (See Exhibit 22).

30. While in high school, Stanley participated in and led numerous extracurricular and volunteer activities.

31. Stanley served as a founding officer and president of the competitive programming club at his high school (See Exhibit 23).

32. Stanley co-founded and served as the 2nd president of a nonprofit named OpenBrackets, which brought free coding lessons to 500+ kids in underserved communities in California, Washington, and Texas over 2 years (See Exhibit 24). It received positive feedback from Stackoverflow co-founder, Mr. Jeff Atwood.

33. Because of his work at OpenBrackets, Stanley received the highest level of the President's Volunteer Service Award (See Exhibit 25).

34. Stanley's college application essay was pretty much captured in the Viewpoint interview mentioned supra. It discussed why he created RabbitSign, how he overcame rejections to eventually find a partner to provide free HIPAA-compliant e-signing to help lower America's healthcare cost, and how RabbitSign is the first Activism Corporation created to counter corporate greed.

35. For enrollment in fall 2023, Stanley applied to the undergraduate Computer Science program at Cornell University. His application was rejected.

36. In direct connection with Cornell's rejection of his applications, Stanley Zhong suffered emotional distress.

37. Stanley's story was reported in national news in October 2023 (See Exhibit 26) and cited in a congressional hearing in September 2023 (See Exhibit 27).

38. After Stanley's story hit the news in October 2023, multiple college admission counselors examined his application, including his essay. None of them could figure out a legitimate reason why Stanley was rejected. Some of them have offered to testify as expert witnesses when this lawsuit proceeds to trial.

39. Stanley was denied the opportunity to compete for admission to Cornell on equal footing with other applicants on the basis of race or ethnicity due to Cornell's discriminatory admissions policies and practices.

40. Stanley is ready and able to apply to Cornell when it ceases its intentional discrimination against Asian Americans.

41. Stanley, Nan, and SWORD reached out to multiple legal resources and entities for representation. However, these entities either declined to take the case or failed to respond. Consequently, Stanley is compelled to represent himself as a pro se litigant.

**A2. Co-plaintiff Nan Zhong**

42. Co-plaintiff, Nan Zhong, an Asian-American resident of California, is Stanley Zhong's father.

43. A first-generation immigrant from China, Nan has a direct and personal stake in this matter due to the discriminatory practices of Cornell's admissions process.

44. The 2024 decision of the Second Circuit Court of Appeals in *Chinese American Citizens Alliance of Greater New York (CACAGNY) v. Adams*, 116 F.4th 161, affirms that an "equal protection claim can be asserted by individuals alleging they suffered harm from the discriminatory policy or law, as well as other individuals (such as a parent or guardian) or organizations that also have standing to sue."

45. Nan suffered emotional distress as a direct result of Cornell's discriminatory policies, thereby establishing his standing to bring this claim.

46. Nan's children intend to apply for admission to Cornell but will be denied the opportunity to compete on equal footing with other applicants due to Cornell's discriminatory admissions policies. As a result, they may face rejection based on race or ethnicity rather than merit. These personal impacts further establish Nan's standing to bring this claim.

47. Beyond personal impact, Nan is acutely aware of the chilling effect that Asian-American students face when asserting their legal rights in college admissions. Public hostility toward such efforts is well-documented, particularly on college campuses.

48. For example, during the *SFFA v. Harvard* trial, widespread protests erupted against SFFA's challenge to race-conscious admissions (See Exhibit 28). Even after the Supreme Court ruled against Harvard, then-president Claudine Gay responded with open defiance, stating, "We will comply with the court's decision. But it doesn't change our values." (See Exhibit 29.) While the first half of her statement reflects legal necessity, the latter half unmistakably signals defiance. Notably, following the Supreme Court's ruling in SFFA, not a single Harvard administrator apologized for the harm their policies inflicted on Asian-American applicants.

49. Academics such as Professor Janelle Wong and Professor Viet Thanh Nguyen publicly asserted that no Asian American had suffered discrimination in the college admissions process, misleading the public with statements like, "Not a single Asian-American student has testified that they faced discrimination in the high-profile Harvard case." (See Exhibit 30.) Such assertions are demonstrably inaccurate and serve to suppress legitimate grievances. On November 4, 2024, Nan challenged both Professor Janelle Wong and Professor Viet Thanh Nguyen to a public debate. Neither replied as of the filing of this lawsuit.

50. This hostile climate has a direct, suppressive effect on potential plaintiffs. Many Asian-American applicants rejected by colleges initially expressed interest in joining SWORD's lawsuit. However, after spending just a few months on college campuses as freshmen, most withdrew.

51. A particularly striking example occurred at a panel discussion following a screening of the MSNBC documentary *Admission Granted* in San Francisco on May 9, 2024. The reaction of the audience, a few hundred people strong, vividly illustrated this bias. When the moderator introduced a Harvard student advocating for race-conscious admissions, the room erupted in thunderous applause and cheers. In contrast, the Asian-American student whose case launched the SFFA lawsuit received only sparse clapping—approximately a quarter of which likely came from Nan alone.

52. This pervasive social hostility—manifesting in microaggressions and overt hostility—creates a profound chilling effect that discourages Asian-American students from challenging discriminatory policies, effectively silencing those who have been harmed. It is therefore reasonable to infer that numerous Asian-American applicants, either already harmed by Cornell's admissions practices or anticipating future discrimination, remain silent due to legitimate concerns about retaliation or social pressure. Under the chilling effects doctrine, which recognizes that individuals may refrain from asserting their rights due to fear of reprisal, Nan's standing to sue is further reinforced.

53. Stanley, Nan, and SWORD reached out to multiple legal resources and entities for representation. However, these entities either declined to take the case or failed to respond. Consequently, Nan is compelled to represent himself as a pro se litigant.

### A3. Co-plaintiff Students Who Oppose Racial Discrimination (SWORD)

54. Co-plaintiff, Students Who Oppose Racial Discrimination ("SWORD"), is a voluntary membership organization focused on stopping racial discrimination in college admissions through litigations. It was established in October 2024 by people harmed and outraged by flagrant racial discrimination in college admissions.

55. SWORD is a coalition comprising prospective applicants to higher education institutions, individuals who were denied admission, their parents, and supporters of the organization's mission to eliminate racial discrimination in higher education admissions.

56. Nan Zhong is the President of SWORD.

57. SWORD's website is https://sword.education.

58. SWORD has at least one Asian-American member who is currently in high school and intends to apply for admission to Cornell ("Future Applicants").

59. Future Applicants will be denied the opportunity to compete for admission to Cornell on equal footing with other applicants on the basis of race or ethnicity due to Cornell's discriminatory admissions policies. As a result, Future Applicants may be denied admission to Cornell because of these discriminatory policies and practices.

60. SWORD has at least one Asian-American member whose children either intend to apply for admission to Cornell or applied for but were denied admission to Cornell in recent years ("Parents").

61. Parents' children were or will be denied the opportunity to compete for admission to Cornell on equal footing with other applicants on the basis of race or ethnicity due to Cornell's discriminatory admissions policies. As a result, Parents' children were or may be denied admission to Cornell because of these discriminatory policies and practices.

62. Under *Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333 (1977)*, SWORD qualifies for associational standing because 1) SWORD has members who have standing to sue Cornell themselves, 2) this lawsuit is germane to SWORD's purpose, and 3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

63. Stanley is not a member of SWORD.

64. The emotional toll experienced by Stanley and Nan exemplify the broader emotional and potential economic harms associated with racially discriminatory admissions practices by Cornell. Such policies do not merely affect statistical representation; they impose real-world consequences on a large group of individual applicants.

65. Stanley, Nan, and SWORD reached out to multiple legal resources and entities for representation. However, these entities either declined to take the case or failed to respond. Consequently, as President of SWORD, Nan is compelled to represent the organization as a pro se litigant.

**B. Defendant**

66. Defendant is a private university in the State of New York. Because it receives federal funding, it is subject to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et. seq*.

## IV. FACTUAL ALLEGATIONS

### A. Asian Applicants Receiving Discriminatory Results

67. For undergraduate enrollment in fall 2023, Stanley applied to Cornell. Despite his extraordinary qualifications, he was rejected. This outcome defies common sense and contradicts expert assessments of his application. As the Supreme Court noted in *Miller v. Johnson*, 515 U.S. 900,901 (1995), "bizarreness" can serve as "persuasive circumstantial evidence that race for its own sake…was a legislature's dominant and controlling rationale." Similarly, the stark disparity between Stanley's qualifications and the Cornell admissions decisions raises serious concerns about the role of race in Cornell's admissions process. This striking incongruity strongly suggests that Cornell's admissions policies are being applied in a discriminatory fashion.

68. Plaintiffs believe and allege that Stanley's rejection by Cornell was not based on his qualifications but on his race, as an Asian American.

**B. Widespread Anti-Asian Discrimination at Elite Universities**

69. After the state audit in 1987 (See Exhibit 31), University of California Berkeley Chancellor Ira Michael Heyman publicly apologized in 1989 for admissions policies that led to a decline in Asian-American undergraduate enrollment (See Exhibit 32).

70. On September 22, 2016, *Inside Higher Education* released a survey of admission officers. It revealed 42% of admission officers from private colleges and 39% of admission officers from public colleges believe that colleges hold Asian-American applicants to a higher standard (See Exhibit 33).

71. On May 25, 2016, Dr. Michele Hernandez, former Dartmouth admission officer, revealed on *Huffington Post* "how even the so-called 'holistic process' can discriminate against Asian students" and how Ivy League college admission officers often use racial stereotypes to discriminate against Asian-American applicants (See Exhibit 34).

72. Harvard openly gave preferential treatment to some racial groups at the expense of Asian-American applicants until its practice was ruled illegal by the Supreme Court in *SFFA v. Harvard* in 2023. Notably, following the Supreme Court's ruling in SFFA, not a single Harvard administrator

apologized for the harm their policies inflicted on Asian-American
applicants.

73. As documented in the SFFA's legal complaint against Harvard (page 60),
Asian-American applicants and their families know that they are being
discriminated against by elite universities (See Exhibit 35).

74. As documented in the SFFA's legal complaint against Harvard (page 57),
college counselors acknowledge discrimination against Asian Americans
at elite universities (See Exhibit 36).

75. It is well documented that many Asian-American applicants attempt to
appear "less Asian" on their college applications to avoid potential bias
(See Exhibit 37).

76. Admission officers at elite universities have described Asian-American
applicants using derogatory racial stereotypes, such as labeling them as
"yet another textureless math grind" (See Exhibit 39).

77. Evidence also shows that elite universities were aware of discriminatory
practices but often ignored or denied the issue until confronted with legal
challenges. For instance, in 2006, Jian Li, an Asian-American applicant,
filed a formal complaint against Princeton University for racial
discrimination in admissions. Following this action, Princeton's admission
rate for Asian-American students rose from 14.7% in 2007 to 25.4% in
2014 (See Exhibit 38). Similarly, after SFFA sued Harvard in 2015, the

percentage of Asian-American admits increased from 17% in 2014 to 22% in 2016 (See Exhibit 38 as well).

78. These patterns demonstrate a troubling reality: institutions were capable of increasing Asian-American enrollment with little change in applicant qualifications, suggesting prior suppression of Asian admissions through discriminatory policies. This raises legal concerns about Cornell's own admissions practices. Legal scrutiny is warranted to uncover the extent of Cornell's awareness of and complicity in similar practices that have disadvantaged highly qualified Asian-American applicants.

79. Compiling his Pulitzer Prize-winning reporting into a book titled *The Price of Admission*, Daniel Golden documented multiple highly qualified Asian applicants rejected by the University of California, Harvard, Yale, Princeton, Brown, Columbia, Stanford, and Massachusetts Institute of Technology. For example, UCLA rejected Stanley Park, a Korean American student who faced serious adversity (single immigrant parent with cancer and no college degree), while accepting non-Asian students with SAT scores 520 and 560 points lower. (See Exhibit 39 for the relevant excerpt from *The Price of Admission*.)

80. In 2003, Mr. John Moores, then chairman of the UC Board of Regents, accused UC's flagship campus of "blatantly" discriminating against Asian Americans (See Exhibit 40).

81. Following the implementation of a holistic review system, UCLA prohibited faculty members on its Admissions Committee from accessing admissions data. In response, Professor Tim Groseclose invoked whistleblower protections and resigned from UCLA in protest (See Exhibit 41). In *Cheating: An Insider's Report on the Use of Race in Admissions at UCLA*, Professor Groseclose described how then-UCLA Chancellor Norm Abrams explicitly cited raising African American enrollment as the motivation behind adopting holistic admissions. In addition, Professor Groseclose's statistical analysis showed that, for a group of applicants receiving the same scores from their initial readers, UCLA admitted 55% poor African Americans, 38% rich African Americans, 23% poor North Asians and 18% rich North Asians. Note that *rich* African Americans were admitted much more frequently than *poor* North Asians. UC never disputed the accuracy of Professor Groseclose's account. (See Exhibit 42 for excerpts from Professor Tim Groseclose's book *Cheating*.)

82. In a study commissioned by UCLA, only later obtained through public records requests, sociology professor Robert Mare documented a consistent pattern of anti-Asian discrimination in admissions at UCLA. His report said, "'North Asian' (Chinese, Japanese, Korean, Indian/Pakistani American) applicants receive somewhat less favorable holistic read scores than applicants in other ethnic identity groups who are otherwise similar in measured academic qualifications, personal characteristics, and measured challenges and hardships." It further indicated that "among

otherwise equivalent applicants, whites, African Americans and Latinos are overrepresented among those admitted, and Asian-American applicants are underrepresented." Additionally, the report noted that "the disadvantages of Asian applicants occur, with varying magnitudes, throughout the admissions process." (See Exhibit 56 in case 2:25-cv-0495 in the U.S. District Court for the Eastern District of California).

83. After Dr. Jennifer Lucero took over UCLA medical school admissions in June 2020, the number of Asian matriculants at UCLA medical school declined from 84 to 55 from 2019 through 2022, a drop of 35% (See Exhibit 43). Precipitous changes in admission rates strongly suggest deliberate conscious race-based directives.

**C. Deep-Rooted Culture of Identity Over Academics and Legal Evasion in Higher Education**

84. According to a survey by the Foundation for Individual Rights and Expression, 88% of Cornell's students self-censor their speech on campus.

85. Around 1990, then-University of Michigan (UM) President James J. Duderstadt instituted the Michigan Mandate, describing it as "a blueprint for fundamental change in the ethnic composition of the university community." (See Exhibit 44.) He claimed it strategically linked 'academic excellence and social diversity.' Decades later, the current UM President Santa Ono echoed this sentiment, stating, "At the University of Michigan,

we are convinced that academic excellence goes hand-in-hand with diversity, inclusion and equity." However, UM's rejection of highly qualified applicants like Stanley suggests a departure from genuine academic excellence in favor of ideological priorities.

86. In 2023, Brown University's Medical School prioritized Diversity, Equity, and Inclusion (DEI) over clinical skills in its faculty promotion criteria, raising concerns about the potential impact on patient care quality (See Exhibit 45).

87. Mr. Steven Dubinett, the dean of UCLA medical school, directs a center that houses a race-based fellowship. Its web page was deleted after media exposure (See Exhibit 46), indicating awareness of its illegality.

88. A New York Times opinion piece by a former UC admissions reader shared her detection of "unspoken directives", questioned whether "Proposition 209 serve(s) merely to push race underground" and described the admission reading process as "an extreme version of the American non-conversation about race." (See Exhibit 47.)

89. Following public outcry over the Varsity Blues scandal, California state lawmakers commissioned an audit of the University of California's admissions practices. The California State Auditor's 2020 report found that UC "has allowed for improper influence in admissions decisions, and it has not treated applicants fairly or consistently." Specifically, the audit revealed that UC Berkeley and UCLA "admitted thousands of applicants whose

1    records demonstrated that they were less qualified than other applicants

2    who were denied admission." (See Exhibit 48).

3    90. Admissions and hiring are inherently interconnected and inseparable in

4    the context of racial discrimination within educational institutions. Faculty

5    and administrators play a pivotal role in shaping academic standards,

6    mentoring students, and influencing the culture and policies of a university,

7    including admissions criteria and practices. A racially biased hiring

8    process can create and perpetuate a discriminatory culture by fostering an

9    environment where certain racial perspectives are prioritized over

10    objective, merit-based considerations. Racially-motivated hiring policies

11    often have a direct ripple effect on student admissions. It is unrealistic and

12    unreasonable to assume that a university can operate one process in a

13    race-conscious manner while keeping the other race-neutral, as both are

14    fundamentally linked in their goals and execution. Therefore, examining

15    both admissions and hiring practices is essential to providing a holistic

16    assessment of whether a university's policies violate constitutional and

17    statutory protections against racial discrimination.

18    91. In a public talk to a large audience, Professor Erwin Chemerinsky, the

19    Dean of the University of California Berkeley Law School, admitted that his

20    school systematically considers race in its internal decision-making and

21    actively conceals this practice (See Exhibit 49). As evidenced in the video,

22    when discussing the consideration of race in faculty hiring, Mr.

23    Chemerinsky described and preached the "unstated Affirmative Action"

practiced at UC as follows: "Don't say that [you are considering the candidate's race]. You can think it. You can vote it… Don't ever articulate that is what you are doing." He also said "If I'm ever deposed, I'm going to deny I said this to you." His statements reveal deliberate intent by senior university administrators to actively conceal their use of race in decision-making.

92. In November 2022, *The New Yorker* staff writer Jay Caspian Kang quoted Mr. Erwin Chemerinsky as follows:

> "What colleges and universities will need to do after affirmative action is eliminated is find ways to achieve diversity that can't be documented as violating the Constitution," Mr. Chemerinsky stated. "So they can't have any explicit use of race. They have to make sure that their admissions statistics don't reveal any use of race. But they can use proxies for race." (See Exhibit 49 as well.)

This statement is a clear acknowledgment that university officials intend to bypass constitutional and legal prohibitions on racial discrimination by employing indirect methods—namely, "proxies for race"—to achieve the same racial outcomes that explicit race-based policies once facilitated.

93. The use of racial proxies to achieve racial balancing is unconstitutional. In *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 743 (2007), the Supreme Court held that racial balancing is not a compelling state interest and that the government may not achieve

racial diversity through indirect methods that amount to race-conscious decision-making. Similarly, in *SFFA v. Harvard*, 600 U.S. 181 (2023), the Supreme Court reaffirmed that admissions policies designed to achieve racial diversity by using proxies for race are equally unconstitutional.

94. The statements made by Mr. Chemerinsky provide strong circumstantial evidence that senior university administrators are knowingly and deliberately structuring its admissions policies to evade legal prohibitions on racial discrimination.

95. As a law professor, Mr. Chemerinsky must know what he was preaching is illegal. By his own admission, he clearly knew it was illegal. Yet, he preached it with a sense of pride and braggadocio. It is worth emphasizing that Mr. Chemerinsky is the Dean, the top administrator, of UC Berkeley Law School. Mr. Chemerinsky's statements happened to be in a public talk, happened to be captured in video, and happened to be shared on the web. What is visible to the public must be only the tip of the iceberg. It is reasonable to infer the preaching and practice of "unstated Affirmative Action" is widespread in universities' admissions and hiring process, which lacks transparency and accountability.

96. Similar to the 'unstated Affirmative Action' approach advocated by Mr. Chemerinsky at UC, the University of Washington (UW) implemented this practice by re-ranking candidates based on race while maintaining an appearance of neutrality. In 2023, the UW psychology department's hiring

committee re-ranked finalists to prioritize hiring a Black candidate over a white and an Asian candidate who were originally ranked first and second, respectively. UW's report concluded that "race was used as a substantial factor in the selection of the final candidate and the hiring process." The report, which redacts all the names of those involved, suggests that faculty members tried to hide the extent to which race was considered, including in the hiring report. "I advise deleting the statement below as it shows that URM [underrepresented minority] applications were singled out and evaluated differently than non-URM applications (which is not allowed as [redacted] noted)," one email read, according to the report. "My inclination is to hold these meetings only for POC [People of Color] candidates. I'm also mindful that our Provost is now getting anxious about anything that's directed to only some identity groups (i.e., they are getting worried about fallout from the pending Supreme Court affirmative action rulings)," a person wrote in an email. "My read is that they'll get fearful of litigation and overcorrect into colorblindness. Maybe our committee can preemptively think our way around this type of future directive," the faculty member wrote. (See Exhibit 53 in case 2:25-cv-00348 in the U.S. District Court for the Western District of Washington.) A report by the National Association of Scholars revealed that the University of Washington's Associate Vice Provost, the Dean of the College of Arts and Sciences, and the Dean of Natural Sciences played major roles in implementing the race-based hiring directive. However, after the exposure, they attempted to shift blame

1    entirely onto the Psychology Department. This case provides a concrete

2    example of how UW's senior administrators prioritized race in hiring,

3    knowingly violating the law. The incident only came to light probably due to

4    a public records request from an external group. Given the pervasive

5    culture of racial preference, it is reasonable to infer that this was not an

6    isolated occurrence.

7   97. Senior university administrators not only preach and practice "unstated

8    Affirmative Action", they also actively persecute those who advocate for

9    academic excellence over identity politics. From 2022 to 2024, Professor

10   Perry Link, Chancellorial Chair for Teaching Across Disciplines at UC

11   Riverside and a leading authority on modern and contemporary Chinese

12   literature and culture, faced disciplinary action after expressing concerns

13   during a faculty search committee meeting about prioritizing a Black

14   candidate's race over qualifications. His comments, which he stated were

15   intended to caution against elevating race as the "overriding criterion,"

16   were reported to university officials without his knowledge. Professor Link

17   was subsequently removed from the search committee and subjected to a

18   prolonged disciplinary process, including hearings resembling a trial,

19   where termination was suggested as a penalty. Although a faculty

20   committee unanimously found him innocent of the charges, Chancellor

21   Kim Wilcox issued a formal letter of censure, overriding the committee's

22   recommendation (See Exhibit 50). Professor Perry Link was accused of

23   making racist comments during the hiring process but was not informed of

the specific remarks deemed problematic until nearly a year later. UC Riverside eventually acquitted him of all charges but allegedly threatened to penalize him if he spoke publicly about the ordeal. Despite UC's threats, Professor Link, a distinguished scholar at age 80, courageously made the incident public (See Exhibit 51). If UC has attempted to silence a prominent tenured professor, it is reasonable to infer the tremendous pressure any professor, non-tenured administrator or staff would face if they were to speak up. Therefore it is reasonable to infer that numerous similar cases exist at UC and other universities in which victims chose to remain silent, fearing retaliation that could jeopardize their careers and livelihoods. This incident highlights senior university administrators' preoccupation with immutable characteristics such as race, in clear violation of the Constitution. It also demonstrates the great lengths to which they go to silence any dissidents or whistleblowers. Furthermore, it clearly illustrates the importance of exercising the chilling effect doctrine when it comes to the legal standing in lawsuits concerning universities' student admissions and faculty hiring.

98. Professor Perry Link has agreed to testify when the lawsuit filed by Stanley, Nan and SWORD against the University of California (Case No. 2:25-cv-0495 in the U.S. District Court for the Eastern District of California) goes to trial.

99. It is noteworthy that California and Washington have had state laws explicitly prohibiting racial preference or discrimination in public education

since 1996 and 1998, respectively, through Proposition 209 and Initiative 200. Nevertheless, both the University of California (UC) and the University of Washington (UW) appear to have disregarded the will of voters and the rule of law. The entrenched culture of legal evasion within higher education institutions suggests that many universities continue to operate as though they are above the law.

100.    Both the University of Michigan and the University of California are constitutionally prohibited from using racial preferences in student admissions. Nevertheless, both institutions have demonstrated a clear desire to circumvent these bans (See Exhibit 52). Reports by Professor Robert Mare and the California State Auditor uncovered major issues in UC's admissions practices. After Michigan's Proposal 2 passed in 2006, UM hosted a 2-day workshop featuring UC administrators, who shared their strategies for navigating California's Proposition 209, enacted in 1996. UC, UW and UM's actions strongly suggest how other universities may be operating. This raises concerns that Cornell is following Mr. Chemerinsky's advice to "just do it without leaving any paper trail." Such tactics could make it difficult for Plaintiffs to obtain direct evidence of discriminatory intent against Asian-American applicants. In this context, Plaintiffs' claims should be assessed based on whether Cornell's admissions policies create a discriminatory impact on Asian-American applicants, either individually or collectively. As Mr. Chemerinsky himself acknowledged, statistical analysis is key to identifying racial discrimination

in admissions. Plaintiffs intend to conduct such an analysis during the discovery phase of this lawsuit.

**D. Cornell's Discriminatory Hiring**

101.    On July 16, 2020, Cornell President Martha Pollack issued a statement that "we must embed anti-racism across" education and research (See Exhibit 53). As of March 19, 2025, Cornell still requires diversity statements in faculty hiring (See Exhibit 54). It raises the question whether Cornell is primarily an academic institution or a political organization.

102.    In September 2020, a faculty coalition at Cornell University publicly demanded race-based hiring and promotions (See Exhibit 55), a practice that would constitute a clear violation of Title VII of the Civil Rights Act and 42 U.S.C. § 1981.

103.    Like the "unstated Affirmative Action" described by Mr. Chemerinsky at UC, Cornell's hiring process appears to be driven by identity while maintaining a façade of neutrality.

104.    On May 22, 2024, according to *Cornell Free Speech Alliance*, whistleblowers revealed how DEI Statements are used as a litmus test to eliminate qualified faculty in the hiring process. About 21% of the candidates were screened out solely based on DEI criteria. Unlawful race-based hiring preferences were applied throughout the entire hiring process to eliminate candidates who had less favorable demographic

characteristics (See Exhibit 56). Such practices are discriminatory and constitute violations of both federal and New York State Anti-Discrimination and Employment Law.

105.    Under this hiring system, even a Nobel Prize winner might not be considered if they prioritized academic research over diversity initiatives.

106.    It is reasonable to infer that rejected applicants would recognize that the public spectacle of bringing a lawsuit against Cornell would : i) almost surely prevent such applicants from being hired by any other leading university, almost all of which engage in similarly discriminatory practices; and ii) be personally and professionally ostracized by the discriminatory cultures existing at most leading US universities, research institutions, and scholarly publications. For these reasons and to avoid self-harm, any aspiring professor would be loath to become a plaintiff in such legal action against Cornell – regardless if such litigation might be won or lost. Once again, it clearly illustrates the importance of exercising the chilling effect doctrine when it comes to the legal standing in lawsuits concerning universities' student admissions and faculty hiring.

107.    In an open letter dated Jan 23, 2024, Jon A. Lindseth, a member of Cornell Board of Trustees (Emeritus) and Counselor to the President, called for the resignation of Cornell's president and provost, citing that "Reports have been made of Cornell's hiring faculty based on race rather than academic merit (even in the pure sciences)." He also called to "return

Cornell to 'merit based' rather than 'politically based' or 'identity based' hiring and admission preferences." (See Exhibit 57.)

**E. Cornell's Motive and Intent for Racial Balancing its Student Body**

108.    The amicus brief that Cornell filed jointly with other universities to the US Supreme Court in *SFFA v. Harvard* stated that "*Amici's experience has demonstrated that the optimal means of creating a diverse student body—and thereby achieving Amici's educational objectives—involves a limited consideration of race and ethnicity in admissions.*" (See Exhibit 58). The brief fails to define the criteria of a diverse student body—a point Plaintiffs intend to explore during discovery. Nevertheless, the amicus brief reveals Cornell's intent to increase enrollment for certain racial groups, a motive that implicates strict scrutiny under constitutional law.

109.    On June 29, 2023, following the Supreme Court's ruling in *SFFA v. Harvard*, Cornell President Martha E. Pollack stated that "Cornell is disappointed by the Supreme Court of the United States' decision today" (See Exhibit 59). This statement openly signaled the university's continued desire to consider race in admissions, despite the Court's decision. While President Pollack claims Cornell "to be a university where 'any person can find instruction in any study'", Plaintiffs would like to question President Pollack whether that applies to highly qualified Asian-American applicants like Stanley.

110.    The Equal Protection Clause of the Fourteenth Amendment prohibits states from denying any person "the equal protection of the laws." The Clause's "central purpose is to prevent the States from purposefully discriminating between individuals on the basis of race." See *Shaw v. Reno*, 509 U.S. 630, 642 (1993). Thus, a state law or policy that discriminates on the basis of race is subject to strict scrutiny, regardless of its intended beneficiaries. See *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995).

111.    As the Supreme Court noted in *SFFA v. Harvard*, 143 S. Ct. 2141, 2169 (2023), "College admissions are zero-sum. A benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." The distinction between preferential treatment and adverse impact is illusory—both actions are inherently racially motivated and inseparable, representing merely different ways of describing the same net discriminatory conduct. In a zero-sum situation, when assessing whether a policy constitutes racial discrimination, courts should focus on the presence of racial intent, regardless of whether that intent manifests as preferential treatment or adverse impact. As the Supreme Court affirmed in *SFFA v. Harvard*, "[W]hat cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows," and the prohibition against racial discrimination is "levelled at the thing, not the name." *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325, 18 L.Ed. 356 (1867).

### F. Cornell's Action for Racial Balancing its Admissions

112.    In addition to its evident motive and intent for racial balancing, Cornell possesses the means and opportunity to manipulate the racial composition of its student body under its current "holistic" admissions framework, which lacks transparency, independent third-party oversight and accountability. Indeed, Cornell's intent is matched by its actions.

113.    According to the 2020 U.S. Census, the New York state's Asian population grew by 36.1% over the prior decade, making it the fastest-growing ethnic group in the state (See Exhibit 60). Similarly, the Asian population in the U.S. grew by 36% from 2010 to 2020, making it also the fastest-growing ethnic group in the nation (See Exhibit 60 as well). It is reasonable to infer that the Asian population in the New York state and the U.S. continued to grow at a similar pace after 2020. However, at Cornell, Asian admits have trended flat from 2018 through 2023. The percentage of Asian students enrolled was 19.1%, 20.1%, 18.1%, 19.1%, 18.7%, 20.1% for those years, respectively. (See Exhibit 61.)

114.    The gap between Asian population growth and admission rates strongly suggests systemic discrimination. As the Court explained in *Reno v. Bossier Parish School Board*, 520 U.S. 471, 487 (1997), the natural consequences of an action often provide probative evidence of intent.

Here, the persistent adverse impact on Asian-American applicants indicates a racially motivated policy, despite Cornell's denials.

115.    Even before the Supreme Court's 2023 ruling in *SFFA v. Harvard*, the use of race in student admissions, as permitted by Justice Kennedy's majority opinion in *Fisher II* (2016), was limited to considering race as a "factor of a factor of a factor" and within the context that "the contention that the University discriminates against Asian-Americans is 'entirely unsupported by evidence in the record or empirical data'" (See Exhibit 62). However, the rejection of Stanley in 2023 casts serious doubt on whether Cornell's use of race adhered to the narrow boundaries established by *Fisher II*.

116.    For the first admission cycle after *SFFA v. Harvard,* Cornell's Asian enrollment grew from 19.2% (2018-2023 average. See Exhibit 61 as well.) to 22.4% in 2024, an increase of 16.7%. The magnitude of the increase further raises serious doubt on whether Cornell's use of race in and before 2023 adhered to the narrow boundaries established by *Fisher II* as a "factor of a factor of a factor".

117.    Cornell insists on implementing both "holistic reviews" and a "test-recommended" admissions policy. According to Cornell Office of Undergraduate Admissions, "*Cornell will be test-recommended for students applying in fall 2024 to enroll for fall 2025. This means that submitting test scores is not required but recommended for applicants to*

*the College of Arts & Sciences; Cornell Engineering; College of Human Ecology; Cornell Jeb E. Brooks School of Public Policy; and School of Industrial and Labor Relations.*" However, this position is inherently contradictory. A review cannot be truly holistic if it deliberately excludes objective measures like standardized tests, especially for STEM applicants where such metrics are crucial for assessing academic preparedness. This decision appears to be a calculated move to compromise intellectual honesty and academic integrity, potentially facilitating the concealment of discriminatory practices against Asian-American applicants. Notably, leading institutions like MIT, Dartmouth, Yale, Brown, Harvard, Caltech, and the University of Texas at Austin have reinstated standardized testing, further highlighting the questionable nature of Cornell's "test-recommended" policy post-COVID. These circumstances necessitate legal scrutiny of Cornell's policy, its underlying motivations, its disparate impact on Asian-American applicants, and whether Cornell continues to merit the traditional judicial deference granted to bona fide academic institutions.

118.    In 2023, the year Stanley applied in, Cornell enrolled 214 African American students (See Exhibit 63 as well). The 25th percentile SAT scores for Cornell students were 1420 (See Exhibit 64 as well). Nationally, 225,954 African American students took the SAT in 2023, with approximately 1% (roughly 2,259 students) scoring in the 1400–1600 range (See Exhibit 65). If Cornell's African American enrollees reflected

the general SAT distribution of Cornell students, approximately 161 (214*75%) of them would have scored above the 25th percentile of 1420, with an even larger number exceeding 1400. This would mean Cornell enrolled about 7.1% (161/2259) of the nation's top African American SAT performers.

119.    Using this analysis, the estimated percentage of national top scorers enrolled at Cornell is approximately 7.1% for African Americans, 1.0% for Asian Americans, 4.1% for Hispanic Americans, and 1.9% for White students (See Exhibit 66).

120.    Given the geographic distribution of high-achieving students, such a high concentration of top scorers from certain racial groups appears statistically improbable. These figures suggest that Asian-American applicants face significantly higher SAT score thresholds for admission compared to other racial groups. While SAT scores are not the sole measure of merit, this statistical irregularity raises serious concerns about whether Cornell's admissions policies comply with constitutional and legal prohibitions or limits against racial preferences.

121.    Cornell does not publish the number of National Merit Finalists in its admissions data. If such information were available, it would help evaluate whether rejecting Stanley—a National Merit Finalist—was reasonable.

122.    Given that Cornell is or was not conducting itself as a bona fide academic institution for student admissions or faculty hiring, any traditional

judicial deference afforded to academic institutions should not apply in lawsuits concerning student admissions or faculty hiring at Cornell.

123.    Studies comparing the academic qualifications of admitted students by race fail to fully capture the extent of racial discrimination faced by Asian-American applicants. By rejecting highly qualified Asian-American applicants like Stanley, Cornell artificially narrows the academic qualification gap between admitted students of different racial groups. As a matter of mathematical fact, the more highly qualified Asian-American applicants the university rejects, the smaller the observed qualification gap among admitted students becomes. To accurately assess the extent of racial discrimination, it is necessary to compare not only the admitted Asian-American students but also the rejected Asian-American applicants against admitted students from other racial groups. However, limitations in the publicly available Cornell admissions data currently prevent such an analysis. The plaintiffs intend to pursue this essential data comparison during the discovery phase of this lawsuit.

124.    The argument that Asian Americans are over-represented in Cornell's student body relative to the general population does not negate claims of discrimination. Equal protection requires that individuals be treated as individuals, not as members of a racial class. See *Miller v. Johnson*, 515 U.S. 900, 911 (1995). Even if aggregate Asian enrollment remains relatively high, systemic bias may suppress their numbers below what they would be in a race-neutral system. "[I]nvidious discrimination does

not become less so because the discrimination accomplished is of a lesser magnitude." See *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 277 (1979).

125.   A university policy that amounts to racial balancing is "patently unconstitutional." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003). Racial balancing seeks to ensure a specified percentage of a racial group within the student body merely due to race or ethnicity. *Id.* Courts have consistently rejected proportional representation as a constitutional justification for race-based admissions. See *Id.* at 343.

126.   The Second Circuit's 2024 decision in *Chinese American Citizens Alliance of Greater New York (CACAGNY) v. Adams* supports this case. The court held that a facially neutral policy driven by racial motives violates equal protection, even if aggregate enrollment improves. The ruling states "if discriminatory intent is proven, a negative effect or harm from that discriminatory policy on individual Asian-American students applying to the SHSs [Specialized High Schools] would be sufficient to trigger strict scrutiny review". The court further held that a policy or a program "is not immunized from strict scrutiny because it underperforms in an unconstitutional mission with respect to a targeted racial group in the aggregate." Therefore, university policies aiming to suppress Asian enrollment—whether or not Asian Americans are over-represented—are subject to strict scrutiny and won't survive it.

127.    Moreover, *CACAGNY* rejected the defense that admitting students to any school within a system negates discrimination claims. The Second Circuit Court stated that denying a student access to their preferred institution due to race is actionable. Similarly, admitting Asian-American students to less selective Cornell campuses does not absolve more selective campuses from discrimination claims.

128.    In *CACAGNY*, the Second Circuit Court stated that "Applying Supreme Court precedent, we have generally recognized three types of discriminatory laws: (1) a facially discriminatory law or policy that expressly classifies individuals on the basis of race; (2) a facially neutral law that is enforced in a discriminatory fashion; and (3) a facially neutral law that was adopted with discriminatory intent and resulted in a discriminatory effect. *See Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Hist. Dist. Comm'n,* 768 F.3d 183, 199 (2d Cir. 2014)."

129.    In this case, at least two types of discriminatory policies and practices identified by the Second Circuit Court are evident:

a. **Discriminatory enforcement**: Cornell's absurd and incongruous admission outcomes strongly indicate that Cornell exercises its admissions policies in a discriminatory fashion.

b. **Discriminatory intent and effect:** The pervasive culture of "unstated affirmative action" at universities underscores discriminatory intent, with substantial evidence of its adverse

impact on Asian-American applicants, both individually and collectively.

These actions constitute violations of the Equal Protection Clause of the Fourteenth Amendment, Title VI of the Civil Rights Act of 1964.

**G. Cornell Ignoring Complaints**

130.    Cornell officials have ignored complaints about questionable admissions outcomes and allegations of racial discrimination, reflecting a broader lack of transparency and accountability in their admissions process. On January 31, 2025, Nan contacted the Cornell Board of Trustees regarding Stanley's admission results, requesting an investigation. As of this filing, they have not responded.

131.    This mirrors the University of California's prolonged refusal to engage with Nan, who sought dialogue for over a year before filing a lawsuit against UC and the U.S. Department of Education on February 11, 2025, in the U.S. District Court for the Eastern District of California (Case No. 2:25-cv-0495).

132.    The denial of Stanley's application to Cornell—combined with Cornell's complete failure to even acknowledge the issue—cannot be dismissed as mere random error. Rather, these actions reveal a pattern of systemic bias and deliberate indifference, suggesting malice toward Stanley and, by extension, other similarly situated Asian-American applicants. While it is

true that Google's job offer came after Cornell's rejection—meaning

Cornell could not have foreseen that Google would recognize Stanley's

skills had already reached the Ph.D. level—the fundamental issue

remains: the technical achievements included in Stanley's Cornell

applications were substantially the same as those sent to Google. While

Google found Stanley's achievements sufficient to consider him for a

Ph.D.-level position, Cornell, in contrast, deemed him unqualified for

undergraduate admission. This stark contrast underscores a systemic

barrier that profoundly affects Asian-American applicants' experiences in

college admissions. Even when their qualifications reach the Ph.D. level,

they may still be denied undergraduate admission. This fosters a

pervasive sense of helplessness—the belief that the system is rigged to

reject you regardless of your merits—that contributes significantly to the

mental health challenges within the Asian-American youth community.

133.    This case echoes the dark legacy of the Chinese Exclusion Act of

1882—a shameful chapter in our nation's history for which Congress

formally apologized in June 2012. Disturbingly, as of the filing of this

lawsuit—after Cornell became aware of Google's assessment of Stanley's

skills—Cornell still refuses to engage in any meaningful discussion about

his applications, which only compounded the emotional distress Stanley

and Nan have endured.

### H. Lack of Response by Government Officials

134.    Stanley's mother filed a civil rights complaint with the Office for Civil Rights (OCR) at the U.S. Department of Education. However, the OCR dismissed the case after misinterpreting her email, relying on reasoning that directly contradicted her intended meaning. When she pointed out the misunderstanding, the OCR refused to reopen the case, stating it had been closed. The official dismissal letter cited a rationale the OCR knew to be false. Despite her repeated requests to correct the letter and remove the inaccurate reasoning, the OCR declined to make any changes, even after she escalated the matter. (For the full record of email exchanges with the OCR, see Exhibit 75 in case 2:25-cv-0495 in the U.S. District Court for the Eastern District of California.) OCR's failure to enforce civil rights laws has let the direct harm to Stanley and other Asian-American applicants persist.

135.    Nan also raised his concerns with California Assemblymember Marc Berman, mentioning that hundreds of his constituents were deeply concerned about UC's admissions practices. Despite several email exchanges, Mr. Berman did not respond substantively. (For the full record of email exchanges with Mr. Berman and his staff, see Exhibit 76 in case 2:25-cv-0495 in the U.S. District Court for the Eastern District of California.)

136.    In November 2023, Nan organized a petition that gathered over 4,000 endorsements for letters expressing concerns about UC admissions.

These letters were sent to Governor Gavin Newsom and Lt. Governor Eleni Kounalakis, both of whom serve as ex officio Regents of the University of California. Neither replied. (For the letters, see Exhibit 77 and Exhibit 78 in case 2:25-cv-0495 in the U.S. District Court for the Eastern District of California.)

137.    Since Plaintiffs were unable to get government officials to engage in California, where they are residents and taxpayers, they have little reason to expect assistance from officials for admissions issues at a private university in New York. As a result, litigation remains the only viable option.

**I. Legal Basis**

138.    The Supreme Court's decision in *SFFA v. Harvard* unequivocally established that racial discrimination in college admissions is unconstitutional. Even before this decision, the Court's ruling in *Fisher II* had already imposed strict limitations, allowing race to be considered only as "a factor of a factor of a factor" in admissions decisions.

139.    Cornell's racial discriminatory admission policies and practices violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

140.    Cornell's racial discriminatory admissions policies and practices also violate Title VI of the Civil Rights Act of 1964, which prohibits racial discrimination in programs receiving federal financial assistance.

141.    In addition to direct evidence of discrimination, racial "prejudice or stereotype" may be proven through circumstantial evidence. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266 (1977).

142.    Further supporting this claim, the Second Circuit Court of Appeals, in *Chinese American Citizens Alliance of Greater New York (CACAGNY) v. Adams*, 116 F.4th 161 (2d Cir. 2024), unanimously affirmed that an equal protection claim may proceed if "any individual has been negatively affected or harmed by a discriminatory law or policy based on race, even if there is no disparate impact on members of that racial class in the aggregate." Under the principle of *stare decisis*, this ruling provides binding authority for the present lawsuit.

## V. CLAIMS FOR RELIEF

**COUNT I - Violation of the Fourteenth Amendment (Equal Protection Clause)**

143.    Plaintiffs reallege and incorporate by reference the allegations set forth above.

144.    Defendant's admissions policies and practices violate the Equal Protection Clause of the Fourteenth Amendment by discriminating against Asian-American applicants, including Stanley, on the basis of race.

145.    As a result of Defendant's discriminatory policies and practices, Plaintiffs have suffered harm, including the loss of educational opportunities, emotional distress, and reputational damage.

146.    Plaintiffs have been and will continue to be injured by Defendant's ongoing discriminatory admissions policies, which deny them an equal opportunity to compete for admission based on race or ethnicity.

147.    Plaintiffs are entitled to a declaratory judgment, pursuant to 28 U.S.C. §2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Defendant from continuing to use admissions policies and practices that discriminate on the basis of race or ethnicity in violation of the Fourteenth Amendment and because the harm Plaintiffs will otherwise continue to suffer is irreparable.

## COUNT II - Violation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d)

148.    Plaintiffs reallege and incorporate by reference the allegations set forth above.

149.    Defendant receives federal financial assistance and is therefore subject to Title VI of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race, color, or national origin in any program or activity receiving federal financial assistance. Defendant's admissions

policies and practices discriminate against Asian-American applicants, including Stanley, in violation of Title VI.

150.   As a result of Defendant's discriminatory policies and practices, Plaintiffs have suffered harm, including the loss of educational opportunities, emotional distress, and reputational damage.

151.   Plaintiffs have been and will continue to be injured by Defendant's ongoing discriminatory admissions policies, which deny them an equal opportunity to compete for admission based on race or ethnicity.

152.   Plaintiffs are entitled to a declaratory judgment, pursuant to 28 U.S.C. §2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Defendant from continuing to use admissions policies and practices that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm Plaintiffs will otherwise continue to suffer is irreparable.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Stanley, Nan, and SWORD, on behalf of its members and all others similarly situated, respectfully request that this Court:

153.   Declare Cornell's Admissions Practices Unconstitutional

    a.  Declare that Defendant's student admissions policies and practices violate:

        i.   The Fourteenth Amendment to the U.S. Constitution,

ii. Title VI of the Civil Rights Act of 1964.

b. Enjoin Defendant from engaging in racially discriminatory admissions and hiring practices, and order it to take all necessary steps to eliminate the effects of past discrimination.

154. Mandate Institutional Reforms & Accountability Measures at Cornell

a. Issue an injunction requiring Defendant to issue a formal public apology to Asian-American applicants.

b. Issue an injunction requiring Defendant to dismiss, following a full and fair public hearing, all Admissions Directors and other administrators responsible for admission cycles found to be racially discriminatory under the Supreme Court's ruling in *SFFA v. Harvard* (2023) or in violation of the narrow limitations on race-based considerations established in *Fisher II* (2016) or earlier.

c. Issue an injunction requiring Defendant to dismiss, following a full and fair public hearing, all administrators who knowingly defend this lawsuit despite being aware of racial preferences in admissions—if excessive before 2023—or in hiring.

d. Issue an injunction requiring Defendant to dismiss, after a full and fair public hearing, all administrators who knowingly certified compliance with federal anti-discrimination laws while being aware of racial preferences in admissions—if excessive before 2023—or hiring.

e. Refer individuals who knowingly made false certifications under penalty of perjury for criminal prosecution.

155. Mandate Oversight & Transparency in Admissions at Cornell

a. Issue a permanent injunction requiring Defendant to establish an independent admissions oversight board, approved by this Court, with sole authority over the hiring and firing of Admissions Directors at each Cornell campus.

b. Issue a permanent injunction requiring Defendant to fund recurring independent audits of its admissions process, approved by this Court, including a breakdown of accepted and rejected applicants' qualifications by racial group.

c. Issue a permanent injunction requiring Defendant to implement admissions procedures that prevent personnel from accessing or inferring an applicant's race or ethnicity.

d. Issue a permanent injunction requiring Defendant to implement hiring procedures that prevent personnel from accessing or inferring a candidate's race or ethnicity.

e. Require Defendant to repeat its admission process independently on a small group of randomly chosen applicants for each admission cycle in order to demonstrate repeatability and self-consistency in admissions decisions.

156. Require Mandatory Training & Compliance Measures at Cornell

    a. Require annual 14th Amendment and Title VI & Title VII training for all Cornell personnel involved in admissions or hiring.

    b. Require all trained personnel to explicitly acknowledge that violating 14th Amendment, Title VI or Title VII, or failing to report violations may result in disciplinary action, including termination.

157. Declare Judicial Scrutiny of Cornell's Academic Policies

    a. Declare that Defendant should no longer receive traditional judicial deference as a bona fide academic institution unless it:

        i. Collects standardized test scores from all applicants in its admission process,

        ii. Ceases prioritizing immutable characteristics over academic merit in admissions and hiring.

158. Award Monetary Damages & Attorney's Fees

    a. Award nominal, compensatory, and punitive damages to Plaintiffs.

    b. Award reasonable attorneys' fees and costs incurred in this action. While Plaintiffs currently appear pro se, they expressly reserve the right to recover any documented legal expenditures should they retain counsel or incur other recoverable costs.

    c. Grant such other and further relief as this Court deems just and proper.

## VII. JURY DEMAND

Pursuant to the Seventh Amendment to the United States Constitution and Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues so triable.

---

I declare under penalty of perjury that the allegations in the complaint are true.

Respectfully submitted,

*Stanley Zhong*

Stanley Zhong (Pro Se)

211 Hope St #390755

Mountain View, CA 94039

*Nan Zhong*

Nan Zhong (Pro Se)

Individually and as President of SWORD

211 Hope St #390755

Mountain View, CA 94039

nanzhong1@gmail.com

**Dated:** March 19, 2025

1

# EXHIBIT 1

2

## EMAIL FROM GOOGLE RECRUITER IN 2019



3

**Stanley Zhong** ███████████████████                    Thu, May 23, 2019, 5:29 PM   ☆   ↩   ⋮

to ████████

I'm available next week on all of Monday and also on Tuesday after 4pm. I will also be open on Wednesday through Friday after 8pm. My resume can be found here: https://docs.google.com/document/d/███████████████████/edit?usp=sharing. It's also attached to this email.

Just to make sure you know, I'm 13 years old.

Stanley

> 📄 **Stanley Zhong's Resume**

⋯

One attachment · Scanned by Gmail ⓘ                                                              ▵



📄 Stanley Zhong's R...

---

████████████████████                    Mon, May 27, 2019, 1:39 PM   ☆   ↩   ⋮

to me ▾

Thank you for taking the time to put together a resume Stanley! Your competitive programming accomplishments are very impressive. Thanks for being transparent about your age. Due to this factor, we won't be able to visit opportunities at Google. I've uploaded your resume to provide visibility to our intern recruiting team for future follow up. Have a great Memorial Day!

1   ⋯

1

# EXHIBIT 2

2

### STANLEY'S RANKING IN GOOGLE CODE JAM



# EXHIBIT 3

1

2    Stanley's ranking in Meta (Facebook) Hacker Cup

3

# EXHIBIT 4

**STANLEY'S RANKING IN MIT BATTLECODE**



# EXHIBIT 5

### STANLEY'S RANKING IN CMU picoCTF

1

2

3

4

## 2nd place winners! W9 needed

D    ████████████ @andrew.cmu.edu>                    Apr 5, 2023, 8:46 AM    ☆  ☺  ↩  ⋮
to ████████████ me ▾

Hi Crusaders of redpwn jr (Stanley Zhong, ████████████████████ )

Congrats again on your amazing picoCTF 2023 performance! crusaders of redpwn jr won 2nd place! Your team will be awarded $2,000, split between each member.

In order to receive your award money, we need each of you to please fill out and return the attached W9 form.

In addition to your prize, we are looking to host an awards ceremony on CMU's campus in Pittsburgh, sometime this summer. Could you please let me know if **June 1st** would work for you? (Flights and hotels will be paid for by picoCTF)

Best,
████████████

# EXHIBIT 6

## STANLEY'S RANKING IN STANFORD PROCO





1            # EXHIBIT 7

2       **STANLEY ADVANCING TO USA COMPUTING OLYMPIAD PLATINUM IN 2021**

## USACO 2021 US OPEN, PLATINUM

The platinum division had 453 total participants, of whom 333 were pre-college students. We saw quite impressive results on the platinum problems in this contest, with several perfect scores. Results for top scorers are here. Congratulations to all of the top participants for their excellent results!

Your score on this contest was **469 (rank 104 among all pre-college participants in this division)**. Each problem contributed 1000/3 possible points, with equal points assigned to each test case; you can recall your performance on each test case by clicking on a problem below and looking at your results in analysis mode.

**1** **United Cows of Farmer John**
View problem | Test data | Solution | Your submission

**2** **Routing Schemes**
View problem | Test data | Solution | Your submission

**3** **Balanced Subsets**
View problem | Test data | Solution | Your submission

## USACO 2021 US OPEN, GOLD

The gold division had 856 total participants, of whom 676 were pre-college students. All competitors who scored 750 or higher on this contest are automatically promoted to the platinum division. Detailed results for all those promoted are here.

Your score on this contest was **1000 (rank 1 among all pre-college participants in this division)**. Each problem contributed 1000/3 possible points, with equal points assigned to each test case; you can recall your performance on each test case by clicking on a problem below and looking at your results in analysis mode.

**1** **United Cows of Farmer John**
View problem | Test data | Solution | Your submission

**2** **Portals**
View problem | Test data | Solution | Your submission

**3** **Permutation**
View problem | Test data | Solution | Your submission

1    **EXHIBIT 8**

2    **NPR** NEWS REPORT ABOUT **COBOL C**OWBOYS

3    https://www.npr.org/2020/04/22/841682627/cobol-cowboys-aim-to-rescue-sluggis

4    h-state-unemployment-systems









5

1

# EXHIBIT 9

2

## STANLEY'S COBOL CODE ON GITHUB

3 https://github.com/qpwoeirut/LearningCOBOL



4

# EXHIBIT 10

### Email exchange with Cobol Cowboys in 2020

On May 25, 2020, at 6:52 PM, YYY <YYY@YYY.com> wrote:

Dear COBOL Cowboys,

We hope you are having a wonderful Memorial Day.

Our names are YYY and Stanley Zhong. We are programming enthusiasts. We became interested in COBOL after learning how the current COVID-19 pandemic has caused issues with outdated COBOL programs. In the last month, we have been learning it to see if we could help. Our code can be found on GitHub here and [here](here).

We found out about the COBOL Cowboys on the news and saw the work you are doing to help people with their COBOL programs. If possible, we would like to help. Would you be interested in us doing volunteer work for you?

As a matter of disclosure, we are both 14 years old, but ready and eager to help the world in any way we can.

YYY and Stanley

From: XXX <XXX@cobolcowboys.com>

Date: Tue, May 26, 2020 at 12:22 PM

Subject: Re: Volunteers Interested in COBOL

To: YYY, Stanley

YYY and Stanley—

Howdy from Cobol Cowboys!

Thank you for reaching out and offering your volunteer services. We also

appreciate you sending us samples of your code. Good work guys.

We (Bill Hinshaw, Founder and myself) are intrigued by your interest and would

like to have further discussions with both of you.

An important next step, given your ages, would be to make contact with a

parent/guardian. I will need to talk to them on the phone and also get an OK in

writing (a quick email is fine) with their written approval for Cobol Cowboys, LLC,

to have an introductory teleconference with you both as well as follow-up emails.

YYY and Stanley, please forward this email to your parent/guardian and ask

them to phone me at xxx-xxx-xxxx, so we may proceed. I am available today:

now until 7pm and tomorrow through Friday, from 9am to 1pm.

Please let me know the name of your parent/guardian that will be calling with an

approximate time of their call.

Bill Hinshaw and I look forward to possible future discussions pertaining to

COBOL.

XXX, COO

Cobol Cowboys, LLC

Cell: xxx-xxx-xxxx

Email: XXX@cobolcowboys.com

not our first rodeo ...

_____

Nan Zhong <nanzhong1@gmail.com>    Tue, May 26, 2020 at 11:31 PM

To: XXX <XXX@cobolcowboys.com>

Cc: Stanley, YYY@YYY.com

Hi XXX,

I am Stanley's dad. Thanks for your quick response to the boys! I know Stanley was excited to see it.

Yes, please accept this email as the written approval for Cobol Cowboys, LLC, to have an introductory teleconference with Stanley as well as follow-up emails. I am sure you will hear from YYY's parent soon as well.

BTW, summer coding job is nothing new to Stanley. He interned at my startup in 2018, and programmed (in Python) the backend service (on AWS) that automatically runs insurance quotes. These days he is very much into competitive programming (mostly in C++) and computer security contests.

YYY and Stanley are school friends. Both live the Bay Area, CA. Based on the NPR news story, I believe you live in Gainesville, Texas, 2 hours ahead of us. If that is correct, can I call you at 11am your time (9am my time) on Wednesday 5/27? I will call from my mobile number xxx-xxx-xxxx.

Looking forward to speaking with you!

Thanks,

Nan

---

XXX <XXX@cobolcowboys.com> Wed, May 27, 2020 at 6:48 AM

To: Nan Zhong <nanzhong1@gmail.com>

Nan—

9am your time (11amCST) today works fine.

The work you've described that Stanley has been doing is most impressive.

Thanks so much for your email.

Will talk soon.

XXX, COO

Cobol Cowboys, LLC

Cell: xxx-xxx-xxxx

Email: XXX@cobolcowboys.com

not our first rodeo ...

1

# EXHIBIT 11

2

## RABBITSIGN FOUNDED BY STANLEY IN 2021

3 [www.rabbitsign.com](www.rabbitsign.com)

*RabbitSign*   Features   FAQ   Team   Contact                    Sign Up   Log In

# Get Unlimited Free E-Signing

Not a free trial. Not a free tier. Completely free. Period.
See how.

Get Started



# Won Accolades from Experts

An AWS Well-Architected Review concluded that RabbitSign was **"one of the most secure and efficient accounts"** reviewed. RabbitSign is in the editorial pipeline to be featured in an AWS case study for its exemplary usage of AWS Serverless and compliance services.

# Audited by Trusted Third Parties

RabbitSign has achieved both SOC 2 Type II compliance with an unqualified opinion and ISO 27001:2022 compliance. Sign in to download RabbitSign's compliance reports. Verify RabbitSign's ISO 27001:2022 certification on IAF here.




4

5

6

7



<sup>1</sup> https://blog.rabbitsign.com/launching-an-unlimited-free-e-signing-service-fe77a5

<sup>2</sup> 0a66aa



# Launching an Unlimited Free E-Signing Service

**RabbitSign Team** · Follow
2 min read · Jun 20, 2021

👏 56    💬                                      🔖  ▶  ⬆



I'm Stanley, founder of RabbitSign.

The pandemic made e-signing essential. But I got frustrated that all the e-signing solutions had very limited free tiers (or no free tier at all) so I decided to make an unlimited free e-signing solution. This led to the creation of RabbitSign.

<sup>3</sup>

<sup>4</sup>

# EXHIBIT 12

**EXCERPT OF THE AWS WELL-ARCHITECTED REVIEW (WAR) FOR RABBITSIGN**

- **Reducing administrator privileges to follow IAM best practices**, protecting themselves from potential insider threats.

- **Enabling WAF for CloudFront Distributions**, which will help protect Rabbit Sign's web application from common web exploits like SQL injection and cross-site scripting.

- **Enabling server-side encryption on their SNS topics** for encryption at rest and also enabling delivery status logging, ensuring that their SNS topics are secure and that they can track the delivery status of their messages.

Overall, Cloud303 concluded that Rabbit Sign's account is one of the most efficient and secure accounts they have reviewed. The remediations that were implemented demonstrate Rabbit Sign's commitment to following AWS security best practices. They also ensure the confidentiality, integrity, and availability of data and infrastructure, protecting Rabbit Sign and its customers from potential security threats. Cloud303 believes that this account would be an ideal AWS case study to demonstrate how using serverless infrastructure can help companies operate more cost-efficiently.



███████████████@amazon.com>                    Fri, Mar 10, 2023, 4:51PM  ☆  ☺  ↩  ⋮

Stanley,

I am back from my 2nd ski trip now, yes. Had to head down to CO for ███ 's birthday and to teach him a few things on the mountain. Glad to hear the feedback after the WAR, that's an accomplishment my man. Cloud 303 correct me if I am wrong but have done more WARs than AWS Partner ever? That's awesome. Throw some time on my calendar for next week and I'll sync up with ███ on my side. Looking forward to catching up

**Schedule 20 Min Meeting w/AWS ██████**

# EXHIBIT 13

**EMAILS FROM AWS REGARDING THE RABBITSIGN CASE STUDY**

1

2

3

4

| ███████████████ @amazon.com> | | May 8, 2023, 6:24 AM | ☆ | ↩ | ⋮ |

to ████████████████████

Great news!  The blog proposal has been accepted.  @Stanley from RabbitSign I have to get RabbitSign added to our internal reference finder for us to be able to write about their journey – I have submitted this request and will let you know if there is anything I need from you for this.

# EXHIBIT 14

## GOOGLE'S FULL-TIME EMPLOYMENT OFFER LETTER

Google

**Stanley Zhong**

20 September 2023

**This offer supersedes and replaces any prior versions**

Dear Stanley,

Thank you for your interest in Google LLC! We are delighted to offer you the exempt position of Software Engineer  in the Sunnyvale office. We look forward to working with you!

# EXHIBIT 15

**Industry news coverage for RabbitSign's free HIPAA-compliant e-signing**

https://www.hipaajournal.com/rabbitsign-achieves-hipaa-compliance-for-its-free-e-signing-solution/



The HIPAA Journal is the leading provider of news, updates, and independent advice for HIPAA compliance

Become HIPAA Compliant »    HIPAA News »    HIPAA Compliance Checklist    Latest HIPAA Updates »    HIPAA Training »    About Us »

## RabbitSign Achieves HIPAA Compliance for its Free e-Signing Solution

Posted By Steve Alder on Sep 8, 2022

RabbitSign, a Palo Alto, CA-based provider of a free-to-use, unlimited e-signing solution, has been assessed by Compliancy Group's HIPAA compliance experts who determined the solution is compliant with the HIPAA Rules.

RabbitSign was devised and developed during the COVID-19 pandemic as a zero-cost e-signing solution for businesses, non-profits, and government entities, with the company providing the solution for the greater good rather than to maximize profits.

All software solutions used by HIPAA-covered entities which come into contact with the protected health information of individuals must support HIPAA compliance. Since the e-signing solution could be used in connection with electronic PHI, RabbitSign would be classed as a business associate under HIPAA if the solution was provided to HIPAA-covered entities.

To broaden its userbase and allow HIPAA-covered entities to use the solution, RabbitSign partnered with Compliancy Group and used the company's HIPAA compliance methodology to take all the necessary steps to ensure compliance with the HIPAA Privacy, Security, Breach Notification, Omnibus Rules, and the HITECH Act. The company's progress toward HIPAA compliance was tracked using Compliancy Group's HIPAA compliance tracking software solution – *The Guard*.



Through that process, which involved a 6-stage risk analysis and remediation program, RabbitSign demonstrated its good faith effort toward HIPAA compliance, and the company was awarded the HIPAA Seal of Compliance, which demonstrates to current and future users of the solution that the company is committed to ensuring the security of ePHI and has an effective HIPAA compliance program in place.



**READER OFFER**

## Get The FREE HIPAA Compliance Checklist

Immediate Delivery of Checklist Link To Your Email Address

Work Email *

Get Free Checklist

Please Enter Correct Email Address

**Your Privacy Respected**
HIPAA Journal Privacy Policy

# EXHIBIT 16

**EPISODE OF VIEWPOINT WITH DENNIS QUAID FEATURING RABBITSIGN AND STANLEY**

https://www.viewpointproject.com/features-postidd3e6da7a/



# EXHIBIT 17

## STANLEY'S GPA



**Henry M. Gunn High Transcript**
School Code: 4332904   Tel: (650)354-8200   Fax: (650)493-7801
780 Arastradero Rd,  Palo Alto, CA 94306

**Zhong, Stanley**
Student Number: ▮▮▮▮ | Grade: 12
Generated on 11/27/2022 09:40:33 PM  Page 1 of 1

### Student Information

Student Number: ▮▮▮▮   Grade:  12
Birthdate:                      Gender: M
State ID:
Counselor:

### GPA Summary

**Cumulative GPA** (Weighted)        4.4242
**Cumulative GPA** (Unweighted)      3.9697

**Weighted 10-12 A-G GPA**           4.5833

#### #4332904 Henry M. Gunn High

| Course | Mark | Weight | Credit |
|---|---|---|---|
| **2019-2020 Grade 09  Term 1** | | | |
| 6205 Art Spec 1 | A | 5.0000 | 5 |
| 3115 Biology 1A | A | 5.0000 | 5 |
| 4010 Chinese 1 | A+ | 5.0000 | 5 |
| 1180 Communic | A | 5.0000 | 5 |
| 2408 Geom H | A | 5.0000 | 5 |
| 2791 PE 9/11 | A | 5.0000 | 5 |
| 1625 Wld Hist | A | 5.0000 | 5 |
| Credit: 35.000  GPA: 4.0000  U/W GPA: 4.0000 | | | |
| **2019-2020 Grade 09  Term 2** | | | |
| 6205 Art Spec 1 | CR | 5.0000 | 5 |
| 3115 Biology 1A | CR | 5.0000 | 5 |
| 4010 Chinese 1 | CR | 5.0000 | 5 |
| 2408 Geom H | CR | 5.0000 | 5 |
| 2792 PE 9/12 | CR | 5.0000 | 5 |
| 0117 Western Literature | CR | 5.0000 | 5 |
| 1625 Wld Hist | CR | 5.0000 | 5 |
| Credit: 35.000  GPA: 0.0000  U/W GPA: 0.0000 | | | |
| **2020-2021 Grade 10  Term 1** | | | |
| 2416 Alg2/TrigH | A | 5.0000 | 5 |
| 2491B APCompSci A | A | 5.0000 | 5 |
| 3625 Chemistry H | A | 5.0000 | 5 |
| 4020 Chinese 2 | A+ | 5.0000 | 5 |
| 1193 Lit Style | A | 5.0000 | 5 |
| 2696 PE 10 | A+ | 5.0000 | 5 |
| 1753 US Govt | A+ | 5.0000 | 5 |
| Credit: 35.000  GPA: 4.4286  U/W GPA: 4.0000 | | | |
| **2020-2021 Grade 10  Term 2** | | | |
| 2416 Alg2/TrigH | A | 5.0000 | 5 |
| 2491B APCompSci A | A | 5.0000 | 5 |
| 3625 Chemistry H | A | 5.0000 | 5 |
| 4020 Chinese 2 | A | 5.0000 | 5 |
| 1191 Cont Herit | B+ | 5.0000 | 5 |
| 1641 ContWld 11 | A | 5.0000 | 5 |
| 2696 PE 10 | A | 5.0000 | 5 |
| Credit: 35.000  GPA: 4.2857  U/W GPA: 3.8571 | | | |
| **2021-2022 Grade 11  Term 1** | | | |
| 2399 Analysis H | A+ | 5.0000 | 5 |
| 3824 AP Physics 1 | A | 5.0000 | 5 |
| 1699 AP US History | A | 5.0000 | 5 |
| 8638 CS Capstone | A | 5.0000 | 5 |
| 5092 Prnc Of Engr H PLTW | A | 5.0000 | 5 |
| 7662 World Classics H | A | 5.0000 | 5 |
| Credit: 30.000  GPA: 4.8333  U/W GPA: 4.0000 | | | |
| **2021-2022 Grade 11  Term 2** | | | |
| 2399 Analysis H | A | 5.0000 | 5 |
| 3824 AP Physics 1 | A | 5.0000 | 5 |
| 1699 AP US History | A- | 5.0000 | 5 |

#### #4332904 Henry M. Gunn High

| Course | Mark | Weight | Credit |
|---|---|---|---|
| **2021-2022 Grade 11  Term 2** | | | |
| 8638 CS Capstone | A | 5.0000 | 5 |
| 1179 Philos Lit | A | 5.0000 | 5 |
| 5092 Prnc Of Engr H PLTW | A | 5.0000 | 5 |
| Credit: 30.000  GPA: 4.6667  U/W GPA: 4.0000 | | | |

#### #500 PAUSD Summer School

| Course | Mark | Weight | Credit |
|---|---|---|---|
| **2021-2022 Grade 11  Term 3** | | | |
| 8458 Liv Skill | CR | 5.0000 | 5 |
| Credit: 5.000  GPA: 0.0000  U/W GPA: 0.0000 | | | |

### In-Progress Courses

| Course | Credit |
|---|---|
| 1525 AnalyticCollWrit | 5.000 |
| 2459 AP Calculus BC | 5.000 |
| 1762 AP Human Geography | 5.000 |
| 3859A AP Physics C: Mechanics | 5.000 |
| 2319 AP Statistics | 5.000 |
| 1811 Econ AP | 5.000 |
| 0676 Tchr Asst | 5.000 |

### Credit Summary

**Curriculum Program: Gunn Graduation 2018 & Up – Alg in Middle School**

| High School | Attempted | Earned | Required | Remaining |
|---|---|---|---|---|
| Wldh | 10.000 | 10.000 | 10.000 | 0.000 |
| USGovt | 5.000 | 5.000 | 5.000 | 0.000 |
| Contwld | 5.000 | 5.000 | 5.000 | 0.000 |
| USH | 10.000 | 10.000 | 10.000 | 0.000 |
| Econ | 0.000 | 0.000 | 5.000 | 5.000 |
| S St | 0.000 | 0.000 | 5.000 | 5.000 |
| English | 30.000 | 30.000 | 40.000 | 10.000 |
| Algebra | 0.000 | 0.000 | 0.000 | 0.000 |
| Geometry | 10.000 | 10.000 | 10.000 | 0.000 |
| Algebra 2 | 10.000 | 10.000 | 10.000 | 0.000 |
| Math | 10.000 | 10.000 | 0.000 | 0.000 |
| Biol Sci | 10.000 | 10.000 | 10.000 | 0.000 |
| Phys Sci | 20.000 | 20.000 | 10.000 | 0.000 |
| World Lang (Level 2) | 10.000 | 10.000 | 10.000 | 0.000 |
| Fine Arts | 10.000 | 10.000 | 10.000 | 0.000 |
| Career  Voc Ed | 30.000 | 30.000 | 10.000 | 0.000 |
| Living Skills | 5.000 | 5.000 | 5.000 | 0.000 |
| PE | 20.000 | 20.000 | 20.000 | 0.000 |
| Electives | 10.000 | 10.000 | 45.000 | 0.000 |
| **Total** | **205.000** | **205.000** | **220.000** | **20.000** |

### Comments

This is an UNOFFICIAL transcript.

Zhong & SWORD v. Cornell University                    Page 75 of 147

# EXHIBIT 18

**STANLEY'S QUALIFICATION FOR ELIGIBILITY FOR LOCAL CONTEXT (ELC)**

## How your application is reviewed

### University of California Fall Quarter/Semester 2023 application

Application ID:1166008
Name: Stanley Zhong

Campuses review each individual application carefully and consider more than just grades. There are multiple factors that all UC campuses weigh, although campuses often apply these factors differently. To review these factors ↗ , visit UC's admission website.

You rank in the top 9 percent of California high school students, based on your A-G course totals, UC GPA and our admissions index ↗ . If you meet the minimum admission requirements and aren't admitted to any UC campus to which you applied, you will be offered a spot at another campus if space is available.

Return to "Application status"

# EXHIBIT 19

### High school rankings by US News and World Report

https://www.usnews.com/education/best-high-schools/california/districts/palo-alt

o-unified-school-district/henry-m-gunn-high-school-2992



# Henry M. Gunn High School

780 Arrastradero Rd., Palo Alto, California  |  (650) 354-8200  |  💼 Award Winning ⓘ

#### #135 in National Rankings

Overall Score 99.24/100

Overview    Student Body    Test Scores    Map

## Overview of Henry M. Gunn High School

Henry M. Gunn High School is ranked 14th within California. Students have the opportunity to take Advanced Placement® coursework and exams. The AP® participation rate at Henry M. Gunn High School is 83%. The total minority enrollment is 72%, and 10% of students are economically disadvantaged. Henry M. Gunn High School is 1 of 4 high schools in the Palo Alto Unified School District.

## Henry M. Gunn High School 2024 Rankings

Henry M. Gunn High School is ranked #135 in the National Rankings. Schools are ranked on their performance on state-required tests, graduation and how well they prepare students for college. Read more about how we rank the Best High Schools.

### All Rankings

💼 #135 in **National Rankings**

💼 #14 in **California High Schools**

💼 #4 in **San Jose, CA Metro Area High Schools**

💼 #38 in **STEM High Schools**

| SCORECARD | 99.24 |
|---|---|
| Took at Least One AP® Exam | 83% |
| Passed at Least One AP® Exam | 78% |
| Mathematics Proficiency | 82% |
| Reading Proficiency | 87% |
| Science Proficiency | 81% |
| Graduation Rate | 96% |

# EXHIBIT 20

1

## HIGH SCHOOL RANKINGS BY NICHE

2

3  https://www.niche.com/k12/henry-m-gunn-high-school-palo-alto-ca/



4

5



1

2

# EXHIBIT 21

### STANLEY'S PSAT AND SAT SCORES



# EXHIBIT 22

STANLEY'S NATIONAL MERIT SCHOLARSHIP FINALIST CERTIFICATE

**NATIONAL MERIT SCHOLARSHIP CORPORATION**
1560 Sherman Avenue, Suite 200, Evanston, Illinois 60201-4897   (847) 866-5100

February 13, 2023

STANLEY L. ZHONG

PALO ALTO CA 94306

Semifinalist ID #: **23-16372**

Selection Unit #: **05-2130**

Dear Finalist:

Congratulations!  You have advanced to Finalist standing in the 2023 National Merit® Scholarship Program, a distinction that places you in a group of more than 15,000 students, representing less than one percent of U.S. high school graduating seniors.  A *Certificate of Merit* attesting to this accomplishment has been sent to your principal for presentation to you.

The National Merit Scholarship Program is privately financed, and the majority of scholarships offered are underwritten by approximately 340 independent sponsor organizations and institutions.  Although this nationwide academic competition is the largest of its kind, scholarship funds are limited and only about 7,250 of the Finalists will receive a Merit Scholarship® award.

Three types of National Merit Scholarships will be offered in 2023; no Finalist can receive more than one award.

- All Finalists are being considered for one of the 2,500 single-payment National Merit $2500 Scholarships that will be offered on a state representational basis.

- Finalists who meet specific criteria of a company or business sponsor will be considered for one of about 950 corporate-sponsored Merit Scholarship awards.  Most of these awards are designated for Finalists who are children of a sponsor's employees, but some are offered for residents of areas where the company is located, and a limited number are reserved for students planning to enter career fields a sponsor wishes to encourage.

- Finalists who meet the three conditions *listed on the reverse side of this letter* may be considered for one of about 3,800 college-sponsored Merit Scholarship awards to be financed by U.S. colleges and universities that have made sponsor arrangements with National Merit Scholarship Corporation (NMSC®).

Every Merit Scholarship award must be used for full-time attendance at a college or university in the United States that holds accredited status with a regional accrediting commission on higher education.  Our records show that as of January 12, 2023, the regionally accredited U.S. college you reported to NMSC as your first choice is:

**Stanford University**

Please log in to NMSC's Online Scholarship Application (OSA) to keep your email and mailing addresses up to date throughout the spring.  We will begin notifying winners of National Merit Scholarship awards by email in March.  Finalists who have not been chosen to receive a Merit Scholarship award will be informed by mail in mid-May after most selections have been completed.  All of us associated with the National Merit Scholarship Program salute you for your attainments to date and offer our best wishes for the realization of the high goals you set for yourself.

Sincerely,

James C. Wittenberg
Director of Scholarship Administration

# EXHIBIT 23

**STANLEY'S ROLE AS A FOUNDING OFFICER AND PRESIDENT OF THE COMPETITIVE PROGRAMMING**

**CLUB AT HIS HIGH SCHOOL**

**GUNN HIGH SCHOOL – ASSOCIATED STUDENT BODY**
**Club Meeting Minutes**

Club Name: Gunn Competitive Programming Club

The meeting was called to order by: ███████

Location: Online over Zoom

Date and Time: September 29th, 2020 at 3:45 pm

The minutes of the previous meeting were: N/A   Read and Approved

First Meeting _____ Corrected & Approved (as corrected)

The following requisitions were submitted for approval:

| Vendor | Purpose | Amount |
|--------|---------|--------|
| N/A | N/A | N/A |
| | | |

Motion: _____ Moved by: _____ Seconded: _____

Communication and Reports: N/A

Old Business: N/A – First Meeting

New Business: Club officers introduced purpose of club presented. List of competitions presented with emphasis on USACO. Lesson on input/output. Example of competitive programming problem given. Signup form to help organize Palo Alto Programming Competition shared. Weekly problem displayed. Officers answered some questions and meeting ended.

ATTENDANCE: PLEASE LIST ATTENDEES ON BACK.

Submitted by Club Secretary: Stanley Zhong   Date: 10/14/2020

*Please continue on back of this form or attach additional information as needed.*

# EXHIBIT 24

### OPENBRACKETS CO-FOUNDED BY STANLEY

https://www.openbrackets.us/



Home     Spring 2025 ▾     Past Semesters ▾     About     Contact     Get Involved

The OpenBrackets Spring Semester starts on Monday, February 3rd and end on Friday, April 11th. Click here to register your free spot today (spots are limited, so hurry)!

# Bridging the Digital Divide

## Our Mission

At OpenBrackets, we want to help bridge the digital divide. Inspired by the Black Lives Matter movement in Spring/Summer 2020, we wanted to make an immediate change in our community. Through our courses, we provide support in computer science to middle and high school kids who may not receive it at home, and encourage kids to consider tech as a career, regardless of their background. We also provide students with the opportunity to hear from Guest Speakers in the industry, to see the versatility a computer science foundation can provide. OpenBrackets is run by students, for students.

## Impact

Our students come from the following schools. Most of the schools are in low-income areas with a higher percentage of residents of color.



## Testimonials

"All your staff were amazing and worked so well with our children considering the circumstances. My son had never done any coding before and not only did he learn so much from this experience but enjoyed his time with you all as well."

"I wanted to thank you all for having this class for our children. Though I know that it was difficult to navigate remotely, my son was still able to get so much out of it. All your staff were amazing and worked so well with our children considering the circumstances. My son had never done any coding before and not only did he learn so much from this experience but enjoyed his time with you all as well. Thank you again for your guidance and patience and for bringing so much joy to our son."

"This was my son's first experience with coding and he has really enjoyed this class. Having this opportunity at no cost was amazing and such a nice addition to a school year that is anything but normal."

"Thank you to everyone involved from OpenBrackets in conducting and offering this opportunity to our children FREE of charge. If it was not for your team, your program and your generosity, I would have never been able to enroll my coding enthusiast daughter in a coding program as they

# EXHIBIT 25

### STANLEY'S PRESIDENT'S VOLUNTEER SERVICE AWARD

For his volunteer work at OpenBrackets, Stanley received the highest level of

PVSA in 2021. His volunteer hours were certified by two adult advisors at

OpenBrackets.

# EXHIBIT 26

**NEWS REPORTS ON STANLEY'S COLLEGE ADMISSION STORY**

**ABC7 Interview of Stanley and Nan on 10/10/2023**

https://abc7news.com/stanley-zhong-college-rejected-teen-full-time-job-google-admissions/13890332/

Bay Area high school grad rejected by 16 colleges hired by Google

**ABC7 follow-up interview of Stanley on 10/13/2023**

https://abc7news.com/high-school-grad-rejected-by-colleges-stanley-zhong-schooler-lands-google-job-bay-area/13909470/

High school grad rejected by 16 colleges reveals how he got Google job

**ABC7 follow-up interview of Nan on 10/16/2023**

https://abc7news.com/stanley-zhong-google-bay-area-teen-college-admissions-transparency/13925114/

Dad of CA teen rejected by colleges but hired by Google calls for admissions transparency

**CBS 10/20/2023**

https://www.cbsnews.com/news/stanley-zhong-google-software-engineer/

**CNBC 11/8/2023**

https://www.cnbc.com/2023/11/08/dad-of-18-year-old-google-engineer-shares-his-top-parenting-rule.html

**People 10/20/2023**

https://people.com/high-school-graduate-rejected-over-dozen-colleges-lands-jobs-at-google-8364398

**USA Today 10/13/2023**

https://www.usatoday.com/story/news/education/2023/10/13/google-hired-high-school-grad-colleges-rejections-stanley-zhong/71166136007/

**Business Today 10/17/2023**

https://www.businesstoday.in/technology/news/story/google-vs-college-google-hires-18-year-old-as-software-engineer-after-16-colleges-reject-him-402101-2023-10-16

**Yahoo News 10/11/2023**

https://news.yahoo.com/bay-area-teen-rejected-16-204200918.html

**Palo Alto Online 10/23/2023**

https://www.paloaltoonline.com/news/2023/10/23/from-gunn-to-google-meet-stanley-zhong-the-18-year-old-college-reject-who-landed-every-techies-dream-job

**Sing Tao Daily 10/4/2023**

https://epaper.singtaousa.com/flippingbook/epaper_sf/2023/20231010/21/

**World Journal 10/13/2023**

https://www.worldjournal.com/wj/story/121469/7504367

https://www.worldjournal.com/wj/story/121472/7504474

# EXHIBIT 27

**CONGRESSIONAL HEARING CITING STANLEY'S COLLEGE ADMISSION CASE**

https://www.youtube.com/live/4Zu5cdfv9kk?si=XufizKznBZZZlnWo&t=2587



1 https://democrats-edworkforce.house.gov/imo/media/doc/mike_zhao.pdf

2 (Appendix A, page 4)

---

**Stanley Zhong, an exceptional student rejected by 16 colleges in 2023**



- **Academic Performance:** GPA (UW/W): 3.97/4.42. SAT: 1590 & National Merit Scholarship finalist
- **Finalist of major global programing competitions:**
  - Advanced to the Google Code Jam Coding Contest semi-final
  - Led his team to the 2nd place in MIT Battlecode's global high school division (1st place in the US)
- **An innovator and entrepreneur: Created an e-signing startup (RabbitSign.com) that's**
  - Grown to tens of thousands of users organically.
  - Recognized by an Amazon Web Services Well-Architected Review as "one of the most efficient and secure accounts" they have reviewed.
  - Featured by Amazon Web Services case study for its exemplary use of AWS Serverless and compliance services.
  - Interviewed by Viewpoint with Dennis Quaid, a series of short documentaries on innovations. (past guests included President George H.W. Bush & Fortune 500 CEOs.)
- **Co-founded a non-profit that brought free coding lessons to 500+ kids in underserved communities in California, Washington, and Texas.**
- <span style="color:red">**Hired by Google (full-time) but rejected by 16 colleges**</span> including Stanford, MIT, CMU, UC Berkeley, UCLA, UC San Diego, UC Santa Barbara, UC Davis, California Polytechnic State University, Cornell, Univ of Illinois, Univ of Michigan, Georgia Tech, CalTech, Univ of Wisconsin, and Univ of Washington.

Page 4        September 2023                    Copyright © Asian American Coalition for Education 2023. All rights reserved.

4

1

# EXHIBIT 28

2

**PROTESTS AGAINST SFFA AND RACE-NEUTRAL ADMISSIONS**

3 https://www.harvardmagazine.com/2023/07/rally-against-scotus-admissions-ruli

4 ng



# Harvard Students Protest Supreme Court Ruling

With a march and speeches, students vowed to fight back.

by Ryan Doan-Nguyen



At a rally in Harvard Yard on July 1, demonstrators expressed their opposition to the Supreme Court decision ending race-conscious admissions.

5

1 ———————————————————————————————————

2

3 https://www.youtube.com/watch?v=OFN4SeF-Lh4

4 Harvard Students Rally in Support of Affirmative Action After Supreme Court

5 Ruling



Harvard students and onlookers rallied in support of affirmative action across campus on Saturday afternoon.

6

7

8 ———————————————————————————————————

9

10 https://youtu.be/Ruc1BlRvsDo?si=FFkWoJiWy_gmHawn&t=89

11 University of Texas students argue over anti-affirmative action bake sale



https://www.youtube.com/watch?v=61ywDq-vEZg

Protesters Clash in Washington After Supreme Court Ends Affirmative Action



1

2   https://www.youtube.com/watch?v=zzeeOBthe9A

3   Affirmative action supporters rally against Supreme Court ruling in 2005



4

# EXHIBIT 29

**Harvard then-President Claudine Gay responding to Supreme Court ruling**

https://www.nbcnews.com/politics/supreme-court/supreme-court-strikes-affirmativ
e-action-programs-harvard-unc-rcna66770

At 1:46 of the video clip



# EXHIBIT 30

**PROFESSOR JANELLE WONG AND PROFESSOR VIET THANH NGUYEN'S LA TIMES OPINION**

**PIECE**

https://www.latimes.com/opinion/story/2023-06-14/affirmative-action-supreme-court-harvard-case-asian-americans



Los Angeles Ti...    SUBSCRIBE    LOG IN

## Opinion: Affirmative action isn't hurting Asian Americans. Here's why that myth survives

Supporters of affirmative action in higher education rally in front of the U.S. Supreme Court before oral arguments in Students for Fair Admissions vs. President and Fellows of Harvard College and Students for Fair Admissions vs. University of North Carolina on Oct. 31, 2022.  (Chip Somodevilla / Getty Images)

**By Janelle Wong and Viet Thanh Nguyen**

# EXHIBIT 31

**STATE AUDIT OF UC BERKELEY'S ADMISSIONS IN 1987**

https://www.auditor.ca.gov/pdfs/oag/p-722.pdf

# EXHIBIT 32

## UC Berkeley Chancellor's apology in 1989

https://www.latimes.com/archives/la-xpm-1989-04-07-mn-1075-story.html

CALIFORNIA

# UC Berkeley Apologizes for Policy That Limited Asians

L.A. Times Archives

April 7, 1989 12 AM PT

 Share

SPECIAL TO THE TIMES

OAKLAND — Seeking to put to rest a five-year dispute, UC Berkeley Chancellor Ira Michael Heyman apologized Thursday for admissions policies that caused a recent decline in Asian undergraduate enrollment and pledged to help change those entrance requirements.

"It is clear that decisions made in the admissions process indisputably had a disproportionate impact on Asians," Heyman said at a press conference here with leaders of the local Asian community. "That outcome was the product of insensitivity. I regret that that occurred."

Heyman said he could not determine whether officials who developed and implemented the admissions policies were intentionally trying to set a ceiling on Asian enrollment, as members of the Asian community have charged.

# EXHIBIT 33

**SURVEY OF COLLEGE ADMISSIONS DIRECTORS**

https://www.insidehighered.com/news/survey/pressure-build-class-2016-survey-admissions-directors

## Admissions Directors on Asian-American Applicants

| Statement | Public<br>% Yes | Private<br>% Yes |
|---|---|---|
| Do you believe that some colleges are holding Asian-American applicants to higher standards? | 39% | 42% |
| At your college, do Asian-American applicants who are admitted generally have higher grades and test scores than other applicants? | 41% | 30% |

1

# EXHIBIT 34

2    **FORMER DARTMOUTH ADMISSION OFFICER ON DISCRIMINATION AGAINST ASIANS**

3    https://www.huffpost.com/entry/the-ivy-league-asian-prob_b_10121814

From where we sit as advocates for transparency in admissions and as advocates for high school students and their parents, the complaint is valid. I've seen from the inside (as a former admissions officer at Dartmouth College) how even the so-called "holistic process" can discriminate against Asian students. I share some of this insider information here: Behind the Scenes in an Ivy League Admissions Office. Often high-scoring Asian applicants with top GPA's were seen as "passive," "robotic," and "just another violin/piano playing standout" with "lack of spark." Though I don't think discrimination was intentional, there persisted a stereotype that the majority of Asian applicants were strong in math/science, played the violin or piano at a high level, attended Chinese (or Korean) school on weekends and often did tutoring, Kumon, high level math contests and award-centered activities like Academic Decathlon or Quiz Bowl. At committee discussions, Asians students were often rejected because they "didn't stand out," were "too quiet," "low impact" or "too one-sided."

Having seen this kind of discrimination first-hand working in an Ivy League admissions office, it comes as no surprise that working with students in private consulting for the past 20 years, we've seen continued discrimination. We tell the Asian clients we work with (both US citizens and international students) that it's not good enough to have the "average" Ivy SAT scores of 730 or so - if you are Asian, you have to be well above average (a third party study proved that number was actually 140 points higher than the average for white students) to get into top US Colleges. We also focus our Asian clients on high level reading and vocabulary as the quickest way for Asians to be rejected is a low Critical Reading score on the SAT. Though 800's on the SAT math section is de rigueur, fewer Asian students excel on the Critical Reading section of the SAT. We put our younger students on a strict reading and vocabulary program for this reason. As educators first, we want our students to have college choices, of course, but we also want them to deepen their love of learning and ability to embrace and even enjoy the classics.

4

# EXHIBIT 35

**EXCERPT FROM THE SFFA'S LEGAL COMPLAINT ABOUT ASIAN-AMERICAN APPLICANTS AND**

**THEIR FAMILIES**

E.    **Asian-American Applicants And Their Families Know That They Are Being Discriminated Against By Elite Universities.**

262.   Asian Americans are not blind to the discrimination employed by Harvard and other elite colleges and universities.

263.   According to Princeton economist Uwe Reinhardt, "within the Asian community, of which I'm a part, there's this feeling that, for you to get into Harvard or Princeton, you've got to be better than everybody else."

264.   According to Kara Miller, a former Ivy League admissions officer, "Asian kids know that when you look at the average SAT for the school, they need to add 50 or 100 to it. If you're Asian, that's what you'll need to get in."

265.   For example, Iris Wang, a senior at Hunter College High School, one of the best public high schools in America, scored a 1520 SAT score and had top grades. Her

60

father is a chemist and her mother a postal worker. She was rejected by Harvard, as well as numerous other schools. According to Wang, "All the schools basically say, 'we don't discriminate.' But I went to the Columbia session and they said they value a multicultural community. If they want to be multicultural, there's only so many of one culture they can take."

266.   Daniel Golden, the Pulitzer Prize-winning reporter then of *The Wall Street Journal*, described Jamie Lee, who applied to Harvard, as well as six other elite private schools: According to Mr. Golden, "Jamie Lee was a superb student. Born in Hong

# EXHIBIT 36

**EXCERPT FROM THE SFFA'S LEGAL COMPLAINT ABOUT COLLEGE COUNSELORS**

industry knows that."  Without affirmative action, "our elite campuses will look like UCLA and Berkeley," and "[t]hat wouldn't be good for Asians or for anyone else."

D.    **College Counselors Acknowledge Discrimination Against Asian Americans At Elite Universities**.

252.    College counselors and advisors recognize that discrimination against Asian Americans occurs at elite universities such as Harvard and thus tell Asian Americans to hide their identity, to emphasize personal characteristics that avoid Asian stereotypes, and, in many cases, to lower their expectations and apply elsewhere.

253.    For example, the Princeton Review, the leading guide to college admissions, gives specific recommendations for Asian-American students applying to elite schools such as Harvard on how to overcome these schools' anti-Asian-American bias.  Its recommendations are both honest and discouraging.

254.    According to the Princeton Review: "Asian Americans comprise an increasing proportion of college students nationwide.  Many Asian Americans have been extraordinarily successful academically, to the point where some colleges now worry that there are 'too many' Asian Americans on their campuses.  Being an Asian American can now actually be a distinct disadvantage in the admissions processes at some of the most selective schools in the country.  Increasingly, the standard for affirmative action isn't minority status, but under-represented minority status.    Since Asian American populations at many colleges exceed the proportion of Asian Americans to the population of the state or country as a whole, Asian Americans are a minority, but not an under-represented minority, at those colleges…. If you are an Asian American—or even if you simply have an Asian or Asian-sounding surname—you need to be careful about what you do and don't say in your application."

57

# EXHIBIT 37

**ASIAN-AMERICAN APPLICANTS TRIED TO APPEAR "LESS ASIAN"**

https://www.nytimes.com/2022/12/02/us/asian-american-college-applications.ht

ml?unlocked_article_code=1.pk4.Oskn.OpS2fQgjTg2C&smid=url-share

*The New York Times*

# *Applying to College, and Trying to Appear 'Less Asian'*

The affirmative action lawsuit against Harvard seemed to confirm advice given for years to Asian Americans: Don't play chess, don't check the box declaring race.

When it came time to fill out his college application form, Max Li chose not to declare his race. Even though he knew his last name sounded Chinese, he selected "prefer not to say."

Clara Chen was advised to avoid the Advanced Placement exam for Chinese because college admissions officers might assume, based on her last name, that she already spoke the language, which could undermine the value of her score. She took the test for Advanced Placement French instead.

When Marissa Li was growing up, she loved playing competitive chess, and spent hours studying the matches of some of her favorite players, like Bobby Fischer. But on her college application, she barely mentioned her interest in the game because she was afraid that it might come across as too stereotypically Asian.

1

2

3 ————————————————————————————————————

Sasha Chada, the founder of Ivy Scholars, a college admissions counseling company based in Texas, said that while his company's Latino clients often emphasized their ethnicity and their engagement with Hispanic cultural organizations on their college applications, his company frequently gave Asian American students the opposite advice, urging them to shift away from "classically Asian activities" to improve their chances of getting into the country's elite universities.

4

5

# EXHIBIT 38

### ASIAN-AMERICAN ENROLLMENT ROSE AFTER LEGAL PRESSURE

https://asianamericanforeducation.org/en/call_for_complaint_2017_en/

 * After the Student for Fair Admissions filed a lawsuit in 2014 and Asian American Coalition for Education (AACE) filed a joint complaint against Harvard University in 2015, Harvard's admission rate of Asian-Americans jumped from 17% prior 2014 to 22% in 2016.

 * After a few Asian-American students filed a complaint against Princeton University since 2006, its admission rate of Asian Americans increased from 14.7% in 2007 to 21.9% in 2012 and 25.4% in 2014.

# EXHIBIT 39

### EXCERPT FROM CHAPTER 7 IN *THE PRICE OF ADMISSION*





Americans. His parents had gone to college in Korea, ruling out legacy preference for their son in the United States, and they couldn't afford to donate to a university; in fact, Henry applied for financial aid to pay his college tuition.

His Groton guidance counselor knew the score. She discouraged Henry from applying to the Ivy League, telling him it was a long shot at best, and advised him to lower his expectations to second- and third-tier schools. When Henry disregarded her advice, he was spurned by four Ivies—Harvard, Yale, Brown, and Columbia—as well as Stanford University and Massachusetts Institute of Technology. While they rejected Henry, Ivy League universities admitted thirty-four of his Groton classmates. Brown accepted the daughter of a best-selling author; Harvard, the grandson of one of its biggest donors; Columbia, an African American candidate; and Stanford, the daughter of an oil tycoon who chaired the university's board.

"When the decisions came out, and all these other people started getting in, I was a little upset," Henry told me. "I feel I have to hold myself to a higher standard." Added his mother, Suki Park, "I was naive. I thought college admissions had something to do with academics."

Unlike Henry, Stanley Park seemed to have a special hook to bolster his academic credentials, which included a 1500 SAT score. Stanley was born and raised in California, where voters abolished affirmative action in public university admissions in 1996. In the wake of that ban, the University of California, Los Angeles, revamped its admissions criteria to favor students who had conquered "life challenges," such as family illness, being raised by a single parent, or being the first in the family to go to college.

Stanley, who graduated from University High in Irvine in 2002, had overcome more than his share of adversity. After his parents—immigrants of modest means with only high school educations and little English—divorced in 1999, he lived with his mother. When she was diagnosed with breast cancer a year later, he began tutoring children to help pay the rent.

"All the money he earned tutoring was donated to his family," his high school guidance counselor wrote in Stanley's college recommendation. "In the time I have known Stanley I have been impressed with his incredible balance. It's easy to view him as a top mathematics student, but there is so much more to this complex young man that makes him interesting. For the past three years, he has gone to the Bethel Korean Church at 6:30 a.m. every Sunday

morning. Once there, he loads vans with food, and with other church members distributes food to the homeless."

Stanley's own college application essay movingly recounted how his mother's illness had inspired him. "I have the most loving and caring mother anyone can ever have," he wrote. "I admire her so much because she works hard even after her divorce last year. She sacrificed her youth and free time so that I might have a promising future. She went as far as to giving up her whole Christmas bonus to pay for an SAT class. Then something unfair happened to my mother; she was diagnosed with breast cancer. When my mother had her breasts removed, I could visibly see the pain and shame on her face. Although I am very grateful that she is alive, I could not bear to see my mom in that kind of pain. Now that she can't work as hard as she used to, I do not want to let all my mom's past sacrifices for me to be in vain. I slowly realized that the only thing I can do to help out was to make her happy by showing her the fruits of her sacrifices. I began to study harder in school and take my volunteer work… more seriously."

Nevertheless, UCLA and the state university's other elite campus, Berkeley, rejected Stanley while admitting black and Hispanic applicants with far lower scores. Stanley learned the hard way that the "life challenge" preference at his state university was a back-door substitute for affirmative action. It was never meant for him or other Asian Americans at all.

—

**ASIAN AMERICANS** are the new Jews, inheriting the mantle of the most disenfranchised group in college admissions. The nonacademic admissions criteria established to exclude Jews, from alumni child status to leadership qualities, are now used to deny Asians. "Historically, at the Ivies, the situation of the Asian minorities parallels very closely the situation of the Jewish minorities a half a century earlier," said former Princeton provost Jeremiah Ostriker.

Once ostracized, Jewish students are now widely coveted for their intellectual prowess. Today, many Jewish applicants have admissions hooks, often as children of alumni, donors, or faculty. Having apologized profusely for restricting Jewish enrollment in the past,

At another mainly Hispanic high school near Los Angeles, Belmont, UCLA student and outreach worker Alex Paredes helped Rosaura Novelo edit her application essay, which appeared tailored to fit the "life challenge" criterion. "It has been difficult for my parents, Mexican immigrants who did not even get to third grade in school, to raise a family of seven," Rosaura's essay began. "My father is the only person in the family who works, getting only minimum wage….Our situation has taught me to appreciate education, learn how to overcome challenges that I have been faced with, and to take advantage of the benefits that come from all my hard work….Taking advantage of the opportunities my parents have provided me with has sometimes been difficult because of all the challenges I have had to overcome….Things have not been handed to me on a silver platter, which makes it challenging for me….My community has also been an obstacle: gangs and violence are an everyday occurrence." UCLA—which took twenty-four Belmont seniors in 2002, tripling the previous year's number—admitted Rosaura despite an SAT score of 980, 520 points below Stanley Park's.

When I dropped by University High in Irvine on the same trip, I found that its admissions to Berkeley and UCLA were plummeting. University High is one of the best public schools in California, with a mean SAT score of 1247 in 2003–4 compared with a state average of 1015. It's also 45 percent Asian American. UCLA admits from University High dropped from 112 in 1998 to 65 in 2004, and Berkeley admits from 91 to 46 over the same period, relegating more University High graduates to less selective campuses such as Riverside and Santa Cruz. As a highly ranked school, University High didn't qualify for University of California outreach, hurting its students' prospects under comprehensive review. In other words, Stanley Park's mother had moved to a cramped Irvine apartment she could barely afford to provide him a better education—and may thereby have thwarted his admission to Berkeley and UCLA.

from rural states, popularized to squelch Jewish applicants from New York City, now hurts Asian students concentrated in metropolitan areas, particularly Los Angeles.

Now as then, a lack of preferences can be a convenient guise for racism. Much as college administrators justified anti-Jewish policies with ethnic stereotypes—one Yale dean in 1918 termed the typical Jewish student a "greasy grind"—so Asians are typecast in college admissions offices as quasi-robots programmed by their parents to ace math and science tests. Asked why Vanderbilt poured resources into recruiting Jews instead of Asians, a former administrator told me, "Asians are very good students, but they don't provide the kind of intellectual environment that Jewish students provide."

Similarly, MIT dean of admissions Marilee Jones rationalized the institute's rejection of Henry Park by resorting to stereotypes. Although she wasn't able to look up his application because records for his year had been destroyed, "it's possible that Henry Park looked like a thousand other Korean kids with the exact same profile of grades and activities and temperament," she emailed me in 2003. "My guess is that he just wasn't involved or interesting enough to surface to the top." She added that she could understand why a university would take a celebrity child, legacy, or development admit over "yet another textureless math grind." College administrators who made such remarks about black or Jewish students might soon find themselves higher education outcasts.

—

**"ASIAN AMERICAN"** is not an identity deeply rooted in history or tradition. Chinese and Japanese students popularized the term in the 1970s in an effort to be included in affirmative action programs. In 1977, the federal government (which had previously counted immigrants from China, Japan, Korea, and so forth by their countries of origin) introduced "Asian or Pacific Islander" as a data collection category—defined as "a person having origins in any of the original peoples of the Far East, Southeast Asia, the Indian subcontinent, or the Pacific Islands."

The strategy worked almost too well. Soaring Asian enrollment soon provoked a backlash. In 1984, with Asian Americans accounting for more than a quarter of its freshman class,

2

# EXHIBIT 40

**MR. JOHN MOORES'S ACCUSATION IN *THE PRICE OF ADMISSION***

on her SATs and is the daughter of a struggling Korean-immigrant pastor. "No matter how bad your situation is, someone has it worse."

Asian applicants to Berkeley or UCLA who hadn't confronted a life challenge soon rued this gap in their resumes. Albert Shin, another University High student and the son of an engineer, scored 1540 on his SAT, had a 3.9 grade point average, and could read English, Korean, and Latin. Both Berkeley and UCLA turned him down. "It would be okay to look at social disadvantage a little bit, but judging it more than academics would be wrong," Albert told me. He, Stanley Park, and Hyejin Jae enrolled at the university's San Diego campus. As of March 2006, Stanley Park was a senior bioengineering major with a 3.5 grade point average, and "pretty worried" about admission to medical school. Financial aid and a job as a nuclear medicine assistant at a San Diego hospital had helped pay his tuition.

By 2003, parental complaints that comprehensive review meant rejecting top Asian and white students caught the attention of John Moores, then chairman of the university's board of regents. Studying Berkeley's admissions records, he found that in 2002—the year Albert, Stanley and Hyejin were rebuffed—Berkeley turned down 1,421 Californians with SAT scores above 1,400, including 662 Asian Americans. Of the 359 students accepted with SAT scores of 1,000 or less, 231 were black, Hispanic, or Native American.

The regents chairman accused his flagship campus of "blatantly" discriminating against Asian Americans and denounced comprehensive review as "fuzzy...It's silly to pretend that very low scoring applicants should be admitted to one of America's premier universities with the expectation that somehow these students will learn material that they missed in K–12." University officials disputed Moores's contention, noting that SAT scores are an imperfect measure of academic ability. Still, in April 2004, a university study group compared a statistical model of how the UC admissions process was supposed to work with actual cases. Buried deep inside its report was the finding that "somewhat fewer Asian students, and more African American and Chicano/Latino students (and, in some cases, White students) were admitted" on most campuses than would have been expected. One possible explanation: "small but real racial or ethnic effects on admissions decisions."

# EXHIBIT 41

**PROFESSOR TIM GROSECLOSE'S PROTEST**

https://youtu.be/zUsuIr1E_6s?si=c7acYOK9LykvZh8a&t=31

Professor Tim Groseclose talking to media about his observations of UCLA

violating Prop 209

_____

https://dailybruin.com/2012/11/08/submission-faculty-letter-misrepresents-mare-reports-findings

Professor Tim Groseclose talking about racial discriminations identified in

Professor Robert Mare's reports

# DAILY BRUIN

   ADVERTISE  DONATE  SUBMIT

NEWS  SPORTS  ARTS  OPINION  THE QUAD  PHOTO  VIDEO  ILLUSTRATIONS  CARTOONS  GRAPHICS  THE STACK  PRIME  ENTERPRISE

**COMMUNITY, OPINION**

## Submission: _Faculty letter misrepresents Mare report's findings_

**By Daily Bruin Staff**
Nov. 8, 2012 11:53 p.m.

**By Tim Groseclose**

**Editor's Note: Portions of this submission have been previously published on Professor Tim Groseclose's blog, specifically his analyses of tables in the Mare report.**

In an Oct. 30, 2012 Daily Bruin column, a group of 57 professors criticized a Daily Bruin news article and column, which documented evidence that UCLA is using race in admissions, a violation of Proposition 209.

The 57 faculty also criticized a report by law professor Richard Sander, who described statistical analyses showing that UCLA is using race in admissions.

The 57 professors cite a report by UCLA sociologist Robert Mare. They write that "(Mare's) report found no signs of race-based reader bias in the awarding of applicant holistic scores."

The professors either did not read the Mare report carefully, or they are intentionally trying to misrepresent its findings.

Mare analyzed two major parts of the admissions process: the scores that each applicant receives from two initial reviewers in the first round of the process, and the scores that some applicants receive in "second chance"  (Mare's term) reviews by senior admissions staff. The latter reviews include "Final Review,"  "Supplemental Review,"  and "School Review."

Sander and Mare found little, if any, evidence of racial bias in the initial reviews. However, both researchers found evidence of bias in the second-chance reviews. Sander was not given data about particular aspects of the second-chance reviews; he could therefore only conclude that the total effect of all aspects of the second-chance reviews contained racial bias. Meanwhile, Mare analyzed each aspect of the second-chance reviews separately.

With the latter analysis at least three of his statistical estimates imply racial bias.

The first of these estimates is the .391 number in column F of his Table 10. Because it is



1

The first of these estimates is the .391 number in column F of his Table 10. Because it is positive and statistically significant, this means the following: Suppose you take a black and a white student who are identical on every other variable in Professor Mare's data set. That is, they have identical grades and SAT scores, have parents with identical incomes and educational backgrounds, etc. They're also identical on the "Limits to Achievement" variable that Professor Mare created.

To construct this, Mare recorded such things as whether the applicants' life experience includes homelessness, whether their life experience includes incarceration, whether their life experience includes being a victim of discrimination, and so on.

The .391 number means that the black student has a significantly higher probability of being selected for "Supplemental Review."    Remember the two students are identical on everything but race. Thus, it indicates a violation of Prop. 209.

The second of Mare's estimates that implies racial bias is the -.706 number in column G of his Table 10. It indicates the following: suppose you take two students who have been selected for supplemental review.

Suppose one is black and one is white, but otherwise they are identical on all the variables that Professor Mare included in his analysis. The fact that the number is negative (and highly significant statistically) means that the black student is more likely to receive a lower holistic score than the white student. Lower scores are better, which means that the black student is more likely to be admitted. Once again, that's a violation of Prop. 209.

A third estimate by Mare that implies a racial bias is the -.865 number in column D of his Table 10. This number indicates that black students receive significant racial preferences in the "Final Review"    stage of the admissions process. (The latter occurs when the scores of two initial readers differ by more than 1.0. When this happens, a senior staff member conducts a third holistic review of the applicant. The applicant's final holistic score is determined by that senior staff member.)

Mare's Table 10 contains eight columns. Five do not show any statistically significant evidence that UCLA is giving racial preferences toward African Americans; however, three do. It is thus false to conclude that Mare found "no signs of race-based reader bias."

Further, when he calculates the net effect of the entire admissions process (that is, all eight aspects, represented by the eight columns of Table 10), Mare finds that the net effect is substantial. Specifically, on page 74, he writes: "Absent the adjusted disparities estimated in this analysis 121 fewer Black applicants would have been admitted, which amounts to approximately 33 percent of the actual number admitted."

The 57 professors also claim the following about Mare's report: "An extensive, independent analysis of UCLA's holistic review process concluded that it works as intended by our faculty."

Here, however, is what Mare actually wrote: "The holistic ranking process for freshman admissions at UCLA appears to work much as intended."    Note that the 57 professors omitted the word "much."

Again, they either did not read the report carefully, or they are intentionally trying to misrepresent its findings.

*Groseclose is a professor of political science.*

1

2

# EXHIBIT 42

**EXCERPTS FROM PROFESSOR TIM GROSECLOSE'S BOOK *CHEATING***





According to Proposition 209, a provision of the California Constitution, public universities cannot use race as a factor in admissions decisions. Meanwhile, students applying to UCLA are asked to check a box that indicates their race. Admissions staff, however, are not allowed to see that information.

But an open secret about admissions is that many students report their race in the essay part of their application. E.g. a student might write, "As a person of color...," or "As a child of Honduran immigrants...." Since admissions staff members read the essays, this gives them a potential backdoor to implement racial preferences.

When the *Los Angeles Times* article appeared, UCLA was using a system in which each applicant was judged across three areas: (i) academic achievement, (ii) personal achievement, and (iii) life challenges. "Academic achievement" was based only on things like grade-point averages and SAT scores. Consequently, the rater of academic achievement did not need to read the personal essays of the applicant. Under the proposed "holistic" system, however, each rater of an applicant would read the personal essays. Some people suspected that this was the real intention behind the new system—to allow all readers to see the essays, thus giving them the ability to implement racial preferences.

At the time, I was a member of UCLA's faculty oversight committee for admissions, officially called the Committee on Undergraduate Admissions and Relations with Schools (CUARS). Near the end of the summer, the chair of my committee called a special meeting at which—unprecedented for the committee—the chancellor of the university addressed the committee. According to notes that I took, the chancellor, Norm Abrams, began his remarks as follows:

> First, I want say how much I favor and respect faculty governance. I don't want to pressure you. But at the same time, we worry about many of the same things. I want to report to you what we are

hearing from the outside world. Several constituencies of UCLA are distressed and upset about the very low numbers of African American freshmen. The political angst and concern is enormous. I don't feel the pressure. I sublimate very well. But there is pressure exerted upon me. The numbers of underrepresented minorities on campus are too small....

And he concluded with the following request:

> I ask that you make the whole admissions process holistic. Not only that, I have a further request: This is that you do it quickly and adopt the exact same process that Berkeley currently uses.

After a brief discussion, the committee voted to implement exactly what Chancellor Abrams requested.

### Results of the Holistic System

As UCLA began to implement the holistic system, it became clear that its admissions staff was under great pressure to admit more African Americans. Around September, 2006, Chancellor Abrams directed Charles Alexander, the Associate Vice Provost for Student Diversity at UCLA, to begin attending CUARS meetings. At one of the first few meetings that Alexander attended, the Director of Admissions, Vu Tran, announced that he would soon hire additional readers to evaluate the admissions files that would soon arrive. After Tran made the announcement, Alexander noted that he was concerned about the "demographics" of the readers, and he encouraged Tran to hire many underrepresented minorities.



TIM GROSECLOSE

Of the students who fell into the above category, the following were the admission rates of African Americans and North Asians, broken down by whether they were rich or poor:

| Group | Admission Rate |
|---|---|
| Poor African Americans | 55% |
| Rich African Americans | 38% |
| Poor North Asians | 23% |
| Rich North Asians | 18% |

Note that *rich* African Americans were admitted much more frequently than *poor* North Asians.[58]

The following thought experiment helps illustrate just how remarkable these numbers are. Suppose you were a rich North Asian student applying to UCLA, and suppose you learned that your initial evaluators gave you scores of 2.5 and 4.0. Now suppose you're only goal is to maximize your chance of being admitted to UCLA, and suppose a magic genie allows you to change (i) your income status to poor or (ii) your skin color to black. Which would you choose?

It's obvious from the above statistics that you're better off changing your skin color. That raises your probability of admission by 20%—from 18% to 38%. By contrast, if you change your income status, that raises your probability of admission only 5%—from 18% to 23%.

The change in skin color would give you four times the advantage that you'd receive from changing your family income. Although this is only a rough measurement, it suggests that, in at least one aspect of its admissions process, the degree to which UCLA grants racial preferences is about four times the degree to which it grants class-based preferences—even though the former is illegal and the latter is legal.

116

# EXHIBIT 43

**UCLA MEDICAL SCHOOL'S ASIAN ENROLLMENT DECLINED 35% FROM 2019 TO 2022**

https://www.latimes.com/business/story/2024-05-30/is-ucla-a-failed-medical-school-debunking-a-dumb-right-wing-meme

https://www.yahoo.com/news/column-ucla-failed-medical-school-130036473.html

(As for a case Sibarium mentions in which Lucero supposedly pushed to admit a Black student whose grades and test scores were below the UCLA average, he doesn't say whether the student was admitted.)

It's true that the entering medical school class at UCLA has become more diverse over time. Figures issued by UCLA and published by the Beacon show that from 2019 through 2022, the number of whites in the 173-member class declined to 46 from 49, the number of Black students rose to 25 from 22, Hispanic students rose from 25 to 37, a catchall "other" category grew to 20 from eight, and American Indians, Hawaiians and other Pacific Islanders went from zero to three. The number of Asian students declined to 55 from 84.

Does this validate the article's assertion, voiced by an anonymous source (of course), that "a third to a half of the medical school is incredibly unqualified"?

The math doesn't pencil out. As blogger and statistics maven Kevin Drum notes, given that the number of nonwhite and non-Asian students increased by only 30 in three years, even if "every single one of these students was woefully unqualified, that's about 17% of the class. How do you get from there to 'a third to a half'?"

By the way, the median grade-point averages and scores on the Medical College Admission Test of accepted applicants haven't declined at all since 2020 — the MCAT average in 2023 was the same as in 2020, and the GPA rose by a hair.

In emails to the medical school class, Dubinett and his fellow deans have reinforced their commitment to merit-based admissions and diversity training. "Students and faculty members are held to the highest standards of academic excellence," they wrote. "Highly qualified medical students and trainees are admitted … based on merit in a process consistent with state and federal law." That said, "we are enriched by the diverse experiences each of you brings to our community."

UCLA, then, is standing firm against the right wing's drive to pretend that racial and ethnic discrimination doesn't exist in our society and to undermine efforts to wipe it out. Would that more institutions took that stand, instead of capitulating to a dishonest, braying mob.

This story originally appeared in Los Angeles Times.

[1]

# EXHIBIT 44

### THE MICHIGAN MANDATE

https://michigantoday.umich.edu/2024/05/17/michigans-affirmative-action-debate/

# Michigan's affirmative action debate

May 17, 2024

**Written By** James Tobin



## 'A blueprint for fundamental change'

To settle the Black Action Movement strike in 1970, the University promised enough financial aid to raise Black enrollment to 10 percent. The aid promise was kept, but Black enrollment rose only by small increments through the 1980s. So, Black students and their supporters insisted that U-M do more.

In 1988, President James J. Duderstadt introduced the Michigan Mandate, "a blueprint for fundamental change in the ethnic composition of the university community." Its thesis: Cultural diversity and a high-quality education were intimately linked.

This story completes the two-part feature
Thirteen days in 1970

1 ───────────────────────────────────────────────

2

3 https://deepblue.lib.umich.edu/handle/2027.42/58612



UNIVERSITY OF MICHIGAN LIBRARY                    EXPLORE ⌄

**M|LIBRARY** DEEP BLUE DOCUMENTS              Log in  ☰

Home  /  Research Collections  /  Open Educational Resources
/  View Item

## The Michigan Mandate: A Strategic Linking of Academic Excellence and Social Diversity

Duderstadt, James J.
1990-03

### View/Open

Micihigan Mandate 1990.pdf
📄 (6MB  PDF)

Am score  7

### Abstract

The University of Michigan is firmly convinced that our institution's ability to achieve and sustain a campus community recognized for it racial, cultural, and ethnic diversity will in large part determine out capacity to serve successfully out state and nation and the world in the challenging times before us.  [less]

### Publisher

University of Michigan

### Subjects

Michigan Mandate
Diversity
Duderstadt

4

1          # EXHIBIT 45

2          **BROWN UNIVERSITY MEDICAL SCHOOL FACULTY PROMOTION CRITERIA**

3 https://brownmedicine.org/3/wp-content/uploads/2023/06/Promotion-Criteria-and-

4 DOM-guidelines-for-Senior-Ranks.pdf

**Major Criterion:** Demonstrated commitment to diversity, equity, and inclusion

2. Effort toward advancing diversity, equity, and inclusion in at least one area for which candidate is evaluated.
    e. Research
    f. Teaching
    g. Clinical care
    h. Service.

**Minor Criterion:** Exceptional clinical skills

Evidence of outstanding clinical ability

5

# EXHIBIT 46

**UCLA MEDICAL SCHOOL'S RACE-BASED FELLOWSHIP PROGRAM**

The Dean of UCLA Medical School says it does not discriminate based on race.

His own research center runs a Fellowship program (named 'iDIVERSE') that

barred white and Asian researchers from applying.

https://freebeacon.com/campus/the-dean-of-ucla-medical-school-says-it-does-n

ot-discriminate-based-on-race-his-own-research-center-runs-a-minorities-only-fe

llowship/



# EXHIBIT 47

**UC Admission Reader's Opinion Piece in New York Times**

https://www.nytimes.com/2013/08/04/education/edlife/lifting-the-veil-on-the-holisti

c-process-at-the-university-of-california-berkeley.html?unlocked_article_code=1.6

Ew.hDKN.WtxDzNosRmxO&smid=em-share

≡  The New York Times         **EDUCATION LIFE** │ Confessions of an Application Reader

After the next training session, when I asked about an Asian student who I thought was a 2 but had only received a 3, the officer noted: "Oh, you'll get a lot of them." She said the same when I asked why a low-income student with top grades and scores, and who had served in the Israeli army, was a 3.

≡  The New York Times         **EDUCATION LIFE** │ Confessions of an Application Reader

Officially, like all readers, I was to exclude minority background from my consideration. I was simply to notice whether the student came from a non-English-speaking household. I was not told what to do with this information — except that it may be a stressor if the personal statement revealed the student was having trouble adjusting to coursework in English. In such a case, I could refer the applicant for a special read.

Why did I hear so many times from the assistant director? I think I got lost in the unspoken directives. Some things can't be spelled out, but they have to be known. Application readers must simply pick it up by osmosis, so that the process of detecting objective factors of disadvantage becomes tricky.

It's an extreme version of the American non-conversation about race.

When the invitation came to sign up for the next application cycle, I wavered. My job as an application reader — evaluating the potential success of so many hopeful students — had been one of the most serious endeavors of my academic career. But the opaque and secretive nature of the process had made me queasy. Wouldn't better disclosure of how decisions are made help families better position their children? Does Proposition 209 serve merely to push race underground? Can the playing field of admissions ever be level?

For me, the process presented simply too many moral dilemmas. In the end, I chose not to participate again.

*Ruth A. Starkman teaches writing and ethics at Stanford and, from 1992 to 1996, taught writing at the University of California, Berkeley.*

1

# EXHIBIT 48

1

2    CALIFORNIA STATE AUDITOR'S REPORT ON UC'S ADMISSIONS IN 2020 - SECTIONS

3    https://information.auditor.ca.gov/reports/2019-113/index.html



1    # EXHIBIT 49

2    **UC Berkeley Law School Dean, Mr.** Erwin Chemerinsky's public teaching to use

3    RACE WHILE CONCEALING IT

4    https://x.com/realchrisrufo/status/1674548940522549248



5

6

7    _____

8    https://www.newyorker.com/news/our-columnists/the-sad-death-of-affirmative-acti

9    on

"What colleges and universities will need to do after affirmative action is eliminated is find ways to achieve diversity that can't be documented as violating the Constitution," Erwin Chemerinsky, the dean of the University of California, Berkeley, School of Law, told me. "So they can't have any explicit use of race. They have to make sure that their admissions statistics don't reveal any use of race. But they can use proxies for race."

[1]

1    # EXHIBIT 50

2    **UC Riverside Chancellor's letter of censure to Professor Perry Link**

3    https://drive.google.com/file/d/1rlivgzTvMD1BeGMAZsFJou-5MXlhN97f/view?us

4    p=drive_link



**Office of the Chancellor**
4108 Hinderaker Hall
900 University Avenue
Riverside, CA 92521

August 16, 2024

Professor Perry Link,

I write to impose discipline in the form of this Letter of Censure. This is my determination after carefully reviewing and considering the Hearing Committee Report ("Hearing Report") of the Committee on Privilege and Tenure ("the Committee") dated June 21, 2024, the hearing transcripts and exhibits/evidence, including the post hearing briefs from you and the administration, and the post-Hearing Report Letter from you and the Administration's response.

As outlined in my decision letter, to which this letter is attached, I conclude that clear and convincing evidence was presented in the hearing on this matter before the Committee on Privilege and Tenure establishing that you engaged in conduct that violated APM 015, Part II, Sections D.1 and C.5.

I issue this Letter of Censure pursuant to my authority under APM 016, Section II:

> 1. Written Censure A formal written expression of institutional rebuke that contains a brief description of the censured conduct, conveyed by the Chancellor. Written censure is to be distinguished from an informal written or spoken warning, and must be delivered confidentially to the recipient and maintained in a designated personnel file or files indefinitely or for a lesser period of time specified in the writing. Informal written or spoken warning is not an official disciplinary action.

Consistent with APM 016, this Letter of Censure will remain indefinitely in a confidential personnel file maintained by the Office of the Vice Provost for Administrative Resolution and will not be subject to disclosure unless permitted by applicable privacy laws and University policy.

Sincerely,

Kim A. Wilcox
Chancellor

5

# EXHIBIT 51

**UC Riverside's persecution of Professor Perry Link**

https://www.wsj.com/opinion/uc-riversides-dei-guardians-came-after-me-39d8e2

6e



1  https://en.wikipedia.org/wiki/Perry_Link



This article **needs additional citations for** verification. Please help improve this article by adding citations to reliable sources. Unsourced material may be challenged and removed.
*Find sources:* "Perry Link" – news · newspapers · books · scholar · JSTOR
*(December 2024)(Learn how and when to remove this message)*

**Eugene Perry Link, Jr.** (Chinese: 林培瑞; pinyin: *Lín Péiruì*; born 6 August, 1944 Gaffney, South Carolina) is Chancellorial Chair Professor for Innovative Teaching Comparative Literature and Foreign Languages in College of Humanities, Arts, and Social Sciences at the University of California, Riverside and Emeritus Professor of East Asian Studies at Princeton University. Link taught Chinese language and literature at Princeton University (1973-77 and 1989-2008) and UCLA (1977-1988). He specializes in modern Chinese literature and Chinese language. [1]

Link is a Harvard University alumnus who received his B.A. in philosphy in 1966 and his Ph.D. in 1976. Link has been a Board Member of the Committee for Freedom in Hong Kong (CFHK) since 2021. CFHK is a US-based non-profit organisation, which presses for the preservation of freedom, democracy, and international law in Hong Kong.[2]

## Tiananmen Square  [ edit ]

Link helped Chinese dissident Fang Lizhi and Fang's wife obtain refuge at the U.S. Embassy following the crackdown on the 1989 Tiananmen Square protests.[3] Fang remained at the embassy for a year until negotiations resulted in Fang's being allowed to leave and settle in the U.S.[3]

Link has translated many Chinese stories, writings and poems into English. Along with Andrew J. Nathan, he translated the *Tiananmen Papers*, which detailed the governmental response to the 1989 democracy protests. In 1996, China blacklisted Link, and he has been denied entrance ever since. In 2001, Link was detained and questioned upon arriving in Hong Kong because of his involvement in the *Tiananmen Papers*. After roughly one hour, he was allowed to enter Hong Kong, where he spoke at the Hong Kong Foreign Correspondents Club. He has been banned from the People's Republic of China since, however.[4]

## Controversy at U.C. Riverside  [ edit ]

From 2022 to 2024, Link faced disciplinary action at U.C. Riverside after expressing concerns in a faculty search committee about prioritizing a Black candidate's race over qualifications.

Link was removed from the search committee and subjected to a disciplinary process, including hearings resembling a trial, where termination was suggested as a penalty.

Link said his comments were intended to caution against elevating race as the "overriding criterion," and that the comments were reported to the university without his knowledge.

Although a faculty committee unanimously found that Link did not violate any conduct codes, UC Riverside chancellor Kim Wilcox issued Link a formal letter of censure.[5][6] [7]

Link was recommended by the university to keep the process confidential and warned that the disclosure of any details of his disciplinary process "may result in discipline."

In December 2024, Link went public about his experience in an op-ed published in the Wall Street Journal.[8]

2

### Infobox

**Perry Link**



| | |
|---|---|
| **Born** | 1944 (age 80–81) |
| **Nationality** | American |
| **Alma mater** | Harvard University |

**Scientific career**

| | |
|---|---|
| **Thesis** | *The rise of modern popular fiction in Shanghai* (1976) |

**Chinese name**

| | |
|---|---|
| Chinese | 林培瑞 |
| **Transcriptions** | [show] |

# EXHIBIT 52

**UM** AND **UC** WANT RACIAL PREFERENCE

https://www.nytimes.com/2022/08/26/us/affirmative-action-admissions-supreme-court.html

*The New York Times*

# *Affirmative Action Was Banned at Two Top Universities. They Say They Need It.*

As a Supreme Court case on college admissions nears, the California and Michigan university systems say their efforts to build diverse classes have hardly worked.

 Share full article  



The University of Michigan stated that despite "persistent, vigorous and varied efforts" to diversify its student body, the enrollment of underrepresented minority students has "fallen precipitously" at many of its schools. Joshua Lott for The New York Times

 By Stephanie Saul

Published Aug. 26, 2022   Updated Oct. 31, 2022

1          **EXHIBIT 53**

2          CORNELL PRESIDENT'S STATEMENT ON ANTI-RACISM

3  https://statements.cornell.edu/2020/20200716-additional-actions.cfm

# Additional actions to create a more just and equitable Cornell

*July 16, 2020*

Dear Cornellians,

A little more than a month ago, I announced a set of actions to enhance our existing programs to promote racial justice. While it was important to take immediate steps in the wake of the racialized violence in our nation, we realize that there is much more to do.

I have heard from many of you over these past weeks, sharing ideas, advocating for change, and offering opinions on ways to counter systemic racism. It is clear that we must think and act holistically to change structures and systems that inherently privilege some more than others. We have not arrived recently at this place in history. Real change will require substantial effort and long-term, ongoing commitment.

I want to publicly acknowledge the advocacy and efforts of so many of our students who continue to champion a more just future for Cornell and for our society. Specifically, #DoBetterCornell has exerted great effort and mobilized broad interest in many important initiatives. Some of the appeals by that movement will be reflected in my announcement today, and a more detailed response will be sent directly to the organizers. I also appreciate those who have engaged on social media platforms to share their stories – often painful – of being Black at Cornell and in the Ivy League. Everyone should read these narratives and think carefully about the role we all must play in building a just, anti-racist world. Students, staff and faculty have long advocated and spoken out about racism and injustice, many prior to my arrival at Cornell, and it is important to acknowledge their work as well.

At the core of our institution lies our primary mission to provide the exceptional education, cutting-edge research and public engagement to shape our world for generations to come, and we must embed anti-racism across these activities. Our world-class faculty play the critical role in defining and advancing our academic mission. Several of the initiatives proposed by our students are the responsibility of our faculty, and, as such, I

4         have asked the Faculty Senate to take the following up as soon as possible:

# EXHIBIT 54

1

2  CORNELL'S REQUIREMENT FOR DIVERSITY STATEMENT IN FACULTY HIRING

3  https://apps.hr.cornell.edu/recruiting/facultyview.cfm?posting_id=_JOB_POSTIN
4  G-3-88665
5

Applications for the position should be submitted at
https://academicjobsonline.org/ajo/jobs/28769. We will begin reviewing candidates
immediately. Applications completed by November 1, 2024 will receive full consideration,
though we highly encourage early application. For applicants who will attend the INFORMS
Annual Meeting, we highly encourage uploading a CV and any other application materials
available to the link above by October 7, even if all application materials are not yet available.
Applications will be accepted until the positions are filled.

Applicants must hold a Ph.D. or equivalent degree. A complete application should include a
cover letter, CV, and three brief statements (1-2 pages per statement): (1) a research
statement, (2) a teaching statement, and (3) a statement of contributions to diversity. Within a
clearly identified subsection of the research statement, the candidate should address prior
accomplishments and future plans related to the commercial and/or broader public
engagement and societal impact dimensions of their research. Candidates are encouraged to
review Cornell University's guidance for writing diversity statements as well as their evaluation
considerations. We ask applicants for all faculty positions to share their experiences and/or
approaches (past, current, or future) to fostering learning, research service, and/or outreach in
a diverse community. Applicants may choose to submit a stand-alone statement or embed the
information in other parts of their application materials. In addition to these statements,
candidates should include a copy of their most significant research publications, a list of the full
contact information for three references, and, for junior applicants, a doctoral transcript.

6

# EXHIBIT 55

### DEMAND FOR RACE-BASED HIRING AND PROMOTION AT CORNELL

https://medium.com/@cornellfacultydemands/faculty-students-and-staff-for-an-an

ti-racist-cornell-2020-demands-b5820bdb1ee4

**IMMEDIATE DEMANDS (IM)**

**Departments**

**IM1: Support and encourage Departments to make cluster hires of Black and other faculty of color.** The need is especially great in those departments that have one or no BIPOC faculty members. This is also an issue of retention; the absence of colleagues of color often plays into the decision of faculty of color to leave Cornell. While we recognize the tremendous need for more Black, Indigenous and Latino/a faculty across the board, the university must also address the underrepresentation of Asian American faculty (especially women and ethnicities such as Filipino, Arab, Iranian, Middle Eastern, Southeast Asian, and Pacific Islander) in the humanities and social sciences.

**IM2: Encourage and support the recruiting of graduate students of color in clusters and cohorts in departments.** Target Black and African American students from HBCUs (Historically Black Colleges and Universities) and state universities around the country in each class, with the aim of achieving balance between international students of color and students of color who are U.S. nationals. Recruit BIPOC graduate students from an array of institutions, including "Hispanic"-serving institutions as well as Tribal colleges and universities and schools located on reservations.

1

# EXHIBIT 56

2 **21% OF THE CANDIDATES WERE SCREENED OUT SOLELY BASED ON DEI CRITERIA**

3 https://drive.google.com/file/d/1q5uiVZQkcOsu3IIxU1ufzZx2dgbwsEqr/view

STEP 1 :    The open faculty position was widely advertised and exposed by the Search Committee to the applicable academic community in a normal outreach and promotional process.

STEP 2 :    Through this process a sizable and demographically diverse applicant pool was identified – all of whom had completed the full paperwork and submittal package (including DEI Statements from every applicant) necessary for Cornell's consideration of their candidacy. As part of the process, the head of the Search Committee reported that the applicant pool was highly "diverse".

STEP 3 :    Prior to commencing a review of the candidate submittal packages, the Search Committee established a "rubric" aimed at performing a comparative qualifications assessment comprised of 5 elements : 1) DEI Statement; 2) Research Strength; 3) Instructional Capabilities; 4) Professional / Volunteer Involvement; and 5) Student Advisory Potential. In the documents received by CFSA, DEI is listed as the "first element" within the 5-element rubric. The implication of this "rubric" is that each candidate should be assessed through the integrated lens of all 5 of the above elements to determine the comparative strength of the candidates. However, instead of employing a 5-element rubric, DEI criteria became the sole "first priority" in candidate review.

STEP 4 :    The 5-element rubric was set aside and a special DEI "litmus test" review was conducted on each candidate. Several designated subgroups of the Search Committee were established which had this singular purpose : To review *only* the DEI Statement of each candidate as the first credential to be assessed.

STEP 5 :    Based on the above DEI "litmus test" alone, 13% of the candidates were eliminated from further consideration because of weak or unacceptable DEI Statements. CFSA believes that eliminating candidates on this basis violates New York State Employment Law.

STEP 6 :    The same DEI-focused Search Committee subgroups then separated out the most experienced candidates who possessed longest tenure in the subject scientific field. These candidates were reviewed  based on their "demographic profile".  Referring to the goal of "equity" (i.e. equitable outcomes in hiring), these more experienced (and likely older and less BIPOC) candidates were eliminated from further consideration for being too qualified. It is reported to CFSA that this process is used to eliminate candidates from "less favored" identity groups while advancing applicants from "more favored" identity groups. Through this screening process, an additional 8% of the applicant pool was rejected. CFSA believes that the elimination of these candidates for such "equity" reasons likely violated US and New York State Anti-Discrimination and Employment Law.

STEP 7 :    Through the DEI screening of Steps 4, 5 and 6 above, roughly 21% of the candidates were rejected based on the personal views and values noted in their DEI Statement or an unfavorable view of the demographic profile of the "most experienced" candidates.  At this stage, the only element of the 5-element "rubric" that had been applied to screen out 21% of the candidates was DEI criteria. There had been no consideration of the other four rubric elements of Research, Instructional Capabilities, Professional Involvement, or Student Advisory.

4

# EXHIBIT 57

## OPEN LETTER TO CORNELL BOARD OF TRUSTEES

https://ivyexcellence.org/news/open-letter-cornell-board-of-trustees

The failure to address a request for Board engagement in this long overdue discussion about the future direction of Cornell is another symptom of the moral rot that has infiltrated all of the Ivy Universities, Cornell included. The Cornell Free Speech Alliance has informed alumni (including myself) that whistleblower accounts from faculty and students describe unacceptable policies and conditions now prevailing on campus. Reports have been made of Cornell's hiring faculty based on race rather than academic merit (even in the pure sciences) to fulfill their DEI targets for tenure track positions in specific departments. This violates U.S. law. Instances are reported of qualified candidates for faculty positions being rejected for their DEI statements alone, thereby screening out faculty candidates based on their personal, religious, and/or political views which are unrelated to their academic discipline and instructional duties. Cornell Law alumni see such practices as violations of New York State employment law. I am told that faculty members have been singled out and disciplined for expressing minority opinions on national events and policy matters. Repeated failures to support faculty members choosing to exercise free expression and academic freedom is unconscionable for a university of Cornell's stature. Cornell leaders have also failed to defend the rights of non-conforming speakers invited to campus and instead have fed a cancel culture on campus where bullying, intolerance, and petulant behavior rule rather than academic rigor and honest debate.

While Harvard, Penn, and MIT were the focus of public testimony in the recent U.S. Congressional hearings, Cornell University is also now under intense national scrutiny. As the subject of three different U.S. Congressional and Federal investigations, Cornell could lose its university accreditation, tax exempt status, and governmental funding. It is my belief that President Pollack would face the same public outcry and demands for resignation as Harvard and Penn had she been on the stand before Congress in early December.

President Pollack is responsible for adding a grave insult to injury. Not only has she given the DEI social engineering experiment equal priority with open inquiry, free expression, and academic freedom, Cornell removed the treasured and historical bust of Abraham Lincoln along with a copy of the Gettysburg Address from the Cornell University Library. Apparently a student found this most highly revered U.S. President to be offensive and requested its removal, which the University obliged. (I am told it has now been returned.) So even Lincoln could be canceled under the present administration. This is an absolute disgrace.

President Pollack and Provost Kotlikoff have allowed their headlong support for DEI policies to take root at the expense of the four essential pillars of Cornell University: 1) Open Inquiry; 2) Academic Freedom; 3) Viewpoint Diversity; and 4) Free Expression. This is an inexcusable violation of their fundamental duty to Cornell. Therefore, they should resign their positions effective immediately.

We all see the increasing frustration of Cornell alumni as DEI continues to wreak havoc under President Pollack's leadership. With my writing of this letter, an increasing number of Cornell alumni are refusing to continue donating to their alma mater. Unfortunately, President Pollack and her administration have refused to engage with concerned alumni and their sound policy recommendations to correct Cornell's course. With all this as background, I now recommend that the Board of Trustees take the following actions :

ITEM 1: Replace the President and the Provost.

ITEM 2: Eliminate DEI staffing and programming. Revert to Open Inquiry, Academic Freedom, Free Expression, and Viewpoint Diversity on campus.

ITEM 3: Adopt and Implement "CFSA Open Inquiry Policy Recommendations To Cornell University" especially the Kalven Report (Political Neutrality) and Chicago Principles (Free Expression).

ITEM 4: Conform to the SCOTUS decision on elimination of Affirmative Action in Admissions and the Schils Report (See CFSA Recommendations) to return Cornell to "merit based" rather than "politically based" or "identity based" hiring and admission preferences.

1 # EXHIBIT 58

2 **CORNELL'S AMICUS BRIEF WITH THE US SUPREME COURT IN SFFA V. HARVARD**

3 https://www.supremecourt.gov/DocketPDF/20/20-1199/232422/20220801150520

4 881_20-1199%20%2021-707%20bsac%20Universities.pdf

19

### C.   Petitioner's Race-Neutral Proposals Would Not Serve *Amici*'s Interest in Diversity.

*Amici*'s experience has demonstrated that the optimal means of creating a diverse student body—and thereby achieving *Amici*'s educational objectives— involves a limited consideration of race and ethnicity in admissions. By the same token, using exclusively race-neutral approaches to admissions decisions would undercut *Amici*'s efforts to attain "the benefits of diversity" they seek. *Fisher II*, 579 U.S. at 385. Petitioner argues that "real diversity" would not decline under its preferred admissions system, Pet. Br. at 70, but Petitioner is wrong.

5

6

# EXHIBIT 59

CORNELL PRESIDENT MARTHA E. POLLACK'S STATEMENT FOLLOWING SFFA V. HARVARD

RULING

https://news.cornell.edu/stories/2023/06/president-pollack-message-supreme-court-decision

# President Pollack message on Supreme Court decision

June 29, 2023

*President Martha E. Pollack sent the following message on June 29:*

Cornell University was founded in 1865 as a university where "any person can find instruction in any study." We have been committed ever since to diversity and inclusion, a commitment that was reiterated and enshrined in the university's core values adopted in 2019.

Cornell is disappointed by the Supreme Court of the United States' decision today in which it found that both Harvard's and the University of North Carolina's admission processes violate the 14th Amendment.

When universities are free to admit broadly diverse classes through an individualized and holistic application review process, they are intentionally creating a student body with the potential to create a spark of insight, to advance knowledge, and to challenge one another and thereby strengthen an argument or call an assumption into question. For generations, Cornell's remarkable students have done just that by bringing different perspectives and backgrounds to their education both inside and outside of the classroom.

As always, Cornell will follow the law, but within its scope we will remain a welcoming community, with strong core values and an unwavering adherence to our historic founding principle: to be a university where "any person can find instruction in any study."

# EXHIBIT 60

### Asian Population Growth in New York and the U.S.

https://www.census.gov/library/stories/state-by-state/new-york-population-chang

e-between-census-decade.html

## Percent Change Asian Alone,
## Total Population by State: 2010 to 2020

### United States: 35.5%



**New York**
Asian alone

**Percent Change in Population**
Percent change: **36.1%** (**increase** of **512,883** people)

**Percentage of Total Population**

7.3% (2010)  9.6% (2020)

1 —————————————————————————————————

2 https://www.nytimes.com/2021/08/12/us/us-census-population-growth-diversity.ht

3 ml

The new data show that Hispanics accounted for about half the country's growth over the past decade, up by about 23 percent. The Asian population grew faster than expected — up by about 36 percent, a rise that made up nearly a fifth of the country's total. Nearly one in four Americans now identifies as either Hispanic or Asian. The Black population grew by 6 percent, an increase that represented about a tenth of the country's growth. Americans who identified as non-Hispanic and more than one race rose the fastest, jumping to 13.5 million from 6 million.

4

1

# EXHIBIT 61

2

**CORNELL CLASS OF 2014-2025 PROFILE**

3 https://irp.cornell.edu/university-factbook/freshman-profile-archives

4

1    # EXHIBIT 62

2    SUPREME COURT'S RULING ON *FISHER II*

3    [https://supreme.justia.com/cases/federal/us/579/14-981/](https://supreme.justia.com/cases/federal/us/579/14-981/)

# Fisher v. University of Texas at Austin, 579 U.S. ___ (2016)

Therefore, although admissions officers can consider race as a positive feature of a minority student's application, there is no dispute that race is but a "factor of a factor of a factor" in the holistic-review calculus. 645 F. Supp. 2d 587, 608 (WD Tex. 2009). Furthermore, consideration of race is contextual and does not operate as a mechanical plus factor for underrepresented minorities. *Id.*, at 606 ("Plaintiffs cite no evidence to show racial groups other than African-Americans and Hispanics are *excluded* from benefitting from UT's consideration of race in admissions. As the Defendants point out, the consideration of race, within the full context of the entire application, may be beneficial to any UT Austin applicant—including whites and Asian-Americans"); see also Brief for Asian American Legal Defense and Education Fund et al. as *Amici Curiae* 12 (the contention that the University discriminates against Asian-Americans is "entirely unsupported by evidence in the record or empirical data"). There is also no dispute, however, that race, when considered in conjunction with other aspects of an applicant's background, can alter an applicant's PAS score. Thus, race, in this indirect fashion, considered with all of the other factors that make up an applicant's AI and PAI scores, can make a difference to whether an application is accepted or rejected.

4

# EXHIBIT 63

CORNELL CLASS OF **2023** AND **2024** PROFILES

https://irp.cornell.edu/wp-content/uploads/2021/02/Profile2019_first-year.pdf

### ETHNICITY AND RACE: INSTITUTIONAL REPORTING

Consistent with practices established by the federal government and in use across higher education, the following reporting framework counts each student within a single category.  Based on these categories,

- **25.6% identify themselves as under-represented minorities (URM).**  URM is defined as American Indian (U.S.), Black (U.S), Hawaiian/Pacific Isle (U.S.) or any combination including one or more of these categories.  All students of Hispanic ethnicity, regardless of race, are also considered URM.
- **48.5% identify themselves as students of color.** This group includes URM plus Asian (U.S.) and Multi Race non-URM (U.S.).

**U.S. Citizens, Permanent Residents, and Refugees**

| | | |
|---|---|---|
| Hispanic (U.S.) | 509 | 15.8% |
| Non-Hispanic/Latino ethnicity, by race | | |
| American Indian (U.S.) | 7 | 0.2% |
| Asian (U.S.) | 647 | 20.1% |
| Black (U.S.) | 214 | 6.7% |
| Hawaiian/Pacific Isle (U.S.) | 3 | 0.1% |
| White (U.S.) | 1,145 | 35.6% |
| Multi Race URM (U.S.) | 91 | 2.8% |
| Multi Race non-URM (U.S.) | 89 | 2.8% |
| Unknown (U.S.) | 199 | 6.2% |
| **International, of any ethnicity and race** | 314 | 9.8% |

https://irp.cornell.edu/wp-content/uploads/2021/02/Profile2020_first-year.pdf

### ETHNICITY AND RACE: INSTITUTIONAL REPORTING

Consistent with practices established by the federal government and in use across higher education, the following reporting framework counts each student within a single category.  Based on these categories,

- **26.9% identify themselves as under-represented minorities (URM).**  URM is defined as American Indian (U.S.), Black (U.S), Hawaiian/Pacific Isle (U.S.) or any combination including one or more of these categories.  All students of Hispanic ethnicity, regardless of race, are also considered URM.
- **51.7% identify themselves as students of color.** This group includes URM plus Asian (U.S.) and Multi Race non-URM (U.S.).

**U.S. Citizens, Permanent Residents, and Refugees**

| | | |
|---|---|---|
| Hispanic (U.S.) | 533 | 16.2% |
| Non-Hispanic/Latino ethnicity, by race | | |
| American Indian (U.S.) | 8 | 0.2% |
| Asian (U.S.) | 738 | 22.4% |
| Black (U.S.) | 265 | 8.0% |
| Hawaiian/Pacific Isle (U.S.) | 3 | 0.1% |
| White (U.S.) | 1,072 | 32.5% |
| Multi Race URM (U.S.) | 78 | 2.4% |
| Multi Race non-URM (U.S.) | 78 | 2.4% |
| Unknown (U.S.) | 216 | 6.6% |
| **International, of any ethnicity and race** | 305 | 9.3% |

1

# EXHIBIT 64

2

**CORNELL CLASS OF 2023 SAT SCORES**

3 https://irp.cornell.edu/wp-content/uploads/2021/02/Profile2019_first-year.pdf

 **Cornell University**      PROFILE:  CLASS OF 2023

**CLASS OF 2023:   ENROLLING FALL FIRST-YEAR STUDENTS**

**3,218 fall first-year students are expected to enroll**[*]

- 55.0% are women; 45.0% are men
- 63.1% attended public high schools
- 16.7% are descendants of Cornell alumni
- 13.4% are first-generation college
- 7.1% are recruited athletes
- The average age is 18

**ENROLLMENT BY CORNELL COLLEGE**

**ENDOWED SECTOR**

| | |
|---|---|
| College of Arts & Sciences | 1,011 |
| College of Engineering | 755 |
| SC Johnson College of Business, Hotel School | 175 |
| College of Architecture, Art & Planning | 114 |

**CONTRACT SECTOR**

| | |
|---|---|
| College of Agriculture & Life Sciences | 560 |
| SC Johnson College of Business, Dyson School | 159 |
| College of Human Ecology | 284 |
| School of Industrial & Labor Relations | 160 |

**STANDARDIZED TESTS**

PERCENT OF ENROLLING STUDENTS SUBMITTING SAT SCORES:  70.8%

PERCENT OF ENROLLING STUDENTS SUBMITTING ACT SCORES:  40.7%

| | 25th Percentile | 50th Percentile | 75th Percentile |
|---|---|---|---|
| SAT  Evidence-based Reading & Writing** | 680 | 720 | 760 |
| SAT  Math | 720 | 780 | 800 |
| SAT  Total | 1,420 | 1,500 | 1,540 |
| ACT Composite | 32 | 34 | 35 |

4

# EXHIBIT 65

### NATIONAL SAT SCORE DISTRIBUTION

https://reports.collegeboard.org/media/pdf/2023-total-group-sat-suite-of-assessm

ents-annual-report%20ADA.pdf (page 7)

| | Total Students | Female | Male | American Indian | Asian | African American | Hispanic | Native Hawaiian | White | Two or More Races |
|---|---|---|---|---|---|---|---|---|---|---|
| **Test Takers** | 1,913,742 | 966,726 | 936,481 | 15,384 | 194,108 | 225,954 | 462,186 | 3,791 | 752,632 | 69,410 |
| **Total Score** | | | | | | | | | | |
| 1400–1600 | 7% | 5% | 8% | 1% | 25% | 1% | 2% | 2% | 6% | 9% |
| 1200–1390 | 17% | 16% | 18% | 5% | 31% | 6% | 9% | 7% | 23% | 22% |
| 1000–1190 | 29% | 30% | 27% | 20% | 27% | 21% | 25% | 23% | 37% | 33% |
| 800–990 | 31% | 33% | 29% | 42% | 14% | 42% | 41% | 41% | 26% | 27% |
| 600–790 | 16% | 15% | 17% | 31% | 3% | 29% | 23% | 27% | 8% | 8% |
| 400–590 | 0% | 0% | 1% | 1% | 0% | 1% | 1% | 0% | 0% | 0% |

# EXHIBIT 66

1

2

**ESTIMATED TOP SAT SCORERS ADMITTED BY CORNELL**

|  | 2023 UM enrollment | Nationwide SAT-takers | Percent in 1400-1600 | SAT-takers in 1400-1600 | Percent of national top scorers enrolled at Cornell |
|---|---|---|---|---|---|
| African American | 214 | 225,954 | 1% | 2,260 | 7.1% |
| Asian American | 647 | 194,108 | 25% | 48,527 | 1.0% |
| Hispanic American | 509 | 462,186 | 2% | 9,244 | 4.1% |
| White | 1,145 | 752,632 | 6% | 45,158 | 1.9% |

3