UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **Stanley Zhong,** and **Nan Zhong** as next friend of his **Minor Son**, | Case No. 3:25-cv-00365-ECC-ML |
| Plaintiffs, | |
| v. | **AMENDED COMPLAINT AND JURY DEMAND** |
| **Cornell University**, **Michael Kotlikoff**, and **Shawn Felton**, , | |
| Defendant. | |

## I.    INTRODUCTION

1.      Plaintiffs Stanley Zhong ("Stanley") and Nan Zhong ("Nan"), acting on behalf of his Minor Son, pursuant to Federal Rule of Civil Procedure 5.2(a), collectively referred to as "Plaintiffs," bring this civil rights action against Cornell University ("Cornell") and the named Cornell officials (collectively, "Defendants").

2.      Plaintiffs allege that Cornell University and its officials racially discriminated against Plaintiff Stanley Zhong, and, by maintaining the same race-conscious policies, place the Minor Son under an imminent threat of similar discrimination. That conduct violates: (1) Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.; (2) 42 U.S.C. § 1981, which guarantees equal contractual rights regardless of race; and (3) the New York State Human Rights Law, N.Y. Exec. Law §§ 290–301, and, (4) N.Y. Civ. Rights Law §§ 40-c & 40-d), which forbid

educational institutions from denying any person the full and equal enjoyment of their programs on the basis of race.

3.      This case is about the most basic of American promises: to give meaning to the Declaration of Independence's affirmation that *all human beings are created equal*. Especially over the past half-century, the nation has made a concerted effort to transform this ideal from a lofty aspiration to enforceable guarantee. At the heart is the simple but profound rule: that racial discrimination is more than unfair—it is illegal and indeed, unconstitutional.

4.      And yet, in one of the most competitive and consequential domains of American life, college admissions, our elite universities like Cornell University— and the federal and state agencies that fund and partner with them—proudly discriminate against Asian American applicants based on their race and have done so for decades.  Cornell operates as though anti-discrimination law protects only *certain* minorities of their preference. Under this conception, Asian Americans are treated not as beneficiaries of civil rights, but as exceptions who are not entitled to civil rights.

5.      Cornell does not openly call these policies what they are—racial discrimination. Instead, Cornell uses euphemistic language like "affirmative action" and "holistic review." Racial favoritism is rebranded as "progress," and Cornell reframes race preferences as somehow desirable. But discrimination by another name is still discrimination. Focusing on the benefit to some rather than the burden on others is a rhetorical sleight of hand.  Forcing one competitor to begin a race far behind the starting line is no different than giving his rival a head start. In a zero-sum admissions process, selecting winners based on race necessarily predetermines losers. Cornell's rhetoric obscures the harm.  But it does not erase it.

6.     The results speak for themselves. For decades, Cornell's college admissions systemically penalized hard-working Asian American students—not because they lack merit, but because they don't fit the racial preferences that Cornell wants to engineer. In the name of vague notions of restitution for past racial injustice, universities like Cornell simply create new victims.

7.     Stanley and the Minor Son of Nan Zhong do not ask for special treatment.  They ask only for what the Constitution guarantees: an equal shot. A chance to be evaluated on the strength of their character, their intellect, and their achievements, without penalty for race. The Constitution demands nothing less.

8.     Plaintiffs seek declaratory and injunctive relief to ensure that Cornell's admissions policies comply with federal and state law and to allow Asian Americans applicants like Stanley Zhong and the Minor Son an equal opportunity to compete for admission on the basis of merit, free from discrimination. Plaintiffs also seek nominal damages and other appropriate relief for the injuries suffered to their civil rights.

## II.     THE PARTIES

### A.  PLAINTIFFS

9.     Plaintiff Stanley Zhong is a second-generation Asian American student who at all relevant times was a resident of the state of California. Stanley was denied admission to Cornell despite extraordinary academic credentials.

10.     Like his older brother, Nan Zhong's Minor Son is an Asian American student and a minor child with strong academic ambitions and performance to match.  He intends to apply to Cornell University. Because he faces a credible and imminent risk of being subjected to the same discriminatory admissions policies, the Minor Son has standing to seek prospective relief.  He is a resident of the state of California.

11.     Plaintiff Nan Zhong proceeds on behalf of and as next friend of his Minor Son pursuant to Fed. R. Civ. P. 17(c); he is a first-generation immigrant from China and a permanent resident of California. He is also the father of Stanley Zhong.

### B. DEFENDANTS

12.     Defendant Cornell is an Ivy League private research university, duly chartered under New York law, with its principal campus located in Ithaca, New York. As a recipient of substantial federal financial assistance in the form of student grants, research funding, and other federal programs, Cornell is thereby subject to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., and its implementing regulations. At all relevant times, Cornell acted through its agents, officials, and employees, including those specifically named herein.

13.     Defendant Michael Kotlikoff, as the President of Cornell University, is the chief executive officer of the University and is responsible for the execution and enforcement of all institutional policies, including those relating to admissions. President Kotlikoff has made public statements reaffirming the University's commitment to diversity, equity, and inclusion, including those which reveal Cornell's use of race as a consideration in admissions decisions, even after controlling legal precedent made such practices unlawful.

14.     Defendant Shawn Felton, as the Director of Undergraduate Admissions at Cornell University, is directly responsible for the development, implementation, and oversight of undergraduate admissions policies and procedures at the University. In that capacity, Felton is a principal architect and enforcer of the admissions system challenged in this lawsuit, including the purportedly "holistic" review process which incorporates racial considerations in a manner inconsistent with federal law.

4

## III.    JURISDICTION AND VENUE

15.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims arise under the laws of the United States, including Title VI of the Civil Rights Act of 1964, 28 U.S.C. § 1343, and 42 U.S.C. § 1981.

16.    The Court has supplemental jurisdiction over Plaintiffs' state-law claims—including those arising under the New York State Human Rights Law (Executive Law §§ 290–301) and the New York Civil Rights Law §§ 40-c & 40-d—pursuant to 28 U.S.C. § 1367, because those claims form part of the same case or controversy as the federal claims. Plaintiffs further seek declaratory relief under 28 U.S.C. §§ 2201–2202.

17.    Venue is proper in the United States District Court for the Northern District of New York under 28 U.S.C. § 1391(b) because Cornell University is located in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## IV.    FACTS

### A.  THE LEGACY OF ANTI–ASIAN DISCRIMINATION

18.    The Zhongs belong to an oppressed minority given the history of the United States.  Asian Americans have long faced systemic exclusion and discrimination in the United States. The Chinese Exclusion Act of 1882 barred Chinese immigrants from entering the country—a policy so discriminatory that Congress formally apologized in 2012. Other Asian communities have faced similar patterns of xenophobia, violence, and exclusion throughout U.S. history. During World War II, over 120,000 Japanese Americans were forcibly incarcerated based solely because of their ancestry.

19.    In recent decades, Cornell along with this nation's most elite educational institutions has continued this sad history.  These institutions of higher education, including Cornell, subject Asian Americans to a quiet but no less insidious form of discrimination. Cloaked

in the language of "affirmative action" and "holistic review," Cornell and other institutions of higher education hold Asian American applicants to higher standards than applicants of other races, penalizing Asian applicants specifically because they were born with the wrong skin color.

20.     Across the country, defenders of race-conscious admissions have downplayed or outright denied the existence of anti–Asian American discrimination. But these denials, however, are untenable. Within the world of college admissions, discrimination against Asian Americans has become the worst-kept secret in academic life: admissions officers, consultants, faculty, and students alike understand that being Asian is a major disadvantage because these institutions discriminate on the basis of race behind closed doors.  Asian Americans are considered "white adjacent."

21.     Sadly, Cornell is typical of its industry and simply follows an industry-wide pattern.

22.     Pulitzer Prize–winning journalist Daniel Golden documented this ubiquitous nationwide trend in his book titled *The Price of Admission*, exposing how elite universities like Cornell routinely pass over Asian American applicants with exceptional qualifications in favor of far less qualified candidates from preferred racial groups.

23.     A 2016 national survey revealed that fully 42% of private college admissions officers and 39% of their public counterparts acknowledged that Asian American applicants are held to higher standards than students of other races. Studies suggest that privileged, wealthy African American applicants are admitted at significantly higher rates than low-income, underprivileged Asian American applicants with identical academic credentials. If affirmative action were truly about leveling the playing field, this outcome is indefensible.

24.     Discriminating against disadvantaged Asian students in favor of affluent Black (or Hispanic) applicants does not advance equality of opportunity; it betrays it.

25.     Cornell and other elite institutions' policies reveal that the goal was never fairness—it is about achieving illegal, predetermined racial preferences, no matter whose rights these institutions trample.

26.     Asian Americans who challenge this discrimination do so at great personal risk. On campus, advocating for equal treatment under the law has been perversely rebranded as an attack on civil rights—an Orwellian inversion that suggests those rights belong only to the "right kind" of minority.

27.     At Cornell, as at many elite colleges, Asian Americans endure a dual-indignity— first, they are subjected to systemic discrimination in the admissions process. Then, should they be lucky enough to reach campus and object to that injustice, they are vilified as opponents of "equity" or "allies" of the "oppressor class" or branded "racist."  This national climate manifests itself at Cornell and throughout the body of academic institutions.  Cornell condemns discrimination against some groups but celebrates discrimination against Asian Americans and other groups.

**B. Cornell University's Enduring Commitment to Racial Engineering**

28.     Cornell University has a long and well-documented history of promoting racial preferences, including but not limited to its admissions practices. For decades, Cornell openly embraced race-conscious admissions policies—indeed, it proudly defended them as integral to its institutional mission. Cornell's own publications acknowledged the university's longstanding use of race as a factor in admissions decisions, describing it as essential to building a so-called "diverse" student body.

7

29.     University leadership consistently reinforced this racialized view of diversity. Ironically, President (up to June 2024) Martha Pollack, for example, repeatedly invoked Cornell's founding motto, "any person, any study," to justify race-based preferences, framing exclusionary racial policies as though they were expressions of inclusion.

30.     Even when race-based admissions policies drew public scrutiny, meaningful reform was elusive. For example, as far back as 1989 UC Berkeley's Chancellor brought national attention to this industry-wide practice when he issued a public apology for admissions that suppressed Asian enrollment.  By 2003, nothing had changed.  The chairman of the UC Board of Regents openly accused the university of "blatantly" discriminating against Asian Americans, and a study by sociology professor Robert Mare confirmed a consistent pattern of anti-Asian bias in admissions.  This was indicative of the entire industry.

31.     This cycle—public contrition followed by quiet continuation of race-based admissions—is a defining feature of how elite universities respond to allegations of anti-Asian discrimination. Cornell University is one of the worst offenders.

32.     In the lead-up to *Students for Fair Admissions v. Harvard*, 600 U.S. 181 (2023), Cornell fought tooth-and-nail to preserve its ability to discriminate against Asian American students.

33.     Cornell University joined fifteen other elite institutions in an amicus brief pleading with SCOTUS to "reaffirm[] their right to consider race and ethnicity" when making admissions decisions.

34.     Astonishingly, to justify race-conscious review, Cornell's brief posed what it framed as a sympathetic hypothetical: *"Should an applicant avoid writing about the challenges she faced as the only Asian-American member of her high-school drama group?"* This was

presumably Cornell's example of when to consider an applicant's race as appropriate. However, Asian-American applicants already know that describing such an experience is more likely to hurt than help—branding them as part of an "over-represented" group and nudging their files into the reject pile.

35.    Asian American students like Stanley and prospective applicants like the Minor Son have long internalized the unspoken rules of an admissions game that is rigged against them. They resort to downplaying their achievements and interests in math and science.  They avoid mention of bilingual households, or they omit involvement in Asian cultural organizations.  They seek to appear "less Asian" to escape the penalty for their racial identity.

36.    These learned behaviors are passed down from older students, for example from Stanley to Minor Son.  Guidance counselors and even college admissions consultants also communicate to Stanley, Minor Son, and other Asian American students the harsh reality that Asian identity is a liability.  This racial double standard is common knowledge, a moral stain on our educational institutions, and a direct violation of the American compact that all Americans are entitled to their civil rights.

37.    No student in America should be compelled, as do Stanley and the Minor Son, to obscure their heritage or downplay their authentic achievements out of fear that their racial identity will count against them.

## C.  Cornell's "Holistic Review" Is a Euphemism Discrimination

38.    The Supreme Court has held that race-based admissions policies unequivocally violate the Equal Protection Clause.  The Supreme Court has also reaffirmed that constitutional protections against racial discrimination apply equally to all racial groups equally—including those who are not labeled "underrepresented."

39.    One might have hoped that a great university would welcome the restoration of merit based, equal treatment.

40.    Instead, Cornell's chief decision-maker signaled regret that the University could no longer discriminate against applicants on the basis of race.  Cornell's leadership all but announced that it would search for workarounds to preserve the racial preferences the Court condemned.

41.    On June 29 2023, the day *SFFA v. Harvard* was decided by the Supreme Court of the United States, President Martha E. Pollack issued an official statement that Cornell was "disappointed."

42.    The message was quickly amplified by Lisa Nishii, Cornell's Vice Provost for Enrollment. Nishii assured the community that Cornell remained "fully committed" to producing a "compositionally diverse incoming class," explaining that admissions officers would continue their "individualized, *holistic* review" to reach the University's preferred demographic result.  To be clear, when Cornell says "diverse" or "diversity," what it means is increasing the representation of preferred racial groups on campus.  Diversity means race.

43.    In other words, Cornell views decisions of the Supreme Court of the United States as a procedural obstacle and simply sought new levers to pull in order to get the same race-based results.

44.    Cornell itself foretold this approach. In its *SFFA* amicus brief, the University touted its unwavering commitment to diversity (i.e. racial engineering), and then conceded, without equivocation, that such diversity could be attained only by "consideration of race and ethnicity in admissions," adding that "no race-neutral alternative presently can fully replace race-conscious individualized and holistic review."

45.     Cornell thus admitted two critical points: (1) its demographic targets remain non-negotiable, and (2) those targets are unattainable without using race. Thus, once the Supreme Court barred the front-door to racial preference, Cornell had already signaled it would look for a back door to reach the same result.

46.     Cornell's "fix" was to rebrand race-based sorting as "race-blind holistic review."

47.     Cornell's "holistic review" nevertheless continues to make the self-declared race of admissions candidates available to its admissions officers.

48.     In public, "holistic" sounds like individualized evaluation; inside the admissions office it operates as a euphemism for race-balancing. This terminology remains merely cosmetic; the discriminatory purpose remains.

49.     Cornell is hardly alone in treating "holistic review" as a workaround.  This is an industry-wide practice.

50.     As documented by Professor Tim Groseclose in a detailed study of UCLA admissions, the switch to "holistic" review was adopted explicitly to increase enrollment of so-called "underrepresented minorities," at the expense of more qualified Asian American applicants.

51.     On May 25, 2016, a former Dartmouth admissions officer revealed how "holistic" review allowed committees to mask racial bias behind vague, subjective criteria—resorting to stereotypes to dismiss Asian American candidates with doublespeak like "yet another textureless math grind."

52.     While Cornell is not the only school to adopt "holistic" review to achieve race-based outcomes, they stand out as one of the worst offenders. Cornell uses "holistic review" as a backdoor to consider prohibited characteristics such as race.

53.     Again, Cornell practically admitted as much in its Amicus Brief submitted to the Supreme Court of the United States in *SFFA*. Cornell argued, "a 'race-blind' version of holistic review would not be a holistic review at all." Authentic "holistic" review is "impossible" unless admissions officers first assign every applicant a racial label. In other words, Cornell asserts a contradiction: to treat applicants as individuals, Cornell must first classify them by race.

54.     These party admissions leave no doubt about Cornell's discriminatory purpose in analyzing applications submitted by Stanley and future applications to be submitted by Minor Son.

55.     When confronted with a choice—between advancing "diversity" (i.e. race-based selection) goals or upholding equal, merit-based selection for high-achieving groups like Asian Americans—Cornell sides with "diversity," even if it means racial discrimination.

56.     In practice, this results in academically superior Asian Americans applicants being systematically disadvantaged to make room for less qualified candidates from other racial groups.

57.     Cornell's leadership began laying contingency plans for this backdoor, "holistic" process well before the Supreme Court ruled in *SFFA*. In late 2022—months before *SFFA* was argued—President Pollack convened a Presidential Task Force on Undergraduate Admissions expressly charged with designing "mission-directed" (i.e. race-based) policies that would reach their diversity goals. In reality, Cornell was searching for camouflage that would disguise pre-determined decisions based on race.

58.     Chief among the Task Force's proposals was an "identity-focused" supplemental essay—a question crafted to elicit the very background information Cornell once gathered by checking a race box. Cornell simply swapped a one-click disclosure for a 250-word narrative,

enabling admissions officers to engage in racial profiling with the benefit of plausible deniability. The label has changed to "holistic," but the function—extracting race data—remains exactly the same.

59.     Moreover, even the euphemism "holistic" suggests a thorough and individualized evaluation process. But on information and belief, and supported by all known statistics of admissions practices in higher education as well as at Cornell, Cornell admissions officers are expected to review at least 8.75 applications per hour.  This is less than seven minutes per applicant. This breakneck pace is entirely incompatible with any genuine notion of "holistic" review. The challenge is only compounded by the sheer volume of applications Cornell receives—more than 65,000 for its 2025 undergraduate admissions cycle.

60.     Maintaining any meaningful consistency across such a vast pool, under severe time constraints, necessarily forces readers to rely heavily on easily digestible, quantifiable metrics such as SAT scores and GPA.

61.     Making matters worse, Cornell then removed the one merit-based yardstick that might have anchored these snap verdicts. Starting with the COVID-era 2021 cycle, Cornell dropped the SAT/ACT requirement for every undergraduate college, and Cornell has kept that test-optional (or even test-blind) policy through the Class of 2029.  In short, Cornell refuses to apply color-blind admissions policy but opts for test-blind policy instead.

62.     By discarding the most objective datapoint, Cornell ensures that admissions decisions lean harder than ever on discretionary, purportedly "holistic" factors.

63.     For example, when it comes to "holistic" criteria like "fit" or "contribution to campus culture," Cornell systematically considers Asian Americans to be a "race" that confers less "individualism" than other races. Upon information and belief, Cornell uses race—or more

13

accurately, self-reported racial identity—as a crude stand-in, a convenient shortcut, that "objectively" indicates cultural value, personality, and individual perspective.  These dehumanizing stereotypes reflect not genuine, individual assessment, however, but racial profiling disguised as discretion.

64.     The one, true individual distinction that matters, individual merit, is discounted so that Asian Americans may be excluded.  Cornell bypasses the need for any genuine individualized understanding but calls it "holistic." In this way, "individualism" can only be recognized through the lens of racial group identity.  This turns equal protection on its head and reveals the extent to which Cornell has (unfortunately) come to view race as a defining feature of personhood.

65.     In an open letter dated Jan 23, 2024, Jon A. Lindseth, a member of Cornell Board of Trustees (Emeritus) and Counselor to the President, called for the resignation of Cornell's president and provost due to Cornell's continued "identity based" admission preferences.  As someone with knowledge of Cornell's operations, Lindseth alleged violations of federal anti-discrimination law. Lindseth specifically noted how the "elimination of grades and SATs has created a system in which equal outcomes rather than proven merit have become the objective," which he describes as "disastrous" for a prestigious research university like Cornell.

66.     When Stanley applied for Fall 2023 enrollment, the test-optional policy was still in force, so his file reached the committee stripped of the one objective measure that might have anchored an honest comparison. Admissions readers—working at a seven-minute pace—were left to fill that vacuum with subjective cues and race-linked proxies, the very tools Cornell had crafted to preserve its preferred race-based demographic engineering. In short, Stanley was

judged by a process "holistic" in name only: rushed, inconsistent, and driven by racial identity rather than by his extraordinary merit.

67.    Cornell's race-conscious practices have not escaped federal notice. On March 14, 2025 the U.S. Department of Education's Office for Civil Rights ("OCR") announced a sweeping Title VI enforcement initiative, opening formal investigations into **45 universities** for "race-exclusionary practices" that violate the Civil Rights Act. Cornell University appears on that list as a chief offender.

68.    OCR's decision to single out Cornell is significant. Title VI investigations issue only where the agency has received credible evidence that an institution continues to deploy race as a decision-making factor after *SFFA*. Thus, a neutral federal body has already found sufficient cause to suspect Cornell of maintaining unlawful racial preferences.

### D.  THE UNMISTAKABLE MERIT OF STANLEY ZHONG

69.    It is against this racially charged backdrop that Stanley faced the admissions process. Stanley is not merely a qualified applicant—he is, by any objective measure, among the top college applicants in the country.

70.    Stanley Zhong attended Henry Gunn High School, ranked #14 in California by U.S. News & World Report and the #1 best public high school in the San Francisco Bay Area according to Niche. Within this elite setting, Stanley still stood head and shoulders above his peers.  With a weighted GPA of 4.42, Stanley distinguished himself as a National Merit Scholarship finalist and earned a place in at least the top 9% of his class—qualifying for the University of California's prestigious "Eligibility in the Local Context" program--a pathway for California high school students to gain guaranteed admissions to that state's flagship university system.

71.    Stanley achieved a perfect PSAT score without any preparation and went on to score 1590 out of 1600 on the SAT, after just a few nights of self-study and without any paid tutoring or test prep.

72.    Stanley's excellence extended well beyond the classroom. While still in high school, he co-founded OpenBrackets, a nonprofit that delivered free coding lessons to more than 500 students in underserved communities across California, Washington, and Texas. For this work, he was awarded the President's Volunteer Service Award at its highest level and received positive feedback from Stackoverflow co-founder Mr. Jeff Atwood. He also founded and led his school's competitive programming club and took on leadership roles in a variety of academic and volunteer organizations.

73.    Stanley is a self-taught programmer whose extraordinary talent has earned him top honors in some of the world's most competitive coding contests.  Stanley often outperforms professional engineers.

74.    Stanley placed 2nd in Carnegie Mellon's picoCTF cybersecurity challenge and was invited to CMU with expenses paid, took 6th in Stanford's ProCo, and reached the elite Platinum Division of the USA Computing Olympiad. Twice, he placed 2nd globally (and 1st in the U.S.) in MIT's Battlecode high school division, earning invitations to MIT. He also ranked among the top 500 worldwide in both Google's Code Jam (427th) and Meta's Hacker Cup (329th)—competitions dominated by seasoned professionals from around the world.

75.    His skill was so advanced that in 2019, Google invited Stanley for a full-time engineering interview, unaware he was only 13 years old; the interview was canceled only after his age came to light.

76.     Stanley repeatedly demonstrated extraordinary initiative far beyond his years. After reading an NPR story in April 2020 about state unemployment systems buckling under COVID-related demand due to outdated COBOL infrastructure, Stanley independently taught himself COBOL, published sample code to GitHub, and volunteered his help to the "COBOL Cowboys" featured in the article—earning a personal phone call and words of encouragement from their CEO.

77.     A year later, frustrated by the lack of affordable e-signature tools during the pandemic, Stanley launched RabbitSign, the world's only unlimited free HIPAA-compliant e-signing platform. Built by Stanley on Amazon Web Services, RabbitSign was so secure and well-architected that AWS named it one of the best-engineered platforms they had reviewed and decided to feature it in a case study. Stanley's innovation drew national attention: RabbitSign was spotlighted on *Viewpoint with Dennis Quaid*—a program that has previously profiled Fortune 500 CEOs and U.S. presidents—for its potential to help reduce healthcare costs through accessible, secure digital tools.

78.     Unfortunately, as an Asian American with superlative STEM skills, in Cornell's "holistic admissions process" these are all signs that Stanley lacks personality, individuality, and depth of character.

79.     Just before his 18th birthday, Stanley underwent one of the most rigorous and objective evaluations available in the modern labor market: Google's full-time engineering interview process. Five randomly assigned professionally trained Google engineers assess the candidates, devoting over ten hours to evaluating Stanley's technical skills, communication abilities, and teamwork—precisely the traits elite universities purport to assess through "holistic" admissions. Importantly, the structure of Google's process eliminates any risk of favoritism:

17

interviewers are randomly assigned, shielded from outside influence, and incentivized to avoid inflating evaluations, as doing so could lead to internal compensation disparities.

80.     Based solely on their independent assessments, the engineers recommended Stanley for an L4 software engineering role, a position typically reserved for candidates with a Ph.D. or equivalent industry experience. Google extended the offer in September 2023, just after Stanley's 18th birthday.

81.     Stanley's performance evaluation in January 2025 confirmed the wisdom of Google's decision: Stanley met all expectations and showed strong potential for continued growth. That Google—an employer with far more applicants than even the most competitive universities—recognized Stanley as qualified for a postdoctoral-level role, while Cornell University deemed him unworthy of undergraduate admission, speaks volumes about the discriminatory standards Cornell applies to Asian American applicants.

### E.  STANLEY APPLIED ON MERIT—CORNELL REJECTED ON RACE

82.     In Fall 2023, Stanley applied to the undergraduate Computer Science program at Cornell University.

83.     Like many Asian American candidates for admission, Stanley naively dared to hope that, despite the well-known barriers facing applicants who look like him, his individual merit might still prevail. That maybe, just maybe, Cornell would look past his race.

84.     Unfortunately, like too many Asian American students, he learned that it would not. Despite extraordinary academic credentials, nationally recognized accomplishments, his application was rejected.

85.     Stanley's story was reported in national news in October 2023 and cited in a congressional hearing in September 2023. Multiple independent college admissions experts and

counselors (unconnected to Cornell) reviewed Stanley's application materials at the family's request.

86.    Tellingly, not one of these experts could identify a legitimate, performance-based reason why Stanley would have been rejected by a school of Cornell's caliber. By all objective indicators, Stanley appeared to be the kind of candidate any top university would eagerly admit. The absence of any apparent, merit-based explanation for this "bizarre" result indicates that Stanley's race played a role in Cornell's decision.  There is no other explanation.

87.    Statistical evidence reveals the extent of anti-Asian discrimination in Cornell's decision to deny Stanley's application.

88.    The 2020 U.S. Census shows that New York's Asian population expanded by 36.1 percent over the prior decade—the fastest-growing ethnic group in the state.  The national Asian population grew by an almost identical 36 percent over the same period. Yet Cornell's Asian enrollment has is stuck in a narrow band—19.1 % → 20.1 % → 18.1 % → 19.1 % → 18.7 % → 20.1 % for the Classes of 2024-2029.

89.    As federal courts have found, the stark gap between surging Asian demographics and a flat Cornell admit rate is highly "probative evidence of intent."

90.    The 2023 cycle exposes the skew with stark arithmetic. Cornell matriculated 214 Black freshmen.

91.    Among all freshmen, Cornell's 25th-percentile SAT score that year was 1420. Nationally, just 1 percent of Black test-takers scored 1400 or higher. If we conservatively assume that three-quarters of Cornell's Black enrollees meet or exceed the 1420 threshold, this would indicate that the University captures roughly 161 of the nation's 2,259 highest-scoring Black students— or about 7.1 percent of the entire pool.

92.    Of course Stanley, his father Nan, and Minor Son would celebrate such an achievement, were Cornell to truly corner the market on talented Black applicants.

93.    However, calculations show Cornell enrolled only 4.1 percent of top Hispanic scorers, 1.9 percent of top White scorers, and a mere 1.0 percent of top Asian American scorers.

94.    For a single university with dozens of elite competitors, enrolling more than seven percent of the country's top Black scorers in a such disproportion to the percentage of elite competitors Cornell captures from other racial groups, would be statistically extraordinary.

95.    There are only two plausible explanations. Either (1) Black students are six to seven times more likely than their Asian counterparts to choose Cornell over peer institutions—a statistical impossibility, especially considering that other top universities are also enrolling large numbers of high-achieving Black students.  There is no evidence that Cornell is hoovering up all high-achieving Black students.

96.    Or the only other and far more simple explanation is that (2) Cornell selectively raises and lowers the bar for admission based on race.

97.    The data leaves no serious doubt that it is the latter: for any single university to enroll that many top-performing Black students would require that school to be overwhelmingly more attractive to America's Black students than any of the dozens of other elite (some even higher ranking) institutions competing for the same applicant pool.

98.    But no one can seriously believe that Cornell, which ranks 16th among the nation's schools according to US News and World Report, has somehow cornered the market on talented Black freshmen.

99.    If Cornell were evaluating applicants under uniform merit criteria, the highest-scoring Asian cohort—far larger in absolute numbers than any other group—would command at

least equal, not markedly smaller, representation among top scoring students admitted to Cornell.

The only plausible explanation is that Cornell is admitting a disproportionately high number of

lower-scoring applicants based on race, while systematically suppressing the admission of

higher-scoring Asian Americans, and also based on race, to engineer its racial preferences.

100.    In short, the data reveal a deliberate pattern: Cornell disproportionately harvests

from preferred racial applicants while erecting steeper hurdles for Asian applicants. That pattern,

coupled with Cornell's public insistence that it "cannot" reach its diversity goals without race-

based sorting, makes plain that Stanley Zhong was denied admission because of his race.

101.    While distinct from undergraduate admissions, Cornell's faculty-hiring practices

mirror the very sleight-of-hand it deploys in undergraduate admissions. This provides compelling

circumstantial evidence of Cornell's institutional and systematic race-conscious agenda.

102.    Despite Cornell's public statements proclaiming their devotion to race-blind

merit, internal correspondence, whistle-blower reports, and hiring data reveal that race and

ideological conformity function as explicit gatekeepers to employment—mirroring the "unstated

Affirmative Action" strategy.  Cornell's decision-makers view demographic engineering as an

institutional imperative, not an accident.

103.    Just as Cornell instituted an "identity essay" to surreptitiously consider the

applicant's race in the admissions process, Cornell's reliance on mandatory "diversity, equity,

and inclusion" (DEI) statements in faculty hiring processes provides a textbook illustration of

how the University disguises racial preferences behind seemingly neutral criteria.

104.    A 2022 life-sciences search began not with teaching portfolios or research

records, but with each candidate's DEI essay. Committee e-mails show that any statement

deemed "highly sub-optimal" triggered immediate rejection, and roughly one-fifth of the

applicant pool was screened out on that basis alone.  Ideological enthusiasm for Cornell's diversity agenda—and, by extension, the racial world-view it advances—became a litmus test that overrode academic merit.

105.    Cornell has gone further still. In 2020 the Department of Ecology & Evolutionary Biology, after "extensive" consultations with senior diversity administrators, decided to skip an open search altogether and invite a single pre-selected candidate drawn from an all-minority short list "so she would not be in competition with others." Internal correspondence celebrated the outcome as the department's long-sought "diversity hire." The process bypassed peer review to guarantee a hire with the desired racial profile—proof that Cornell engineers racial outcomes first and justifies them later.

106.    These policies reveal a university-wide culture steeped in race-consciousness— one that cannot plausibly separate hiring practices from its admissions decisions as demonstrated by its suspect admissions outcomes. When university leadership consistently selects and empowers individuals committed to race-based decision-making, it is hardly surprising that those values also shape admissions policy and the student body.

107.    The through-line is unmistakable: as with the "identity-focused" essay for applicants, Cornell uses the DEI statement as a pretext—a backdoor means of discovering whether an applicant has the particular racial characteristics they're looking for. Cornell's faculty-hiring record therefore supplies powerful circumstantial evidence that race remains a defining criterion in Cornell's decision-making, including the exclusion of Stanley and imminent exclusion of the Minor Son.

108.    These are not incidental expressions of Cornell's values in niche departments or by isolated academics.  Cornell's admissions decisions track the racial discrimination of its

industry outside the campus; and they also track the racial discrimination of its faculty hiring within the campus.

109.    As a result of this unlawful discrimination, Stanley Zhong has suffered significant harm, including but not limited to the loss of educational opportunities, reputational damage, and emotional distress. Plaintiffs seek all available legal and equitable relief to remedy these injuries.

## F.  MINOR SON AS A PROSPECTIVE APPLICANT CAN ONLY CONCLUDE THAT HE IS NOT WELCOME AT CORNELL

110.    Minor Son is currently a rising junior in high school and anticipates applying to Cornell during the 2026-2027 application cycle for fall 2027 enrollment.

111.    Like his brother, Minor Son is talented.  Minor Son already demonstrates the academic excellence, intellectual curiosity, and extracurricular achievement that define top college applicants. Although he has not yet taken the PSAT due to his grade level, he expects to achieve a perfect or near-perfect score, just as his older brother Stanley did, based on his advanced coursework and consistent academic performance.  Minor Son's GPA stands at a perfect 4.0, notably higher than Stanley's at the same stage, placing him among the very top of his class.

112.    Outside the classroom, Minor Son exhibits a well-rounded and disciplined character. He has been a member of his high school's varsity cross-country team since his freshman year, he is a national-level Rubik's Cube competitor capable of solving the cube in 6.25 seconds during official events, and he has taught himself to juggle five balls.  Minor Son has performed on stage at the second largest annual juggling festival in North America.

113.    However, based on Stanley's experience, Minor Son has learned of a consistent pattern in which Cornell discriminates against Asian American applicants because of their race.

114.    Minor Son is also discouraged and humiliated by repeated and public knowledge of Cornell's discrimination against Asian Americans in admissions practices practices.

115.    Minor Son has also learned through friendship networks within his community and through publicly available reports that Asian American students who speak up for equal treatment under the law on Cornell's campus and throughout academia are branded "racists" and ostracized on campus —reinforcing that Cornell's bias extends beyond admissions into campus culture.

116.    Minor Son is aware of admissions statistics indicating that—even among the most qualified—Asian Americans face significantly lower admission rates without the 'correct' race for Cornell's race-based admissions process.

117.    Both because of hard data indicating that the collective experience of Asian Americans at Cornell University is dismal in the admissions pool and also because of his direct experience of his brother's hardship and rejection; Minor Son faces certain harm if he applies to Cornell.  In short, Minor Son has come to view application to Cornell as an Asian American student, no matter how talented, as a fool's errand.  Through its actions, Cornell has concretely deterred Minor Son from applying for admission in the future.

118.    In sum, while Minor Son is positioned to be a highly competitive applicant to any elite university, he confronts a tangible and immediate risk of race-based discrimination at Cornell University.

## CAUSES OF ACTION

**COUNT I.    Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (against Cornell University)**

119.    Plaintiffs here incorporate by reference all preceding paragraphs as if fully restated in this paragraph.

24

120.    Plaintiffs bring this claim under Title VI of the Civil Rights Act of 1964, which prohibits any program or activity receiving federal financial assistance from subjecting individuals to discrimination on the basis of race.

121.    Cornell University receives hundreds of millions of dollars annually in federal research grants, student-aid funds under 20 U.S.C. § 1070 et seq., and other federal contracts, and is therefore a 'program or activity' subject to Title VI's nondiscrimination mandate.

122.    Although Title VI does not, by its terms, incorporate constitutional standards, the Supreme Court has made clear that a Title VI claim for racial discrimination in admissions is coextensive with a claim under the Equal Protection Clause.

123.    Defendant Cornell's discriminatory intent may be inferred from a constellation of evidentiary factors, including: (1) the demonstrable statistical evidence of disparate impact on Asian Americans in admissions; (2) Cornell's historical track record of discrimination against Asian Americans and admissions; (3) the sequence of events demonstrating Cornell's resolute opposition to legal mandates to evaluate admissions candidates without regard to racial preference; and (4) Cornell's deviations from regular procedures or substantive norms of racial equality and evaluation of academic candidates on the basis of merit regardless of race.

124.    Cornell's admissions system continues to pursue racial balancing even after the Supreme Court forbade it. Statements by President Martha E. Pollack and Vice-Provost Lisa Nishii confirm that Cornell views race as indispensable to achieving its "compositionally diverse" class.  Race was therefore a substantial and motivating factor in Cornell's decision to deny Stanley admission, and Stanley would have been admitted but for his race.

125.    That inference is underscored by Cornell's rejection of Stanley Zhong—a National Merit Finalist and internationally recognized programmer who was objectively assessed

by Google to be qualified for a Ph.D.-level job.  Due to Cornell's policies, practices, and customs of racial engineering, less-qualified applicants of favored races were admitted.

126.    Likewise, Defendant Cornell's acts and omissions have caused Minor Son to expect certain rejection at Cornell University, due to Defendants' intentional discrimination against not only his brother, Stanley Zhong, but also due to their established pattern, practice, and policies of discrimination on the basis of his race.

127.    Taken together, these facts form a consistent, disturbing pattern of intentional racial discrimination—one that culminated in the rejection of Stanley Zhong and the discouragement meant of his brother Minor Son, not because they lack merit, but because they do not fit the racial profile Cornell wants to engineer.

128.    Cornell's intentional discrimination violates Title VI and has caused Plaintiffs tangible economic injury, including the loss of educational opportunity and the attendant financial advantages of a Cornell degree in an amount to be determined at trial.

129.    Plaintiffs thus seek declaratory and injunctive relief, together with compensatory damages for these economic harms and any other relief the Court deems just.

## COUNT II.    Violation of 42 U.S.C. § 1981
### (against Cornell University)

130.    Plaintiffs here incorporate by reference all preceding paragraphs as if fully restated in this paragraph.

131.    42 USC § 1981(a) of the Civil Rights Act provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

132.    And 42 USC § 1981(b) provides:

. . . the term 'make and enforce contracts' includes . . . the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship

133.    42 USC § 1981 guarantees all persons in the United States the right to make and enforce contracts on equal terms, regardless of race. The right "to make and enforce contracts" includes the opportunity to enter, on equal terms, the contractual relationship for educational services offered by a private university such as Cornell.

134.    Plaintiffs are Asian-American and therefore members of a protected racial class within the meaning of § 1981.

135.    Both Stanley and Minor Son are objectively qualified for admission to Cornell University.

136.    Stanley earned a 1590 SAT, is a National Merit Finalist, possesses national-level programming accolades, and was objectively evaluated by Google as possessing Ph.D.-level qualifications—credentials that place him in the top echelon of Cornell's applicant pool. Cornell nonetheless denied Stanley admission. But-for his race, Stanley would have received materially different treatment.

137.    Defendants' decision to deny Stanley admission was not made in a vacuum. As detailed in the preceding counts, the University has repeatedly affirmed its commitment to racially balancing its student body, and has continued to rely on "holistic review" as a smokescreen for based admissions even after the Supreme Court's ruling in *SFFA v. Harvard*.

138.    Minor Son, though still in high school, has already demonstrated academic excellence, intellectual maturity, and exceptional extracurricular involvement that place him on track to be a top-tier college applicant. He maintains a perfect 4.0 GPA, outpacing Stanley at the same stage, and exhibits advanced cognitive abilities—including varsity athletic performance,

deep engagement with complex global affairs, and multiple six-second Rubik's Cube solves in official competition.

139.    Many similarly situated, non-Asian applicants were accepted despite having inferior credentials whereas Stanley was rejected.

140.    Cornell's race-based admission standards have discouraged and preemptively prevented Minor Son from contracting with Cornell.

141.    Cornell's President Michael Kotlikoff and its Director of Undergraduate Admissions Shawn Felton—personally implemented and enforced the admissions policies that disadvantaged Stanley and threaten to disadvantage the Minor Son.

142.    The stark statistical disparities in admission rates by race, Cornell's long and well-documented history of defending race-based preferences, and its continued resistance to race-neutral alternatives provide overwhelming circumstantial evidence that Stanley's race was the but-for cause of his rejection. Had he not been Asian American, his application would have received materially different treatment. That is precisely what § 1981 forbids.

143.    Race was the but-for cause of Stanley's rejection and of the Minor Son's imminent loss of a contract opportunity.

144.    By denying Stanley (and deterring the Minor Son) on the basis of race, Defendants impaired Plaintiffs' right to make and enforce a contract for education on equal terms, in violation of 42 U.S.C. § 1981.

145.    As a direct and proximate result, Plaintiffs have suffered, and will continue to suffer, economic loss, emotional distress, and loss of educational opportunity, in an amount to be proven at trial.

146.    Accordingly, Cornell has violated 42 U.S.C. § 1981, and Plaintiffs seek all appropriate legal and equitable remedies.

147.    Plaintiffs seek (a) compensatory damages, including emotional distress and economic loss; (b) punitive damages against the individual Cornell for their willful, malicious conduct; and (c) declaratory and injunctive relief barring further race-based admissions practices.

### COUNT III.    Violation of the N.Y. Executive Law §§ 290–301
### (against all Defendants)

148.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

149.    Section 296(4) of the New York State Human Rights Law ("NYSHRL") makes it unlawful for "any … education corporation or association … to deny the use of its facilities to any person otherwise qualified, or to permit the harassment of any student or applicant, by reason of … race, color, [or] national origin."

150.    Cornell University is an "education corporation" within the meaning of § 296(4) and offers educational services to the public in the State of New York. It is thus subject to the NYSHRL's nondiscrimination mandate.

151.    Plaintiffs Stanley Zhong and the Minor Son are Asian-American and therefore members of a protected class under the NYSHRL.

152.    Both are, or will be, "otherwise qualified" for admission to Cornell: Stanley earned a 1590 SAT, is a National Merit Finalist, and possesses national-level programming accolades; the Minor Son maintains a perfect 4.0 GPA and comparable extracurricular achievement that will render him a top-tier candidate when he applies.

153.    Cornell nevertheless denied Stanley admission—and, by maintaining the same race-conscious policies, places the Minor Son under an imminent threat of identical treatment. This constitutes an adverse action within the meaning of § 296(4).

154.    As detailed above, Cornell has maintained and enforced undergraduate-admissions policies that intentionally disadvantage Asian-American applicants, including, but not limited to, the use of race-proxy "holistic" factors designed to replicate the racial balancing the Supreme Court has outlawed. These practices deny Asian American applicants the full and equal enjoyment of Cornell's educational opportunities in violation of § 296(4).

155.    Cornell's officers Michael Kotlikoff and Shawn Felton personally designed, implemented, and enforced these discriminatory policies and, in doing so, aided and abetted Cornell's violation of the NYSHRL within the meaning of § 296(6).

156.    As a direct and proximate result of Cornell's conduct, Stanley Zhong was denied admission, and the Minor Son faces imminent danger of the same discriminatory treatment. Plaintiffs have suffered, and will continue to suffer, economic loss, reputational harm, emotional distress, and other injuries, in an amount to be determined at trial.

157.    Pursuant to N.Y. Executive Law § 297, Plaintiffs seek (a) declaratory relief that Cornell's admissions practices violate § 296; (b) permanent injunctive relief prohibiting Cornell from considering race, whether directly or through proxies, in undergraduate admissions; (c) compensatory and punitive damages; (d) costs and reasonable attorneys' fees; and (e) such other and further relief as the Court deems just and proper.

**COUNT IV.    Violation of New York Civil Rights Law §§ 40-c and 40-d (against all Defendants)**

158.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

159.    Section 40-c(2) of the New York Civil Rights Law provides that "no person shall, because of race, creed, color, national origin, [or] sex … be subjected to any discrimination in his or her civil rights by any other person, firm, corporation, or institution, or by the state or any agency or subdivision of the state."

160.    Section 40-d authorizes a civil action for violations of § 40-c, permitting both injunctive relief and a statutory penalty of not less than $500 for each aggrieved person who establishes discrimination, together with such other relief as the court deems appropriate. It further requires that "at or before the commencement of any action under this section," the plaintiff serve written notice on the New York Attorney General. Plaintiffs have complied with that notice requirement by serving a stamped copy of this Complaint on the Office of the Attorney General contemporaneously with filing.

161.    Cornell University is an "institution" within the meaning of § 40-c and offers educational programs to the public in the State of New York. The individual defendants, Michael Kotlikoff and Shawn Felton, are "persons" subject to liability because they personally participated in, aided, and abetted the discriminatory conduct alleged herein.

162.    Plaintiffs Stanley Zhong and the Minor Son are Asian-American and therefore members of a protected class. By denying Stanley admission—and by maintaining identical race-based policies that place the Minor Son under imminent threat of the same treatment—Defendants discriminated against Plaintiffs in the exercise of their civil right to pursue higher education on equal terms.

163.    Pursuant to § 40-d, Plaintiffs have served written notice of this action upon the Attorney General of the State of New York contemporaneously with filing this Complaint.

164.    As detailed above, Defendants intentionally discriminated against Plaintiff Stanley Zhong—and, prospectively, against the Minor Son—on the basis of race when evaluating their applications (or prospective applications) for admission to Cornell, thereby denying them equal civil rights in violation of § 40-c.

165.    Defendants' conduct was willful and knowing. They maintained race-conscious policies, disguised as "holistic" review, with the specific purpose and predictable effect of suppressing Asian-American enrollment.

166.    As a direct and proximate result of Defendants' violations of §§ 40-c and 40-d, Plaintiffs have suffered—and, absent injunctive relief, will continue to suffer—irreparable harm, loss of educational opportunity, emotional distress, and other damages.

167.    Pursuant to § 40-d, Plaintiffs seek: (a) a statutory penalty of at least $500 per violation per plaintiff; (b) permanent injunctive relief prohibiting Cornell and its officers, employees, and agents from considering race—whether directly or by proxy—in undergraduate admissions; (c) any additional compensatory damages the Court deems just and proper; (d) where permitted, punitive damages, (d) reasonable attorneys' fees, and (e) costs and such other equitable relief as the Court may deem just and proper.

## V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Stanley and Nan, respectfully request that this Court:

     i.    Declare the Cornell University's admissions practices in violation of Title VI of the Civil Rights Act of 1964, as well as relevant state anti-discrimination laws;

    ii.    Enjoin all Defendants racially discriminatory admissions and hiring practices;

   iii.    Order all Defendants to take all necessary steps to eliminate the effects of past discrimination;

iv.    Order Defendants to pay monetary damages in an amount to be proven at trial in addition to Plaintiffs' reasonable attorney fees and costs;

v.    Order, in the alternative, nominal damages in the amount of $1;

vi.    Grant such other and further relief as this Court deems just and proper.

## JURY DEMAND

**PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

DATE: July 25, 2025               Respectfully submitted,

Michael Thad Allen (700491)
ALLEN HARRIS PLLC
PO Box 404
Quaker Hill, CT  06320
(860) 772-4738
mallen@allenharrislaw.com

### CERTIFICATE OF SERVICE

I hereby certify that on the date appearing in this document, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system. I certify that the following counsel of record are registered as ECF filers and that they will be served by the CM/ECF system

/s/ *Michael Thad Allen*

Michael Thad Allen, Esquire