UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

STANLEY ZHONG and NAN ZHONG,
as next friend of his minor son,

PLAINTIFFS

vs.

CORNELL UNIVERSITY, MICHAEL
KOTLIKOFF, and SHAWN FELTON,

DEFENDANTS.

Civil Case No. 3:25-cv-00365--ECC-ML

RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO
DISMISS

Date: October 7, 2025

**TABLE OF CONTENTS**

Factual background ......................................................................................................... 1

  I.   Cornell's Enduring Pattern of Anti-Asian Discrimination ............................ 1

  II.  "Holistic Review" Is a Pretext for Racial Engineering ................................... 2

  III.  Stanley Zhong ................................................................................................... 6

  IV.  Ongoing Threat to Minor Son .......................................................................... 9

Argument .......................................................................................................................... 9

  I.   The Zhongs' Discrimination Claims Should Proceed to Discovery ............... 9

    A.  The 12(b)(6) Legal Standard .......................................................................... 9

    B.  Legal Standard for Title VI and *SFFA* ...................................................... 10

  II.  12(b)(1) – Standing Standard ........................................................................ 19

    A.  Stanley Zhong Has Standing for Claims of Past Discrimination ............... 21

    B.  Both Plaintiffs Have Standing for Prospective Relief ................................. 21

  III.  The § 1981 Claim Also Survives ................................................................... 23

  IV.  The Zhongs' State Law Claims Should Proceed for the Same Reasons ........ 24

Conclusion ...................................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Adarand Constructors, Inc. v. Peña*, 515 U. S. 200, 115 S. Ct. 2097, 132 L. Ed. 2d 158......................12, 28

*Annabi v. N.Y.U.*, No. 22-cv-3795 (LJL), 2024 U.S. Dist. LEXIS 169857 (S.D.N.Y. Sep. 20, 2024) 17, 23

*Ashcroft v. Iqbal*, 556 U.S. 662, 670, 129 S. Ct. 1937 (2009) ............................................................10

*Askin v. Dep't of Educ. of City of N.Y.*, 110 A.D.3d 621, 973 N.Y.S.2d 629, 630 (1st Dep't 2013) ........30

*Barrett v. Forest Labs.*, Inc., 39 F. Supp. 3d 407 (S.D.N.Y. 2014) ..................................................14, 15, 21

*Bell Atl. Corp. v Twombly*, 550 US 544 (2007) ....................................................................................10, 11

*Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000) ....................................................................30

*Buon v. Spindler*, 65 F.4th 64, 79 (2d Cir. 2023)......................................................................................21

*Burgis v. N.Y.C. Dep't of Sanitation*, 798 F.3d 63, 69 (2d Cir. 2015) ......................................................16

*Chinese Am. Citizens All. of Greater N.Y. v. Adams*, 116 F.4th 161 (2d Cir. 2024)......................15, 19, 25

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S. Ct. 1138, 1147 (2013) ......................................24

Eng v. City of N.Y., 715 F. App'x 49, 52 (2d Cir. 2017)............................................................................31

*Ex parte Young, 209 U.S. 123, 28 S. Ct. 441 (1908)* ................................................................................22

*Faculty Alumni, & Students Opposed to Racial Preferences v. N.Y. Univ.*, 11 F.4th 68 (2d Cir. 2021) ... 25, 28

*Fisher v. University of Tex. at Austin*, 570 U. S. 297, 311-312, 133 S. Ct. 2411, 186 L. Ed. 2d 474 (2013) ............................................................................................................................................13

*Gonzalez de Fuente v. Preferred Home Care of N.Y. LLC*, 858 F. App'x 432, 433 (2d Cir. 2021) ..............23

Gordon v. PL Long Beach, LLC, 2010 NY Slip Op 4954, ¶ 4, 74 A.D.3d 880, 885, 903 N.Y.S.2d 461, 466 (App. Div. 2nd Dept.) ....................................................................................................31

*Gratz v. Bollinger*, 539 U. S. 244, 123 S. Ct. 2411, 156 L. Ed. 2d 257 (2003) ......................12, 25, 27, 28

*Grutter v. Bollinger*, 539 U. S. 306, 326, 123 S. Ct. 2325, 156 L. Ed. 2d 304 (2003)................................13

*Hardie v. City of Albany*, No. 1:18-CV-470 (GLS/CFH), 2019 U.S. Dist. LEXIS 184833, at *6 (N.D.N.Y. Oct. 25, 2019)................................................................................................................10

*Hazelwood* at 307-308................................................................................................................................16

*Heckler v. Mathews*, 465 U.S. 728, 104 S. Ct. 1387 (1984) ...........................................................25

*Hines v City of Albany*, 542 F Supp 2d 218, 227 (NDNY 2008) ...................................................11

*Hudson v. Int'l Bus. Machs. Corp.*, 620 F.2d 351, 355 (2d Cir. 1980) ...........................................17

*Iqbal*, 556 U.S. at 678 ...................................................................................................................11

*Kubicek v. Westchester Cty.*, No. 08-CV-372 (KMK), 2009 U.S. Dist. LEXIS 117061, at *39 (S.D.N.Y. Oct. 8, 2009) ..........................................................................................................................30

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) .............14

*MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy*, 861 F.3d 40, 45 (2d Cir. 2017) ...........................26

*Ottaviani v. SUNY at New Paltz*, 875 F.2d 365, 371 (2d Cir. 1989) ...............................................17

*Packer v Raging Capital Mgt., LLC*, 105 F.4th 46, 49 (2d Cir 2024) ..............................................25

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748, 127 S. Ct. 2738, 2768 (2007) ..................................................................................................................................13

*Rice v. Cayetano*, 528 U. S. 495, 517, 120 S. Ct. 1044, 145 L. Ed. 2d 1007 (2000) ...................................13

*Runyon v. McCrary*, 427 U.S. 160, 168-169, 96 S. Ct. 2586, 2593-2594, 49 L. Ed. 2d 415 (1976)..........29

*Soule v. Conn. Ass'n of Sch., Inc.*, 90 F.4th 34, 46 (2d Cir. 2023) ...................................................24

*Stoler v. Inst. for Integrative Nutrition*, 13 Civ. 1275, 2013 U.S. Dist. LEXIS 163796, 2013 WL 6068598, at *7 (S.D.N.Y. Nov. 18, 2013) ..............................................................................................16

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 143 S. Ct. 2141 (2023).....................................................................................................................2, 3, 11, 12

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 134 S. Ct. 2334, 2341 (2014) ...........................24

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 122 S. Ct. 992 (2002) ........................................11

*Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001) ...............................................................30

*U.S. EEOC v. Bob Evans Farms, LLC*, 275 F. Supp. 3d 635, 652 (W.D. Pa. 2017) ...............................20

*U.S. v. City of N.Y.*, 717 F.3d 72 (2d Cir. 2013)...........................................................14, 15, 16

*Uzuegbunam v. Preczewski*, 592 U.S. 279, 141 S. Ct. 792 (2021) .......................................... 24, 26

*Watson v. N.Y. Pressman's Union No. 2, NYP Holdings, Inc.*, 444 F. App'x 500, 501 (2d Cir. 2011)........10

**Statutes**

42 U.S.C. § 1981 ...................................................................................................................1

New York Civil Rights Law (NYCRL), N.Y. Civ. Rights Law §§ 40-c & 40-d..........................1, 30, 31

New York State Human Rights Law (NYSHRS), N.Y. Exec. Law §§ 290–301 .............................1, 30

Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq...............................................1, 11, 12

**Other Authorities**

Equal Protection Clause...........................................................................................................2, 10, 24

**Rules**

Federal Rule of Civil Procedure 12(b)(6)....................................................................................9

In accord with N.D.L.R. 7.1, Plaintiffs Stanley Zhong and Nan Zhong, proceeding as the next friend of his Minor Son, respectfully oppose Defendants' Motion to Dismiss.  ECF No. 34.

## FACTUAL BACKGROUND

Plaintiffs Stanley Zhong and his father, Nan Zhong (on behalf of his Minor Son), bring this civil action against Cornell University and its officials for intentional racial discrimination in undergraduate admissions. Plaintiffs allege that Cornell rejected Stanley—a highly qualified Asian American applicant—because he is Asian, and that by maintaining the same race-conscious admissions policies, Cornell places the Minor Son under an imminent threat of similar discrimination. These actions violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.; 42 U.S.C. § 1981; the New York State Human Rights Law, N.Y. Exec. Law §§ 290–301; and the New York Civil Rights Law, N.Y. Civ. Rights Law §§ 40-c & 40-d (ECF No. 28 ("Amended Complaint" or "AC"), ¶¶ 1–2).

## I. CORNELL'S ENDURING PATTERN OF ANTI-ASIAN DISCRIMINATION

Asian Americans have long endured exclusion and prejudice in the United States, from the Chinese Exclusion Act to Japanese internment (ECF No. 28 ("Amended Complaint" or "AC"), ¶ 18). In higher education, this history has mutated into subtler but no less pernicious racial discrimination. Colleges, including Cornell, systematically hold Asian applicants to higher standards while advantaging other preferred racial groups (AC, ¶¶ 19–23). Studies confirm what is widely known among students, parents, and admissions professionals alike: being Asian is a liability in college admissions (AC, ¶¶ 20–24).

Cornell epitomizes this pattern. For decades, Cornell has openly defended race-based admissions as its institutional mission. Cornell's own publications acknowledged the university's longstanding use of race as a substantial motivating factor in admissions, describing it as essential to building a so-called "diverse" student body. (AC, ¶ 28).

Cornell's leadership has repeatedly framed race-based **exclusion** as though it were a fulfillment of an **inclusive** mission. For example, former President Martha Pollack (up to June 2024) regularly invoked Cornell's founding motto—"any person, any study"—as a justification for race-conscious admissions, presenting discriminatory policies as if they embodied inclusion rather than undermined it (AC, ¶ 29).

At Cornell, as at many elite colleges, Asian Americans endure a dual-indignity—first, they are subjected to systemic discrimination in the admissions process; then, should they be lucky enough to reach campus and object to that injustice, they are vilified as opponents of "equity" or "allies" of the "oppressor class" or branded "white adjacent" or "racist." (AC, ¶ 27). Cornell condemns discrimination against some groups but celebrates discrimination against Asian Americans and other groups. (AC, ¶ 27).

Cornell's commitment to race-based admissions was unmistakable at the time that Stanley applied (2023), in the lead-up to *Students for Fair Admissions v. Harvard*, 600 U.S. 181 (2023). (AC, ¶ 32). Cornell joined fifteen other elite universities in filing an amicus brief urging the Supreme Court to "reaffirm[] their right to consider race and ethnicity" in admissions (AC, ¶¶ 32–33). Cornell's own brief thus revealed the perverse reality that, for Asian Americans, acknowledging one's lived experience as Asian is itself a liability in the admissions process (AC, ¶ 34-35).

## II. "HOLISTIC REVIEW" IS A PRETEXT FOR RACIAL ENGINEERING

Over Cornell's protestations, the Supreme Court in *Students for Fair Admissions v. Harvard* held that race-based admissions policies violate the Equal Protection Clause and that equal protection applies to all racial groups alike—including those, like Asian Americans, whom Cornell and other institutions have labeled "overrepresented" (AC, ¶¶ 38, 41). But even on the day the Supreme Court issued its decision, Cornell's then-President Pollack expressed "disappointment" that race-conscious admissions were deemed unconstitutional (AC, ¶¶ 41). Cornell's Vice Provost for Enrollment assured

the community that the school remained "fully committed" to producing its preferred "compositionally diverse class" (i.e., racially engineered) through "holistic review" (AC, ¶¶ 41–42). These are admissions that Cornell would seek "backdoor" workarounds to achieve the same race-based outcomes the Constitution forbids (AC, ¶¶ 43–45). Thus, here as elsewhere, Cornell indicated that it's "holistic review" is race conscious and indicates the intent to discriminate.

Cornell's so-called "holistic review" is a euphemism for racial balancing. (AC, ¶¶ 48). While framed as individualized assessment, in practice it enables admissions officers to mask discriminatory stereotypes—dismissing Asian American applicants as "textureless math grinds," for example—based on a smokescreen of criteria such as "fit" or "individualism" (AC, ¶¶ 51, 63–64). This system is designed to conceal racial discrimination, not eliminate it.

Cornell concedes as much in its own words, arguing that authentic holistic review is "impossible" unless applicants are first classified by race, because "a 'race-blind' version of holistic review would not be a holistic review at all." (AC, ¶ 53). According to Cornell, "no race-neutral alternative presently can fully replace race-conscious individualized and holistic review." (AC, ¶ 44).

Cornell's responses to the *SFFA* were part of a deliberate, long-term plan to circumvent Supreme Court law. Months before the Supreme Court even heard arguments, then-President Martha Pollack convened a Presidential Task Force on Undergraduate Admissions to design "mission-directed" policies aimed at securing Cornell's preferred racial outcomes (AC, ¶ 57). The goal was not compliance with the law but getting around it.

One hallmark of this strategy was an "identity-focused" supplemental essay crafted to elicit precisely the racial and cultural background information that used to be collected through a simple check-box. In practice, Cornell merely swapped a check box for a 250-word narrative, allowing admissions officers to continue using race under the guise of "holistic review"—with the added benefit of plausible deniability (AC, ¶ 58).

At the same time, Cornell stripped away the most objective yardstick available by eliminating SAT and ACT requirements, a policy it has maintained since 2021 (AC, ¶ 61). By discarding standardized testing, Cornell ensured that admissions decisions would lean even more heavily on subjective criteria—such as "fit" or "contribution to campus culture"—which are easily manipulated to advance predetermined racial outcomes (AC, ¶ 62).

Moreover, Cornell's admissions process makes true individualized review impossible. (AC, ¶ 59). Admissions officers are expected to process nearly nine applications per hour—less than seven minutes per file—forcing them to rely on crude shortcuts rather than any genuine individual assessment (AC, ¶ 59). In practice, this breakneck pace combined with the test-optional policy guaranteed that "holistic review" functions not as a safeguard of merit, but as a mechanism for embedding racial preferences by another mechanism.

The effects of these disguised policies are evident in Cornell's admissions outcomes. Even as Asian Americans have become the fastest-growing demographic group in both New York and the nation, Cornell's Asian enrollment has remained trapped within a narrow band, around 18–20% (AC, ¶ 88). By contrast, Cornell admits a disproportionately higher number of Black students, so high that this defies any explanation grounded in merit-based selection, a proportion that would, if they were equally qualified, capture more than 7% of the nation's top-scoring Black applicants, while admitting only about 1% of similarly high-achieving Asian students (AC, ¶¶ 89–99). These numbers confirm what Cornell's leadership already acknowledges: the University could not achieve so-called "diversity" goals without manipulating its admissions process—including through the new "identity essay"—to suppress Asians and engineer its preferred, pre-determined racial "balance" (AC, ¶ 100).

As comparators, the Amended Complaint indicates that, at the very least, Cornell overwhelmingly prefers black students with lesser qualifications. AC, ¶ 87-100. This can be demonstrated statistically by first comparing the average distribution of merit among black college-

bound students nationally based on the College Board's 2023 SAT Suite of Assessments Annual Report with Defendants' extraneous evidence.[1]

In its available statistics nearest in time to the year in which Stanley applied (class of 2025, applied 2021), Cornell reports that it admits few students (less than 25%) who score less than a combined 1450 on the SAT.[2] Half of Cornell students score at least 1510 and above, only a mere 60 points further up the scale. In short, it is reasonable to infer that Cornell admits almost no one who scores below 1400 on the SAT (a full 50 points below its 25% mark).

Among the national population of students who took the SAT in 2023, 194,108 were Asian, and 225,954 were black.[3] However, fully 25% of the Asian students scored in the range of 1400 to 1600. 1% of Black students scored in this same range. This indicates that a total of 48,527 Asian students were applying to college in this range compared to 2,260 black students. The ratio between these two populations is a little more than 21:1.[4] Yet the ratio of Asian to black students at Cornell has been confined to a narrow band that is woefully lower, between a minimum of 2.25 to 1 (class of 2022) and a maximum of 3.13 to 1 (class of 2018).[5] Over a decade Cornell has maintained an average of 2.7 Asian students to 1 black students. This gross disparity can only be explained by Cornell's racial preferences. AC, ¶¶ 87-100. And similar disparities could be backed out of the statistics for other racial categories.

Cornell's illegal discrimination has drawn scrutiny from federal regulators. On March 14, 2025, the U.S. Department of Education's Office for Civil Rights ("OCR") announced a nationwide Title

---

[1] Avail. https://reports.collegeboard.org/media/pdf/2023-total-group-sat-suite-of-assessments-annual-report%20ADA.pdf.
[2] https://irp.cornell.edu/wp-content/uploads/2021/10/Profile2021-first-year.pdf
[3] See p. 7 at https://reports.collegeboard.org/media/pdf/2023-total-group-sat-suite-of-assessments-annual-report%20ADA.pdf.
[4] That is, 48,527 : 2,260 is equivalent to 21.5 : 1.
[5] All figures from https://irp.cornell.edu/university-factbook/freshman-profile-archives.

VI enforcement initiative targeting universities suspected of maintaining "race-exclusionary practices" in violation of the Civil Rights Act. (AC, ¶ 67). Cornell was identified as a chief offender (AC, ¶ 67).

Cornell's race-conscious decision-making is not confined to student admissions (AC, ¶ 101-102). Its faculty-hiring practices mirror the same sleight-of-hand that it practices in admissions, providing powerful circumstantial evidence of a university-wide commitment to racial engineering (AC, ¶ 101). Despite public claims of race-blind merit, internal communications and whistleblower reports reveal that race and ideological conformity serve as explicit gatekeepers in employment decisions, just as they do in admissions (AC, ¶ 102). The same tools—identity essays and DEI statements—serve the same purpose. (AC, ¶¶ 106-108.) Disguising racial engineering behind facially neutral criteria. As a result, Cornell's-hiring record supplies compelling corroboration that race remains a defining factor in its decision-making, including the rejection of Stanley (and students like him), including the imminent exclusion of the Minor Son. Id.

III.    STANLEY ZHONG

Against this backdrop, Cornell rejected Stanley Zhong's 2023 application to the Computer Science program and would have entered the class of 2027, had Cornell maintained a process free of racial discrimination. (AC, ¶¶ 82–84). Stanley Zhong and his younger brother, the Minor Son, exemplify the extraordinary merit and promise of Asian Americans who nevertheless face systemic racism and intentional barriers when seeking admission to elite universities like Cornell.

Stanley Zhong is a second-generation immigrant with extraordinary academic and extracurricular accomplishments. (AC, ¶¶ 9, 71–72). He graduated from Henry Gunn High School—ranked among the best public schools in California—with a weighted GPA of 4.42, status as a National Merit Finalist, and a near-perfect 1590 SAT score earned without tutoring (AC, ¶¶ 9, 70–71). Cornell's own admissions data confirm that the middle 50% SAT range for admitted students is 1510 to 1560,

placing Stanley's 1590 score well above the 75th percentile of Cornell's incoming class. See Cornell Univ., Common Data Set 2024–2025, available at https://irp.dpb.cornell.edu.

Stanley's record of achievement extends far beyond the classroom. Stanley co-founded OpenBrackets, a nonprofit that provided free coding lessons to more than 500 underserved students, earning the President's Volunteer Service Award (AC, ¶ 72). He distinguished himself in national and international programming competitions, repeatedly outperforming professional engineers in contests hosted by institutions such as Carnegie Mellon, Stanford, MIT, Google, and Meta (AC, ¶¶ 73–74).

Stanley's record also reflects a remarkable innovation and public service. In 2020, after learning from an NPR report that systems were crippling state unemployment programs during the pandemic, he taught himself the programming COBOL, published sample code to GitHub, and volunteered his assistance to the "COBOL Cowboys," who have been tackling these problems and earning recognition from their CEO for doing so (AC, ¶ 76).

The following year, Stanley launched RabbitSign—the world's only unlimited, free, HIPAA-compliant e-signature platform—built entirely on Amazon Web Services "(AWS)" (AC, ¶ 77). RabbitSign was praised by Amazon as one of the best-engineered applications they had reviewed, and it will be featured in an AWS case study. *Id.* *Viewpoint with Dennis Quaid* also profiled Stanley and his platform alongside Fortune 500 CEOs and U.S. presidents for RabbitSign's potential to reduce healthcare costs through secure, accessible digital tools (AC, ¶ 77). Thus, Stanley's skills were recognized at the highest levels of the tech industry. In 2023, Google offered him a full-time software engineering position at a level typically reserved for Ph.D. graduates or equivalent professionals. (AC, ¶ 80). Google's evaluation process—ten hours of rigorous interviews and reviews by multiple, full-time engineers—found him qualified for an L4 role. (AC, ¶¶ 79–80).

In totality, Stanley's credentials placed him in the very top echelon of applicants nationwide, and independent experts could find no legitimate merit-based reason for his rejection (AC, ¶¶ 82–86).

Stanley's academic record, national recognition, and unprecedented professional achievements offered every indication that he was precisely the type of candidate Cornell should have welcomed. *Id.* In line with Cornell's entrenched pattern of disadvantaging Asian applicants, however, the university denied Stanley admission without any merit-based justification (AC, ¶¶ 82–86). Cornell concluded he was unworthy of undergraduate admission in its computer science program. (AC, ¶¶ 79-81.)

Cornell's admissions data reveal stark disparities that cannot be explained by chance or by student preference. In the 2023 cycle, if Cornell's enrollment statistics reflected true, merit-based admissions; this would mean that Cornell enrolled over seven percent of the nation's top Black SAT scorers, but admitted only 4.1 percent of top Hispanic scorers, 1.9 percent of top White scorers, and a mere 1.0 percent of top Asian American scorers (AC, ¶ 93). For a single university competing against dozens of other elite institutions, capturing such a disproportionate share of o the highest-scoring Black students would be statistically extraordinary (AC, ¶ 94).

There are only two conceivable explanations. Either Black students are six to seven times more likely than their Asian American counterparts to choose Cornell over peer institutions—a statistical impossibility given competition among elite universities—or Cornell is selectively raising and lowering its standards depending on race (AC, ¶¶ 95–96). Only the latter explanation is plausible. No one can believe that Cornell, ranked 16th nationally by *U.S. News & World Report*, has somehow "cornered the market" on the nation's most talented black students (AC, ¶¶ 97–98). It is suppressing Asian applicants with the highest talent in favor of black students (among others).

While aggressively enrolling lower-scoring applicants from racial groups it prefers, Cornell excludes objectively qualified candidates who are Asian, including Stanley—an applicant Google itself deemed capable of performing at a Ph.D.-level (AC, ¶¶ 79–81, 93–100).

8

## IV.    ONGOING THREAT TO MINOR SON

Cornell's admissions policies do not merely harm Stanley; they place his younger brother under a credible and imminent threat of the same treatment. Minor Son, though still in high school, will begin the arduous process of preparing for admission within months.  (AC, ¶¶ 10, 110). He follows in his brother's footsteps by earning a perfect 4.0 GPA, competing successfully in varsity athletics, and earning national recognition in Rubik's Cube competitions. (AC, ¶ 111). Minor Son is already positioned as a highly competitive applicant (AC, ¶¶ 110–112). Yet, having witnessed his brother's rejection and understanding Cornell's admissions practices, he reasonably believes that his race dooms his candidacy (AC, ¶¶ 113, 116). He is therefore deterred from even applying, despite his qualifications (AC, ¶¶ 113–118). Cornell's policies thus inflict ongoing harm by depriving both brothers of equal opportunity to pursue higher education free from racial bias.

## ARGUMENT

## I.    THE ZHONGS' DISCRIMINATION CLAIMS SHOULD PROCEED TO DISCOVERY

### A.    The 12(b)(6) Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a cause of action shall be dismissed if a complaint fails "to state a claim upon which relief can be granted."  *Hardie v. City of Albany*, No. 1:18-CV-470 (GLS/CFH), 2019 U.S. Dist. LEXIS 184833, at *6 (N.D.N.Y. Oct. 25, 2019). The Court must construe the complaint liberally, accepting all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor. *Watson v. N.Y. Pressman's Union No. 2, NYP Holdings, Inc.*, 444 F. App'x 500, 501 (2d Cir. 2011).  To survive the motion to dismiss, a complaint's allegations must meet the plausibility standard of *Ashcroft v. Iqbal*, 556 U.S. 662, 670, 129 S. Ct. 1937 (2009) and *Bell Atl. Corp. v Twombly*, 550 US 544, 548 (2007).  That is, whereas a "[t]hreadbare recital[] of the elements of the cause of action, supported by mere conclusory statements do[es] not suffice"; a "heightened fact pleading of specifics" is not required; "but only enough facts to state a claim to relief that is plausible

on its face." *Twombly*, 550 U.S. at 555, 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

However, the Supreme Court has rejected imposing a heightened pleading standard in discrimination cases. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 122 S. Ct. 992 (2002); see also *Hines v City of Albany*, 542 F Supp 3d 218, 227 (NDNY 2008) (emphasizing civil rights claims are subject to a "flexible plausibility standard"). Thus, for example, for their discrimination claims, the Zhongs do not need to plead a prima facie case at this stage. *Id.*

**B.  Legal Standard for Title VI and *SFFA***

*1)  Cornell Must Survive Strict Scrutiny*

The Supreme Court of the United States has set a new standard for Title VI claims in university admissions cases which equates violations of Title VI of the Civil Rights Act of 1964 to violations of the Equal Protection Clause. *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 198 n.2, 143 S. Ct. 2141, 2156 (2023) (hereafter *"SFFA"*). Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 USC § 2000d.  And "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI."  *SFFA*, 600 U.S. at 198 n.2 (quoting *Gratz v. Bollinger*, 539 U. S. 244, 276, n. 23, 123 S. Ct. 2411, 156 L. Ed. 2d 257 (2003)).

There is no dispute, and Defendants raise none, that Cornell receives federal financial assistance.  Therefore, no different from Harvard in *SFFA*, a private institution, Cornell must survive the Constitutional standard of strict scrutiny.  *Id.*  "Any exception to the Constitution's demand for equal protection must survive a daunting two-step examination known in our cases as "strict scrutiny.""

*SFFA*, 600 U.S. at 206 (quoting *Adarand Constructors, Inc. v. Peña*, 515 U. S. 200, 227, 115 S. Ct. 2097, 132 L. Ed. 2d 158 (1995)).  This Court must ask:

> 1) [W]hether the racial classification is used to 'further compelling governmental interests.'
>
> 2) [I]f so, . . . whether the government's use of race is 'narrowly tailored'—meaning 'necessary'—to achieve that interest.

*SFFA*, 600 U.S. at 206-207 (quoting *Grutter v. Bollinger*, 539 U. S. 306, 326, 123 S. Ct. 2325, 156 L. Ed. 2d 304 (2003) and *Fisher v. University of Tex. at Austin*, 570 U. S. 297, 311-312, 133 S. Ct. 2411, 186 L. Ed. 2d 474 (2013)).

Race-based action is not less repugnant when shrouded in high-minded euphemisms like "holistic," "diversity," "equity," or "inclusion."   In fact, Defendants' drenching downpour of euphemisms stands in contrast to Chief Justice Roberts' observation, as dry as it is terse, "The way to stop discrimination on the basis of race is to stop discriminating on the basis of race."  *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748, 127 S. Ct. 2738, 2768 (2007) (overturning decision to uphold school district racial allocations after applying strict scrutiny).   Race-based discrimination rarely survives strict scrutiny for a reason.  *SFFA* at 208.  "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality."  *Id.* (quoting *Rice v. Cayetano*, 528 U. S. 495, 517, 120 S. Ct. 1044, 145 L. Ed. 2d 1007 (2000)).

Cornell cannot survive strict scrutiny here.  In fact, Cornell advances no argument at all about any "compelling" interest because there is none that justifies its discrimination.

*2) Statistical Evidence Shows Racial Discrimination*

Plaintiffs more than raise a minimal inference of discriminatory intent at this stage on a Title VI disparate treatment theory based on Cornell's pattern or practice of discrimination.  Disparate treatment is "the most easily understood type of discrimination" and "the most obvious evil

Congress had in mind when it enacted" the Civil Rights Act of 1964.  *Barrett v. Forest Labs.*, Inc., 39

F. Supp. 3d 407, 426 (S.D.N.Y. 2014) (surviving dismissal and advancing pattern-or-practice claims

in class action along with individual disparate treatment claims of 11 plaintiffs) (quoting *Int'l Bhd. of*

*Teamsters v.  U.S.,* 431 U.S. 324, 335 n.15, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977)); *Zigler v. Jones*, 676

F. Supp. 3d 615, 623 (N.D. Ill. 2023) (individual plaintiff's "allegations amply satisfy[ied] [Title VII]

standard" for "her claim of a 'pattern or practice' of discrimination").  In addition to the familiar

framework borrowed from employment law that is articulated in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), plaintiffs may show disparate treatment

through what is called a "pattern-or-practice suit."  *Barrett* at 426.  A pattern-or-practice claim

requires plaintiffs to show that 'discrimination was the company's standard operating procedure' . . .

[and] . . . directed at a class of victims.'" *Id.* at 426-427 (quoting *U.S. v. City of N.Y.*, 717 F.3d at 83.

This is not a "separate and free-standing cause of action"; it is "merely another method by which

disparate treatment can be shown."[6]  *Id.*

　　　For pattern-or-practice claims "[w]here gross statistical disparities can be shown, they alone

may in a proper case constitute prima facie proof of a pattern or practice of discrimination."  *U.S. v.*

*City of N.Y.*, 717 F.3d 72, 88 (2d Cir. 2013) (quoting *Hazelwood Sch. Dist. v. U.S.*, 433 U.S. 299, 307-

308, 97 S. Ct. 2736 (1977)).  Although "'instances of discrimination against particular [plaintiffs] are

relevant to show a policy of intentional discrimination, they are not required' . . . 'a statistical

showing of disparate impact might suffice.'"  *U.S. v. City of N.Y.*, 717 F.3d 72, 88 (2d Cir. 2013); see

also *Chinese Am. Citizens All. of Greater N.Y. v. Adams*, 116 F.4th 161, 172 (2d Cir. 2024) ("aggregate

disproportionate impact on a particular racial group may be evidence of discriminatory animus or

discriminatory effect").

---

[6] Courts use "pattern or practice" and "pattern and practice" interchangeably, often in the same case, to describe this
theory.  See e.g., *U.S. v. City of N.Y.*, 717 F.3d 72, 82 n.8 (2d Cir. 2013).

In *U.S. v. City of N.Y.*, successful plaintiff-intervenors were both named individual firefighters as well as the Vulcans, an entity formed by black firefighters. *Id.* at 76. They challenged screening procedures for entry-level firefighters. *Id.* Like *Barrett, supra*, the case therefore combined the claims of named individuals with collective plaintiffs under a pattern-or-practice theory of disparate treatment. They used "undisputed statistical evidence showing that black and Hispanic applicants disproportionally failed ... exams." *Id.* at 79. The District Court entered summary judgment in the plaintiff-intervenor's favor on the disparate treatment theory. Although the Second Circuit vacated this portion of the ruling, the plaintiff intervenors were nevertheless remanded for trial. In other words, the intervenors were not entitled to judgment as a matter of law, but their disparate treatment claim on the pattern-or-practice theory survive dismissal and summary judgment. *Id.* at 79, 101. Here, the Zhongs are not required to pass summary judgment, but only the 12(b)(6) hurdle.

*City of N.Y.* shows that a statistically well-grounded pattern-or-practice disparate treatment claim is more than sufficient to survive a motion to dismiss: "The statistical disparities . . . also served to establish a prima facie case on the Intervenors' claim of a pervasive pattern of discriminatory treatment, especially in light of the long-standing pattern of low minority participation in the FDNY." *Id.* at 88 (quoting *Hazelwood* at 307-308, *supra*.) See also *Stoler v. Inst. for Integrative Nutrition*, 13 Civ. 1275, 2013 U.S. Dist. LEXIS 163796, 2013 WL 6068598, at *7 (S.D.N.Y. Nov. 18, 2013) ("In class actions such as this, individual and class issues are not readily separated. Evidence of company-wide policies of discrimination strengthen individual discrimination claims and vice versa").

"[I]n certain circumstances . . ., statistics alone may be sufficient." *Burgis v. N.Y.C. Dep't of Sanitation*, 798 F.3d 63, 69 (2d Cir. 2015) (§ 1981 and equal protection case). "[T]he statistics must not only be statistically significant in the mathematical sense, but they must also be of a level that makes

other plausible non-discriminatory explanations very unlikely." *Id.* (collecting cases, including Title VII case, *Ottaviani v. SUNY at New Paltz*, 875 F.2d 365, 371 (2d Cir. 1989)); see also, *Annabi v. N.Y.U.*, No. 22-cv-3795 (LJL), 2024 U.S. Dist. LEXIS 169857, at *23 (S.D.N.Y. Sep. 20, 2024) ("in some circumstances, statistical allegations will, on their own, be sufficient to prompt an inference of discriminatory intent").

And even where statistical evidence is not dispositive, it may "be used to bolster a claim of race discrimination." *Hudson v. Int'l Bus. Machs. Corp.*, 620 F.2d 351, 355 (2d Cir. 1980) (noting admission of statistical evidence on discrimination claim in case that proceeded to trial). Here, the Zhongs show that Cornell has a decade-long practice of suppressing qualified Asian-American applications so that it may maintain, by way of example, an average student-body ratio of Asian to black admittees of *2.7 to 1*, whereas the actual ratio of qualified Asian students to black students is almost 10 times that, more like *21 to 1* (the year Stanley applied).

*3)  Cornell Fixes the Admission of Asian Students within a Narrow Band*

Defendants main attack is upon Plaintiff's pleaded admissions statistics. Defendants fault Plaintiffs for culling statistics from the wrong years and substitute their own. ECF No. 34-1 at 21. But even if this Court permits Defendants to introduce extraneous evidence, Cornell's own statistics track in near lockstep the statistics that the Supreme Court found dispositive in *SFFA*, 600 U.S. at 222. Chief Justice Roberts noted, "Harvard uses race to 'track how each class is shaping up relative to previous years with an eye towards achieving a level of racial diversity'"; in particular, "black students represented a tight band of 10.0%-11.7% of the admitted pool" from class years 2009-2018. *Id.* And "[t]he same theme held true for other minority groups":

14

| Share of Students Admitted to Harvard by Race | | | |
|---|---|---|---|
| | African-American Share of Class | Hispanic Share of Class | Asian-American Share of Class |
| Class of 2009 | 11% | 8% | 18% |
| Class of 2010 | 10% | 10% | 18% |
| Class of 2011 | 10% | 10% | 19% |
| Class of 2012 | 10% | 9% | 19% |
| Class of 2013 | 10% | 11% | 17% |
| Class of 2014 | 11% | 9% | 20% |
| Class of 2015 | 12% | 11% | 19% |
| Class of 2016 | 10% | 9% | 20% |
| Class of 2017 | 11% | 10% | 20% |
| Class of 2018 | 12% | 12% | 19% |

*Id.* Importantly, the Supreme Court did not cavil about comparing class populations to admitted populations or graduating populations. *Id.*; compare ECF No. 34-1 at 20 (arguing "enrolled class does not necessarily encapsulate or represent the <u>admitted</u> class for the same year").

That argument is a red herring. The Supreme Court drew the same conclusion that this Court should draw: "Harvard's focus on numbers is obvious." *Id.* And Harvard's numbers for Asian students are nearly identical to those Cornell posts up here. The two universities' number series even overlap for the eight years from 2010-2018 with only one real difference: Cornell's numbers are **even lower**.

| Share of Students Admitted by Race | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Class Year | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| Harvard[*] | 18% | 18% | 19% | 19% | 17% | 20% | 19% | 20% | 20% | 19% | . . . | . . . |
| Cornell[**] | . . . | 14.9 | 16.4 | 16.9 | 16.5 | 19.1 | 20.1 | 18.1 | 19.1 | 18.7 | 20.1 | 22.4 |
| * *SFFA* at 222.  ** ECF No. 34-1 at 21 | | | | | | | | | | | | |

Cornell emphasizes that its Asian population started from a lower base (14.9% in 2010). ECF No. 34-1 at 16-17. But the Court should not reward Cornell for even more vicious discrimination against Asians compared to Harvard prior to 2014. Harvard was found liable despite admitting **3%-4% more** Asians during the same time period. *SFFA*, 600 U.S. at 222.

Moreover, a "slight overall increase in Asian-American admission . . . is of no comfort to the individual Asian-American students who were disproportionately excluded. . ." *Chinese Am. Citizens*

*All. of Greater N.Y. v. Adams*, 116 F.4th 161, 177 (2d Cir. 2024) (reversing summary judgment on Asian-American's Equal Protection claim, where New York's elite public schools eliminated applicants from roughly half of Asian-majority schools).

Finally, Cornell raises the issue of admissions statistics in its engineering program as supposedly different from its general admissions. However, this is merely a dispute of fact which discovery will resolve. The Zhongs have no doubt that the disproportionate discrimination against qualified Asians in engineering is even more drastic, given the disproportionate preponderance of STEM skills among Asian-American applicants.

Whether the Court relies upon Cornell's own extraneous evidence to establish the statistics or on the Zhongs' numbers, the numbers don't lie. Cornell, along with its peer institutions, suppressed Asian American admissions within a narrow band. All of these institutions now call this discriminatory practice "holistic" review. *SFFA*, 600 U.S. at 298.

4) *Cornell's Policies, Patterns, and Practices of Discrimination*

Plaintiff has pleaded evidence of overt policies of racial discrimination which necessarily had only one outcome for the Zhongs: their unfair elimination by Cornell because they are Asian.

First, both Stanley and Minor Son have superlative qualifications. Stanley was a National Merit Scholar finalist.[7] *Id.* He earned a 1590 on the SAT, at a time when Cornell's 75th percentile for the class of 2023 was 1540.[8] (AC, ¶ 71.) In addition, he excelled in entrepreneurial activities, volunteer service, and global competitions in computing. *Id.*, ¶ 72-77. Stanley's weighted GPA far exceeded the vaunted 4.00 at one of the highest ranked high schools in California. (AC, ¶ 70.)

---

[7] Of whom there were only 7,250 in 2023. See https://www.nationalmerit.org/s/1758/blog.aspx?sid=1758&gid=2&pgid=1740&cid=2686&ecid=2686&crid=0&calpgid=567&calcid=1366.
[8] See PROFILE: CLASS OF 2023, https://irp.dpb.cornell.edu/wp-content/uploads/will 2019/08/Profile2019-Freshmen.pdf, accessed Oct. 2, 2025.

Where Cornell rejected Stanley, Google snapped him up in lieu of candidates with the equivalent of a PhD or analogous industry experience. *Id.*, ¶ 80-81.

Minor Son is clearly following in his brother's footsteps yet consequently also faces Cornell's race-fueled scorn. *Id.*, ¶ 110-118. He is now a high school junior and is already embarking upon preparations for application. *Id.*, ¶ 110. He has a perfect unweighted 4.0. *Id.*, ¶ 111. He is also a varsity athlete and competes at the national level in Rubik's Cube competitions and juggling festivals. *Id.*, ¶ 112. Both Zhongs are eminently qualified.

But Cornell repeatedly emphasizes that race is a qualification in "holistic review," which it simply whitewashes as "diversity" and "inclusion." *Id.*, ¶ 42. Cornell has pleaded with the Supreme Court of the United States that there is "no race-neutral alternative presently" that can replace "race-conscious individualized and holistic review." Although perhaps not dispositive, this is still evidence of discriminatory intent. See *U.S. EEOC v. Bob Evans Farms, LLC*, 275 F. Supp. 3d 635, 652 (W.D. Pa. 2017).("Even if so-called stray remarks are not direct evidence, they do provide background evidence and can support a finding of . . . discriminatory motive").

Cornell adopted "holistic review" to increase enrollment of "underrepresented minorities" at the expense of more qualified Asian applicants. *Id.*, ¶ 50-51. Cornell has argued that "race-blind" review of applicants cannot be "holistic . . . at all." *Id.* ¶ 53. In addition, at least one Cornell emeritus trustee, Jon Lindseth, with knowledge of Cornell's operations, openly calls for the resignation of Cornell's President and Provost due to "identity based" admission preferences. *Id.*, ¶ 65. Unsurprisingly, Cornell has been identified in a sweeping Title VI enforcement initiative for its "race-exclusionary practices." *Id.*, ¶ 67.

Cornell's responds by disputing the Zhongs' facts, which is not appropriate at this stage. In particular, Cornell argues that the Zhongs do not plead facts concerning its current admissions practices. ECF No. 34-1 at 24. But the Zhongs are not required to know the intimate details of

17

Cornell's discriminatory admissions process at this stage because Cornell's "managers' reasons for taking these actions—legitimate or otherwise—are appropriately addressed after discovery." *Barrett*, 39 F.Supp. at 447; *see also Buon v. Spindler*, 65 F.4th 64, 79 (2d Cir. 2023) ("[b]efore discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formulation of the required prima facie case in a particular case").

For the same reason, Defendants' attempt to silo its College of Engineering's admissions from its University-wide policies is an inappropriate dispute of facts. The Zhongs' Amended Complaint adequately pleads Defendants' discriminatory intent as articulated by University-wide leadership through President Pollack and Vice Provost Nishii and how this ethos infects all aspects of Cornell's operations, including hiring.

Cornell also disputes the "actual substance" of its officers' discriminatory articulation of policy. ECF No. 34-1 at 25. They emphasize that Cornell supposedly complied with *SFFA* **after** Stanley's application had been rejected. *Id.* But these are again disputes of fact, and the latter has no bearing on Stanley's claim. *Id.* It is unclear why Cornell raises the post-*SFFA* argument, other than perhaps confusion with actions against state actors under *Ex parte Young, 209 U.S. 123, 28 S. Ct. 441 (1908)*, which are predicated on grounds for prospective relief.

Defendants' draw upon many summary judgment cases, which only buttresses the Zhongs' argument that they are entitled to discovery. Compare e.g., *Weiss v. CUNY*, No. 17-CV-3557 (VSB) (VF), 2025 LX 104862 (S.D.N.Y. June 23, 2025) (deciding summary judgment only after discovery based on argument concerning admissions data); *Weser v. Glen*, 190 F. Supp. 2d 384 (E.D.N.Y. 2002) (same).

Defendants provide a large block quote from *Doe v. N.Y. Univ.*, No. 23-CV-10515 (VSB), (S.D.N.Y. May 30, 2024). There an Asian student alleged that he was excluded from NYU's Law Review. *Id.* at *8. But he could show no statistics of discrimination, such as the Zhongs show here,

and his case did not advance a pattern-or-practice theory.  In fact, the only numerical analysis the plaintiff raised was that the NYU Law Review invited only 55 students out of a class of 430 to join. *Id.* at *4 n.4.  The plaintiff offered no factual allegations to support his assertions that the Law Review preferred select minority groups.  *Id.* at *14.  But the Zhongs have pleaded these facts, including quoting Cornell's officers, indicating that when Cornell invokes lofty rhetoric of "diversity," what it means specifically is "race."

Leaning on another NYU case, *Annabi v. N.Y. Univ., No. 22-cv-3795 (LJL), 2024 U.S. Dist. LEXIS 169857, at *2 (S.D.N.Y. Sep. 20, 2024)*, Defendants compare Stanley and Minor Son to a disgruntled *pro se* plaintiff they identify as an "Arabic male," who failed in a competitive entrepreneurship competition.  Contrary to Defendants' stylization of this case as presenting "more detailed allegations regarding the defendants' admissions practices than Plaintiffs do here" (ECF No. 34-1 at 28); Annabi "did not allege … any remarks indicating animus on the basis of race or national origin or [that] otherwise evinced such animus"; and did not allege that the "judges were aware of the race, national origin, or gender of any applicant."  *Id.* at *15-*16, *19.  As to statistical evidence, not only did Mr. Annabi confront the problem of an extremely low N (22 award recipients), he could only allege that one white woman and then (upon re-pleading) another black woman were chosen rather than himself.  *Id.* at *16-*18.  Furthermore, he could not demonstrate his own superlative qualifications compared to the other applicants.  *Id.*  By contrast, the Zhongs show by Cornell' own statistics that it suppresses the applications of qualified Asians and has done so for over a decade, keeping them within an iron bracket of approximately 2.7:1 (i.e., compared to black students).

## II.    12(B)(1) – STANDING STANDARD

To establish Article III standing, a plaintiff must demonstrate (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief.

*Gonzalez de Fuente v. Preferred Home Care of N.Y. LLC*, 858 F. App'x 432, 433 (2d Cir. 2021).

The injury-in-fact requirement ensures that the plaintiff has a personal stake in the controversy. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 134 S. Ct. 2334, 2341 (2014). And the injury must not be conjectural or hypothetical. *Id.* However, "for the purpose of Article III standing, nominal damages provide the necessary redress for a completed violation of a legal right." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 293, 141 S. Ct. 792, 802 (2021). An allegation of future injury may suffice if the threatened injury is "certainly impending"—i.e., or there is a substantial risk that the harm will occur. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S. Ct. 1138, 1147 (2013).

The U.S. Supreme Court identifies "'discriminatory treatment' as an example of a concrete, de facto, injury" for purposes of standing. *Soule v. Conn. Ass'n of Sch., Inc.*, 90 F.4th 34, 46 (2d Cir. 2023) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425-426, 141 S. Ct. 2190, 2205, 210 L. Ed. 2d 568 (2021)). The Supreme Court has "repeatedly emphasized [that] discrimination itself, by perpetuating archaic and stereotypic notions or by stigmatizing members of the disfavored group as innately inferior and therefore as less worthy participants in the political community . . . can cause serious noneconomic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group." *Heckler v. Mathews*, 465 U.S. 728, 739-40, 104 S. Ct. 1387, 1395 (1984). Personal injury from discriminatory treatment is "judicially cognizable" because it involves unequal treatment based on protected characteristics. *Heckler*, 465 US at 738. Injuries may include both tangible harms, such as physical harms and monetary harms, and intangible harms, such as reputational harms, disclosure of private information, and intrusion upon seclusion. *Packer v Raging Capital Mgt., LLC*, 105 F.4th 46, 49 (2d Cir 2024) (citations omitted).

With regard to Minor Son, the Supreme Court has established that a plaintiff challenging discrimination must show that he "was 'able and ready' to apply in the reasonably foreseeable future." *Faculty Alumni, & Students Opposed to Racial Preferences v. N.Y. Univ.*, 11 F.4th 68, 78 (2d Cir. 2021)

(quoting *Carney v. Adams*, 141 S. Ct. 493, 501, 208 L. Ed. 2d 305 (2020) and collecting cases). Thus, in *Gratz v. Bollinger*, 539 U.S. 244, 123 S. Ct. 2411 (2003), two students had standing to attack the University of Michigan's racial preferences in admissions. One plaintiff had previously applied for admission, had been rejected, and said he intended to apply to transfer to the university in the future. The Court found standing even though the plaintiff had not actually submitted a transfer application, noting that whether the applicant had "actually applied" for transfer did not bar him from seeking relief. *Id.* at 285.

### A. Stanley Zhong Has Standing for Claims of Past Discrimination

Stanley Zhong satisfies the standing requirements for his claims challenging Cornell's discriminatory practices during the 2023 application cycle. Stanley applied for admission to Cornell during the 2022-2023 academic year for enrollment in Fall 2023 and was rejected. This completed harm persists regardless of his current enrollment or employment status. Even if he can show no other damages or remedy, nominal damages are an appropriate, cognizable remedy that satisfies redressability. *Uzuegbunam*, 592 U.S. at 293. The harm inflicted by Cornell's discriminatory denial of Stanley's application is complete and concrete. He has adequately pleaded that he was rejected due to racial bias in violation of federal civil rights laws. This past injury provides a sufficient basis for standing to challenge the discriminatory practices, regardless of whether he intends to reapply. *Heckler*, 465 US at 738; *Soule*, 90 F.4th at 46; *MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy*, 861 F.3d 40, 45 (2d Cir. 2017).

### B. Both Plaintiffs Have Standing for Prospective Relief

Both Stanley and Minor Son also have standing to seek prospective relief challenging Cornell's ongoing discriminatory admissions practices. They allege that Cornell continues to engage in racial discrimination in admissions but has merely fashioned "new levers to pull in order to get the same

race-based results" following *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 198 n.2, 143 S. Ct. 2141, 2156 (2023).  (AC, ¶ 43.)

Stanley's standing for prospective relief is supported by his demonstrated interest in Cornell and the ongoing nature of the alleged discrimination. While defendants claim Stanley does not intend to reapply, the complaint establishes his continued interest in challenging Cornell's discriminatory system that doomed his original application. The fact that Stanley obtained employment at Google after his rejection demonstrates his qualifications.  It also demonstrates that he remains a superlative candidate for educational opportunities at Cornell.  But simply because Google does not discriminate on the basis of race as does Cornell, Stanley's success there does not extinguish his claim to prospective relief against Cornell.

Minor Son's standing is established through his concrete plans to apply to Cornell and his likewise superlative achievements.  See e.g., *Gratz v. Bollinger*, 539 U.S. at 285.  Furthermore, the Amended Complaint alleges that guidance counselors and admissions consultants counsel Minor Son and other Asian-American students concerning "the harsh reality that Asian identity is a liability."  AC, ¶ 36.  Thus, Minor Son suffers a present injury in the form of the chilling effect on his educational aspirations and limited opportunities through the application process going forward.

Defendants' rely on an overly restrictive interpretation of the "ready and able" standard they draw from *Faculty Alumni & Students Opposed to Racial Preferences v. N.Y. Univ.*, 11 F.4th 68, 77 (2d Cir. 2021).  But there is no absolute requirement to actually apply for benefits. For example, in *Gratz v. Bollinger*, the Supreme Court held that a college student had standing to seek prospective injunctive relief on equal protection grounds against a university's use of race in admissions, even though the student had no pending application for admission as a transfer student. *Gratz v. Bollinger*, 539 U.S. 244, 260, 123 S. Ct. 2411, 2422-23 (2003).  The plaintiff demonstrated standing by showing he was "able and ready" to apply if the discriminatory policy were removed, and the Court explicitly noted that an

actual application was not required to establish standing. *Id.* Similarly, in *Adarand Constructors v. Pena*, 515 U.S. 200, 211-12, 115 S. Ct. 2097, 2105 (1995), the Supreme Court found that a company had standing to challenge race-based presumptions in federal contracts without needing to show it had bid on a specific contract. The company's standing was based on its demonstration of a particularized injury and readiness to bid on future contracts if discrimination were eliminated. *Id.*

Cornell's discriminatory admissions practices inflict ongoing harm, not only on current applicants but also on future ones. The complaint shows that Stanley and Minor Son have already been warned about the systemic discrimination in Cornell's admissions practices, illustrating how each admissions cycle deters qualified Asian students from even applying (AC, ¶¶ 35–37, 113–118). The complaint thus establishes that both Stanley and Minor Son are "ready and able" to benefit from Cornell's admissions process in the absence of discriminatory practices.

Minor Son is actively preparing to apply for college, a process that begins now, e.g., with preparations for standardized tests undertaken with specific university requirements in mind. He has already developed an academic profile suitable to highly selective universities like Cornell. But as alleged, Cornell's discriminatory cloud hangs over this entire process. Minor's guidance counselors and college admissions consultants recognize being Asian is a liability and have conveyed this to him. This direct impact on Minor Son is sufficient to demonstrate a legitimate, imminent stake in ensuring that Cornell complies with the law.

## III. THE § 1981 CLAIM ALSO SURVIVES

Under 42 USC § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts , to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens. § 1981(a).

The Supreme Court has held that § 1981 prohibits intentional racial discrimination in private, as well as public, contracting. *Runyon v. McCrary*, 427 U.S. 160, 168-169, 96 S. Ct. 2586, 2593-2594, 49 L. Ed. 2d 415 (1976); *Duplan v. City of N.Y.*, 888 F.3d 612, 620 (2d Cir. 2018). And seeking admission to a private school is contractual in nature and therefore comes within § 1981. *Runyon*, 427 U.S. at 172.

"[P]laintiffs must meet the same pleading standard for their § 1981 claims as for their § 1983 claims under the Equal Protection Clause . . ." *Kubicek v. Westchester Cty.*, No. 08-CV-372 (KMK), 2009 U.S. Dist. LEXIS 117061, at *39 (S.D.N.Y. Oct. 8, 2009) (quoting *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000) (granting summary judgment on § 1981 claim only after discovery). Thus the § 1981 claim should proceed for the same reasons argued above, which are likewise to be decided under the standards set for the Equal Protection Clause as established by *SFFA*. See also *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001) ("In order to establish a claim based on either statute [Title VI and § 1981], the plaintiff must show, inter alia, that the defendant discriminated against him on the basis of race").

Therefore, for the reasons already argued above, the Zhongs §1981 claim should proceed.

## IV.    THE ZHONGS' STATE LAW CLAIMS SHOULD PROCEED FOR THE SAME REASONS

Plaintiffs have properly stated claims under both New York State Human Rights Law ("NYSHRL") and New York Civil Rights Law ("NYCRL"). To state a claim under NYSHRL, a plaintiff must plausibly allege that they: (1) are a member of a protected class; (2) were qualified for the position or opportunity at issue; (3) suffered an adverse action; and (4) under circumstances giving rise to an inference of unlawful discrimination. *Askin v. Dep't of Educ. of City of N.Y.*, 110 A.D.3d 621, 973 N.Y.S.2d 629, 630 (1st Dep't 2013). NYSHRL claims proceeding in federal court are subject to the same pleading standard as Title VI. *Eng v. City of N.Y.*, 715 F. App'x 49, 52 (2d Cir. 2017). And the New York Civil Rights Law §§ 40-c and 40-d, which prohibits discrimination in civil rights and

public accommodations on the basis of race, is considered coextensive with the NYSHRL. *Gordon v. PL Long Beach, LLC*, 2010 NY Slip Op 4954, ¶ 4, 74 A.D.3d 880, 885, 903 N.Y.S.2d 461, 466 (App. Div. 2nd Dept.).

For the reasons stated in the Title VI section above, Plaintiffs have adequately alleged race-based disparate treatment.  The Zhongs allegations, taken as true, more than suffice to raise a plausible inference of intentional discrimination under NYSHRL and NYCRL.

## CONCLUSION

For the forgoing reasons Defendants Motion to Dismiss should be denied.

Date: October 7, 2025                                   Respectfully submitted,

Michael Thad Allen (435762)
ALLEN HARRIS PLLC
PO Box 404
Quaker Hill, CT  06320
(860) 772-4738
mallen@allenharrislaw.com