

**PENNSYLVANIA OFFICE**
**Samantha K. Harris, Esq.**
**Allen Harris PLLC**

PO Box 673
Narberth, PA 19072
(610) 634-8258
sharris@allenharrislaw.com

**CONNECTICUT OFFICE**
**Michael Thad Allen, JD, PhD**
**Allen Harris PLLC**

PO Box 404
Quaker Hill, CT 06375
(610) 634-8258
mallen@allenharrislaw.com

**Allen Harris Law**

**December 19, 2025**

Hon. Elizabeth C. Coombe, U.S. District Judge
Federal Building and U.S. Courthouse
P.O. Box 7255
Syracuse, NY 13261-7255

**Re-Notification of Supplemental Authority in *Zhong, et al. vs. Cornell Univ.*, *et al.*, No. 3:25-cv-00365--ECC-ML (NDNY)**

Your Honor,

Plaintiff writes to notify the Court of persuasive, supplemental authority issued in a parallel case pending before the United States District Court for the Central District of California, *Students Against Racial Discrimination (SARD) v. Regents of the University of California, et al*., No. 8:25-cv-00192-JWH-JDE (C.D. Cal.).

Only three days ago—and prior to the parties' briefing on Defendants' Motion to Dismiss in the above-captioned case—the Central District of California ruled on the University of California system's motion to dismiss (and motion to strike). The court ruled against the University in relevant part. A copy of that decision is attached to this letter as Exhibit A. *SARD v. Regents of the University of California, et al*., No. 8:25-cv-00192-JWH-JDE, ECF No. 51 (C.D. Cal. Dec. 16, 2025).

Of note, in that case, SARD (an organization of applicants and potential applicants to the University of California system) is challenging discrimination in admissions practices, particularly discrimination against Asian-American and white students.

As do Plaintiffs here, SARD pleaded that the UC schools "engage in racial discrimination in admissions processes" with well-pleaded facts in the form of data and anecdotes. The issue, therefore, is whether those data and anecdotes are sufficient to make SARD's claims of racial discrimination plausible. (*Id.* at PageID #: 521). The court concluded that, "at the pleading stage, they are." (*Id.*)

SARD relied on statistical evidence at the pleading stage similar to that which Plaintiffs in the above-captioned case have placed before Your Honor. See, e.g., *SARD*, ECF No. 26, ¶¶ 23–25, 29, 31–34 (First Amended Complaint) (e.g., "black students with low relative credentials have, at the five UC law schools analyzed collectively, about 10 times the chance to be admitted…" and graph at ¶ 32).

For the Court's convenience, the First Amended Complaint in that case is also attached for reference as Exhibit B. The First Amended Complaint in that case relied, as do the

*December 19, 2025*
*Page 2*

Zhongs, on admissions rates for Black, White, and Asian freshmen indicating a disproportionate admission of Black students compared to White or Asian students with similar or superior qualifications. (*Id.*)

Thank you for your consideration of this matter and for your service.

Sincerely,

Michael Thad Allen

Exhibit A
(Order on Motion to Dismiss)

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STUDENTS AGAINST RACIAL DISCRIMINATION,<br><br>Plaintiff,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA; MARIA ANGUIANO, ELAINE E. BATCHLOR, JOSIAH BEHARRY, CARMEN CHU, MICHAEL COHEN, GARETH ELLIOTT, HOWARD "PETER" GUBER, JOSE M. HERNANDEZ, NANCY LEE, RICHARD LEIB, HADI MAKARECHIAN, ANA MATOSANTOS, ROBERT MYERS, LARK PARK, JANET REILLY, MARK ROBINSON, GREGORY SARRIS, JONATHAN "JAY" SURES, GAVIN NEWSOM, ELENI KOUNALAKIS, ROBERT RIVAS, TONY THURMOND, MICHAEL V. DRAKE M.D., GEOFFREY PACK, and ALFONSO SALAZAR each in their official capacities as regents of the University of California System; | Case No. 8:25-cv-00192-JWH-JDE<br><br>**ORDER REGARDING DEFENDANTS' MOTION TO DISMISS AND STRIKE PLAINTIFF'S AMENDED COMPLAINT [ECF No. 35]** |

RICH LYONS, in his official capacity as chancellor of the University of California at Berkeley;

JULIO J. FRENK MORA, in his official capacity as chancellor of the University of California at Los Angeles;

HOWARD GILLMAN, in his official capacity as chancellor of the University of California at Irvine;

SAM HAWGOOD, in his official capacity as chancellor of the University of California at San Francisco;

PRADEEP K. KHOSLA, in his official capacity as chancellor of the University of California at San Diego;

CYNTHIA K. LARIVE, in her official capacity as chancellor of the University of California at Santa Cruz;

GARY S. MAY, in his official capacity as chancellor of the University of California at Davis;

JUAN SÁNCHEZ MUÑOZ, in his official capacity as chancellor of the University of California at Merced;

KIM A. WILCOX, in her official capacity as chancellor of the University of California at Riverside; and

HENRY T. YANG, in his official capacity as chancellor of the University of California at Santa Barbara,

Defendants.

Before the Court is the motion of Defendants[1] to dismiss and strike the First Amended Complaint of Plaintiff Students Against Racial Discrimination ("SARD").[2] The Court conducted a hearing on this matter in October 2025. After considering the papers in support and in opposition,[3] as well as the argument of counsel at the hearing, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion.

## I. BACKGROUND

SARD filed this action against Defendants in February 2025, alleging that The University of California ("UC") illegally discriminates on the basis of race in admissions processes for all of its undergraduate colleges, law schools, and medical schools. Specifically, SARD asserts that Defendants give discriminatory preferences to non-Asian racial minorities.[4]

To support its claims of racial discrimination, SARD pleads that two individuals—who have knowledge of the admissions process at UCLA's undergraduate college—released materials documenting racial discrimination taking place as part of the school's "holistic" admissions process. SARD further alleges that UC administrators encouraged other UC campuses to adopt that practice.[5] SARD also asserts that disaggregated racial data of admitted students at the nine UC undergraduate colleges demonstrates the convergence of admission rates for Black applicants with overall admission rates, which suggests the existence of impermissible racial considerations in admissions at those schools.[6] SARD points to UCLA undergraduate admissions data for applicants from individual California high schools as exemplary of racial discrimination at all UC undergraduate colleges.[7]

---

[1]     Defendants are The Regents of the University of California (all 25 of whom are named in the First Amended Complaint) and each of the Chancellors of the 10 schools within the University of California.

[2]     *See* Defs.' Mot. to Dismiss and Strike (the "Motion") [ECF No. 35].

[3]     The Court considered the documents of record in this action, including the following papers:  (1) First Am. Compl. (the "Amended Complaint") [ECF No. 26]; (2) Motion; (3) Pl.'s Opp'n to the Motion (the "Opposition") [ECF No. 37]; and (4) Defs.' Reply in Supp. of the Motion (the "Reply") [ECF No. 41].

[4]     Amended Complaint ¶ 8.

[5]     *Id.* at ¶¶ 19-22.

[6]     *Id.* at ¶¶ 23-26.

[7]     *Id.* at ¶ 28.

With respect to UC law schools, SARD refers to a study finding racial discrimination at UC Berkeley School of Law and statistics purporting to show admissions preferences for Black applicants at all five UC law schools.[8]  Finally, with regard to the six UC medical schools, SARD alleges that a simultaneous proportional increase in Black first-year students and a decrease in White first-year students at UCSF medical school after 2020 demonstrate racial discrimination.[9]  SARD also notes the decrease in White and Asian matriculants at UCLA's medical school from 2020 to 2023.[10]

Based upon those allegations, SARD asserts the following three claims for relief:

- violation of Title VI, 42 U.S.C. § 2000d;
- violation of 42 U.S.C. § 1981; and
- violation of the Equal Protection Clause of the Fourteenth Amendment under 42 U.S.C. § 1983.

In August 2025, Defendants filed their instant Motion, and it is fully briefed.[11]

## II.  LEGAL STANDARD

### A.    Motion to Dismiss

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims asserted in a complaint.  *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  In ruling on a Rule 12(b)(6) motion, "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party."  *Am. Family Ass'n*, 277 F.3d at 1120.  Although a complaint attacked by a Rule 12(b)(6) motion "does not need detailed factual allegations," a plaintiff must provide "more than labels and conclusions."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

To state a plausible claim for relief, the complaint "must contain sufficient allegations of underlying facts" to support its legal conclusions.  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are

---

[8]     *Id.* at ¶¶ 29 & 31.

[9]     *Id.* at ¶ 32.

[10]    *Id.* at ¶ 34.

[11]    *See* Opposition; Reply.

true (even if doubtful in fact) . . . ." *Twombly*, 550 U.S. at 555–56 (citations and footnote omitted). Accordingly, to survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," which means that a plaintiff must plead sufficient factual content to "allow[] the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A complaint must contain "well-pleaded facts" from which the court can "infer more than the mere possibility of misconduct." *Id.* at 679.

## B.      Motion to Strike

A court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "'Immaterial' matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994). "Federal courts have frequently exercised their discretion under Rule 12(f) to strike pleadings that exceed the scope of a permitted amendment or do not comply with the court's instructions pursuant to an order granting leave to amend." *Terry v. City of Pasadena*, 2019 WL 2895192, at *8 (C.D. Cal. Apr. 22, 2019) (collecting cases). A court has discretion in determining whether to strike matter from a pleading. *See Fantasy*, 984 F.2d at 1528.

## C.      Leave to Amend

A district court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a). The purpose underlying the liberal amendment policy is to "facilitate decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). Therefore, leave to amend should be granted unless the court determines "that the pleading could not possibly be cured by the allegation of other facts." *Id.* (quoting *Doe v. United States*, 8 F.3d 494, 497 (9th Cir. 1995)).

# III.   ANALYSIS

## A.      Defendants' Motion to Dismiss

### 1.      Standing

Defendants argue that SARD (1) lacks standing because it fails to allege plausibly that it is a genuine membership organization; and (2) at a minimum, lacks standing to challenge admissions practices at UC medical schools because no SARD member is able and ready to apply to those schools.

SARD does not allege that it—the organization itself—suffered injuries, but, rather, it seeks to establish standing based upon injuries to its members. "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

It is axiomatic that to sue on behalf of its members, an organization must have members or constituents who possess indicia of membership. *See id.* at 344-45. Defendants contend that SARD has not plausibly alleged that it is a genuine membership organization and that SARD's constituents do not possess sufficient indicia of membership. The Court disagrees.

SARD pleads that it is a voluntary membership organization incorporated under the laws of California.[12] SARD has "student members," and it was founded in 2024 to "restore meritocracy in academia and eliminate the corrupt and unlawful race and sex preferences that subordinate academic merit to so-called diversity considerations."[13]

To support its position, SARD argues that its membership allegations are indistinguishable from those in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 198-99 (2023) (rejecting the argument that the plaintiff lacked standing because it is not a "genuine" membership organization). As in *Students for Fair Admissions*, SARD has alleged that it is a validly incorporated membership organization, it has articulated its purpose, and it has identified student members. That level of detail is sufficient for SARD to allege plausibly that it is a membership organization. Because SARD is a membership organization, it does not need to allege that its constituents possess sufficient indicia of membership. *See id.* at 201.

Defendants also contend that SARD fails to establish standing to challenge the admissions practices of UC medical schools because SARD's identified member, Individual E, is not ready and able to apply for admission to UC medical schools. A plaintiff such as SARD who, through Individual E, asserts that a discriminatory barrier prevents its member from pursuing an opportunity must allege "concrete fact[s]," *Loffman v. Cal. Dep't of Educ.*, 119 F.4th 1147, 1161 (9th Cir. 2024), sufficient to show that its member is "'able and ready' to pursue the opportunity at issue," *id.* at 1159. That obligation arises from the injury-in-fact standing requirement that mandates that an injury must be "concrete and particularized," as well as "actual or imminent." *Id.* Here,

---

[12]     Amended Complaint ¶ 3.

[13]     *Id.* at ¶¶ 37 & 38.

SARD alleges that Individual E intends to apply for admission to each of UC's six medical schools and that he meets all requirements for admission, including a bachelor's degree from an accredited college and the completion of all required undergraduate courses and lab work, and that he "will take the MCAT before applying to medical school next year."[14]

Defendants argue that because Individual E has not taken the MCAT—a requirement for admission to a UC medical school—he is not able and ready to apply, and, thus, his injury is too hypothetical to confer standing. SARD does not dispute that an MCAT score is a necessary component of a medical school application, nor does SARD dispute that Individual E has not taken the MCAT. SARD merely represents that Individual E plans to take the MCAT before applying to medical school.

The Court concludes that Individual E is lacking an essential element of his application and that he is, thus, not able and ready to apply for admission to any UC medical school. Because SARD does not identify any other member who is able and ready to apply to UC medical schools, it lacks standing to challenge the admissions processes of those schools. Accordingly, the Court **GRANTS** Defendants' Motion to Dismiss with respect to SARD's claims insofar as they depend upon the admissions practices of, or seek relief against, UC medical schools.

Defendants also argue that SARD's Amended Complaint should be dismissed with respect to all UC medical schools because SARD does not allege sufficient facts plausibly to state a claim. However, because SARD lacks standing to challenge the admissions practices of UC medical schools, the Court declines to reach that argument.[15]

### 2. Shotgun Pleading

Defendants assert that SARD's Amended Complaint constitutes an impermissible "shotgun pleading" because it does not allege sufficiently specific facts to render plausible SARD's claims of illegal racial discrimination at each UC undergraduate college, law school, and medical school. Defendants characterize SARD's allegations as blanket accusations that leave Defendants without the ability to make informed responses and that risk provoking uncontrolled discovery. SARD responds that it pleads all that is needed to state a claim by alleging that UC schools "pursue proportional racial

---

[14]    *Id.* at ¶ 53.

[15]    On October 28, 2025—the same date as the hearing on Defendants' instant Motion—SARD filed a Notice of Withdrawal of its Claims Related to Medical School Admissions [ECF No. 45]. The Court expects that SARD will make appropriate revisions in any amended pleading that it elects to file.

representation" and give race "preferences to black and Hispanic applicants"[16]—claims for relief that it supports with "detailed data and anecdotes."[17]

SARD is correct that the breadth of the challenged conduct and requested relief does not, without more, make its Amended Complaint an impermissible shotgun pleading. SARD supports its allegations that UC schools engage in racial discrimination in admissions processes with facts in the form of data and anecdotes. The issue, therefore, is whether those data and anecdotes are sufficient to make SARD's claims of racial discrimination plausible. The Court concludes that, at the pleading stage, they are.

SARD's allegations of fact include racially disaggregated admissions data for all nine undergraduate campuses, data and analysis purporting to show that admissions processes at the five UC law schools engage in racially discriminatory conduct, and exemplary data from UC medical schools purportedly demonstrating the existence of impermissible racial preferences. Those facts are sufficient to meet the plausibility pleading standards of *Twombly* and *Iqbal*. With regard to Defendants' contention that SARD's allegations are so general as to "make it difficult or impossible for defendants to make informed responses,"[18] the Court concludes that SARD's allegations adequately identify which UC schools they concern and provide Defendants with sufficient information to make informed responses. Accordingly, the Court **DENIES** Defendants' Motion with respect to their argument that SARD's Amended Complaint is an impermissible shotgun pleading.

### 3. Sovereign Immunity

Defendants seek the dismissal of SARD's § 1981 and Equal Protection Clause claims, which SARD asserts against only the Chancellor Defendants in their official capacities,[19] on the basis that those Defendants are protected by sovereign immunity. Defendants correctly assert that the Eleventh Amendment bars claims for damages against the Chancellor Defendants acting in their official capacities because the State of California has not waived its sovereign immunity. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985). SARD does not contest that point. Accordingly, the Court **GRANTS**

---

[16]    Amended Complaint ¶¶ 28, 29, & 32.

[17]    Opposition 19:14-18.

[18]    Motion 21:6-9 (quoting *Sollberger v. Wachovia Sec., LLC*, 2010 WL 2674456, at *4 (C.D. Cal. June 30, 2010)).

[19]    The "Chancellor Defendants" are Rich Lyons (Berkeley), Julio J. Frenk Mora (UCLA), Howard Gillman (UC Irvine), Sam Hawgood (UC San Francisco), Pradeep K. Khosla (UC San Diego), Cynthia K. Larive (UC Santa Cruz), Gary S. May (UC Davis), Juan Sánchez Muñoz (UC Merced), Kim A. Wilcox (UC Riverside), and Henry T. Yang (UC Santa Barbara).

Defendants' Motion with respect to SARD's claims for damages arising under § 1981 and the Equal Protection Clause.

Defendants also contend that *Ex parte Young*, 209 U.S. 123 (1908), cannot strip the Chancellor Defendants of their Eleventh Amendment immunity because SARD does not allege a sufficient connection between the Chancellor Defendants and the enforcement of the challenged admissions practices. *Ex parte Young* authorizes a lawsuit for prospective declaratory or injunctive relief against a state official who has allegedly violated a plaintiff's constitutional rights. "[I]t is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party." *Id.* at 157. The Ninth Circuit has further clarified that "[t]hat connection must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit." *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013). Here, Defendants argue that because SARD failed to plead facts that the Chancellor Defendants have any connection to the enforcement of the challenged admissions practices, the Chancellor Defendants cannot fall within the *Ex parte Young* exception.

SARD first responds that it need not anticipate or plead around sovereign immunity because that doctrine is an affirmative defense; SARD maintains that "the Court cannot dismiss its claims for failing to allege facts" connecting the Chancellor Defendants with the challenged conduct.[20] SARD misapprehends the law. SARD is correct that sovereign immunity is an affirmative defense, and, accordingly, "the burden of pleading it rests with the defendant." *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). But that is precisely what Defendants have done in their Motion. SARD need not anticipate a sovereign immunity defense plausibly to state a claim in the first instance, but that procedural nuance does not prevent Defendants from arguing that, taking SARD's allegations as true, the Chancellor Defendants are immune and that there is no basis to conclude otherwise.

SARD next cites *Jackson v. Wright*, 82 F.4th 362 (5th Cir. 2023), for the proposition that the Chancellor Defendants' "governing authority" over UC schools is sufficient to overcome Defendants' sovereign immunity argument. *See id.* at 368; *see also Arizona Students' Ass'n v. Arizona Board of Regents*, 824 F.3d 858, 865 (9th Cir. 2016). However, in both *Jackson* and *Arizona Students' Association*, the operative pleadings alleged some connection between the state officials and the challenged conduct. Indeed, the officials in *Jackson* had "direct supervisory authority over the [university] officials who took the actions at issue." *Jackson*, 82 F.4th at 368. And the plaintiff's complaint in

---

[20]   Opposition 21:23-22:6.

*Arizona Students' Association* "identified [the officials'] changes to [their] fee-collection policies as the sources of ongoing violations of federal law." *Arizona Students' Association*, 824 F.3d at 865. SARD's Amended Complaint, on the other hand, is devoid of allegations of any such connection between the Chancellor Defendants and the challenged conduct.

For the same reason, the Court agrees with Defendants that, in the absence of any facts connecting the Chancellor Defendants to the challenged intentional conduct, SARD fails plausibly to allege that the Chancellor Defendants intentionally violated federal law as required by §§ 1981 and 1983. *See Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 390-91 (1982); *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).

The Court does not conclude that the Chancellor Defendants **cannot** fall within the *Ex parte Young* doctrine, but, based upon SARD's pleading as currently constituted, there is no factual basis to conclude that they could. Accordingly, Defendants' Motion is **GRANTED with leave to amend** with respect to the claims that SARD asserts against the Chancellor Defendants in their official capacities.

### 4.    Request for Damages

SARD prays for punitive and nominal damages in its Amended Complaint. As previously discussed, the Court dismisses all claims for damages against the individual Chancellor Defendants who are sued in their official capacities. Furthermore, SARD concedes that punitive damages are unavailable under Title VI and that the doctrine of sovereign immunity prevents it from seeking damages under its § 1981 and Equal Protection claims. But SARD contends that nominal damages are nevertheless available against institutional Defendants under Title VI.

Defendants argue that SARD—an associational plaintiff—cannot seek damages, including nominal damages, on behalf of its individual members without their participation in the lawsuit. *See Warth v. Seldin*, 422 U.S. 490, 515-16 (1975). SARD counters that an associational plaintiff may seek nominal damages under Title VI because Congress abrogated sovereign immunity for Title VI claims and because participation by an associational plaintiff's members is not required for such damages. SARD cites *Landau v. Corp. of Haverford Coll.*, 789 F. Supp. 3d 401 (E.D. Pa. 2025), in support of its argument. In that case, the district court stated in a footnote that when an associational plaintiff's "only available relief is a nominal damages award, individual plaintiffs need not participate for the claim's vindication." *Id.* at 431 n.20. SARD also cites *California Rifle & Pistol Ass'n, Inc. v. Los Angeles Cnty. Sheriff's Dep't*, 2025 WL 2324625 (C.D. Cal. July 21, 2025), for the proposition that a "request for nominal damages and costs do[es] not require individualized proof from members." *Id.* at *6. In that case, the district court

concluded that an associational plaintiff's standing was not defeated by its request for nominal damages. The Court finds those authorities persuasive.

Thus, because SARD's prayer for nominal damages does not require the participation of SARD's members, and because Title VI abrogates sovereign immunity, the Court **DENIES** Defendants' Motion with respect to SARD's prayer for nominal damages.

## B. Defendants' Motion to Strike

### 1. SARD's Attempt to Incorporate the *Do No Harm* Complaint

Defendants ask the Court to strike SARD's allegation purporting to incorporate by reference "all the allegations that appear in the *Do No Harm* complaint."[21] The plaintiffs in *Do No Harm*—like SARD in this case—claim that the admissions practices of UCLA's medical school illegally discriminate on the basis of race. While Rule 10(c) allows for a statement in another pleading to be adopted by reference, a plaintiff may not "adopt pleadings from a wholly separate action," even when that separate action involves the same parties. *See Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*, 301 F.R.D. 487, 492 (C.D. Cal. 2014) (collecting cases). *Do No Harm* involves entirely different plaintiffs who are litigating similar claims; SARD may not adopt those other plaintiffs' allegations wholesale, in place of pleading its own. Accordingly, the Court **GRANTS** Defendants' Motion to strike with respect to SARD's allegation in its Amended Complaint purporting to incorporate by reference the allegations in *Do No Harm*.

### 2. Allegations Related to Individuals B and C

Defendants request that the Court strike the allegations in SARD's Amended Complaint regarding Individuals B and C, contending that those allegations are immaterial. The Court **GRANTS** Defendants' request.

Individuals B and C allegedly intend to apply for a "master's degree in electrical engineering" and for "admission as an undergraduate transfer," respectively.[22] However, the Amended Complaint disclaims any challenge to "transfer or graduate admissions."[23] SARD counters that its allegations concerning Individuals B and C are nevertheless material because they tend "to show that SARD is a genuine membership organization and that it has members applying to other UC programs in addition to those

---

[21] Amended Complaint ¶ 34 (referring to *Do No Harm v. David Geffen School of Medicine at UCLA*, Case No. 2:25-cv-04131 (C.D. Cal.)).

[22] *Id.* at ¶¶ 43 & 46.

[23] *Id.* at ¶ 58.

that are targets of this lawsuit."[24]  But SARD does not explain how its allegations concerning Individuals B and C are relevant to its status as a membership organization, nor does SARD explain the relevance of its members' applications to UC programs that are **not** the targets of this lawsuit.  Accordingly, the Court **GRANTS** Defendants' Motion to strike with respect to SARD's allegation in its Amended Complaint related to Individuals B and C.

## IV.  DISPOSITION

For the foregoing reasons, the Court hereby **ORDERS** as follows:

1.    Defendants' Motion to Dismiss and Strike [ECF No. 35] is **GRANTED in part** and **DENIED in part**.  Specifically,

  a.    SARD's claims against UC medical schools are **DISMISSED with leave to amend**;

  b.    SARD's claims for damages arising under 42 U.S.C. § 1981 and the Equal Protection Clause of the Fourteenth Amendment are **DISMISSED without leave to amend**;

  c.    SARD's claims against the Chancellor Defendants in their official capacities are **DISMISSED with leave to amend**;

  d.    SARD's allegation in its Amended Complaint purporting to incorporate by reference the allegations in the *Do No Harm* case is **STRICKEN**;

  e.    SARD's allegations in the Amended Complaint related to Individuals B and C are **STRICKEN**; and

  f.    Defendants' Motion is otherwise **DENIED**.

2.    SARD is **DIRECTED** to file an amended pleading, if at all, no later than January 9, 2026.  If SARD chooses to file an amended pleading, then it is also **DIRECTED** to file contemporaneously therewith a Notice of Revisions to First Amended Complaint that provides the Court with a redline version that shows the amendments.  If SARD fails to file its amended pleading by January 9, 2026, then the Court will **DISMISS with prejudice** SARD's claims against the UC medical schools and its claims against the Chancellor Defendants in their official capacities.

---

[24]    Opposition 25:12-16.

3.      Defendants are **DIRECTED** to file their respective responses to SARD's operative pleading no later than January 30, 2026.

**IT IS SO ORDERED.**

Dated:_____December 16, 2025_____

_____
John W. Holcomb
UNITED STATES DISTRICT JUDGE

Exhibit B
(First Amended Complaint)

1   JONATHAN F. MITCHELL *
2   jonathan@mitchell.law
    Mitchell Law PLLC
3   111 Congress Avenue, Suite 400
4   Austin, Texas 78701
    (512) 686-3940
5
6   * admitted *pro hac vice*
7
    WILLIAM J. BROWN JR.
8   California Bar No. 192950
9   bill@brownwegner.com
    Brown Wegner LLP
10  2010 Main Street, Suite 1260
11  Irvine, California 92614
    (949) 705-0081
12
13  *Counsel for Plaintiff*
14  [Additional counsel for Plaintiff on next page]
15              UNITED STATES DISTRICT COURT
16          CENTRAL DISTRICT OF CALIFORNIA
17                  SOUTHERN DIVISION
18
19  **Students Against Racial Discrimination,**        Case No. 8:25-cv-00192
20                      Plaintiff,
21
22  v.
23  **The Regents of the University of**                **First Amended Complaint**
    **California; Maria Anguiano, Elaine E.**
24  **Batchlor, Josiah Beharry, Carmen Chu,**
25  **Michael Cohen, Gareth Elliott, Howard**
    **"Peter" Guber, Jose M. Hernandez,**
26

**Nancy Lee**, **Richard Leib**, **Hadi Makarechian**, **Ana Matosantos**, **Robert Myers**, **Lark Park**, **Janet Reilly**, **Mark Robinson**, **Gregory Sarris**, **Jonathan "Jay" Sures**, **Gavin Newsom**, **Eleni Kounalakis**, **Robert Rivas**, **Tony Thurmond**, **Michael V. Drake M.D.**, **Geoffrey Pack**, **Alfonso Salazar**, each in their official capacities as regents of the University of California System; **Rich Lyons**, in his official capacity as chancellor of the University of California at Berkeley; **Julio J. Frenk Mora**, in his official capacity as chancellor of the University of California at Los Angeles; **Howard Gillman**, in his official capacity as chancellor of the University of California at Irvine; **Sam Hawgood**, in his official capacity as chancellor of the University of California at San Francisco; **Pradeep K. Khosla**, in his official capacity as chancellor of the University of California at San Diego; **Cynthia K. Larive**, in her official capacity as chancellor of the University of California at Santa Cruz; **Gary S. May**, in his official capacity as chancellor of the University of California at Davis; **Juan Sánchez Muñoz**, in his official capacity as chancellor of the University of California at Merced; **Kim A. Wilcox**, in her official capacity as chancellor of the University of California at Riverside; **Henry T. Yang**, in his official capacity as chancellor of the University of California at Santa Barbara,

Defendants.

[Additional counsel for Plaintiff]

Ryan Giannetti*
ryan.giannetti@aflegal.org
America First Legal Foundation
611 Pennsylvania Avenue SE #231
Washington, DC 20003
(202) 964-3721

* admitted *pro hac vice*

Federal law prohibits universities that accept federal funds from discriminating on account of race. *See* 42 U.S.C. § 2000d (Title VI); 42 U.S.C. § 1981. The University of California System is flouting these requirements by using racial preferences in student admissions—a practice that violates the clear and unequivocal text of Title VI and 42 U.S.C. § 1981, as well as the Equal Protection Clause of the Fourteenth Amendment. The plaintiff brings suit to enjoin these discriminatory practices, and to ensure that the defendants comply with their obligations under federal anti-discrimination laws.

## Jurisdiction and Venue

1. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

2. Venue is proper because a substantial part of the events giving rise to the claims occurred in this judicial district and division. *See* 28 U.S.C. § 1391(b)(2). Venue is additionally proper because at least one of the defendants resides in this judicial district and division and all defendants reside in California. *See* 28 U.S.C. § 1391(b)(1).

## Parties

3. Plaintiff Students Against Racial Discrimination (SARD) is a voluntary, non-profit membership organization incorporated under the laws of California. SARD was formed and exists for the purpose of restoring meritocracy in academia and fighting illegal race and sex preferences that subordinate academic merit to so-called diversity considerations. SARD has members who intend to apply and will apply for admission to each of the University of California's nine undergraduate campuses. SARD also has members who intend to apply and will apply for admission to each of the University of California's five law schools and each of its six medical schools. SARD's website

is at https://www.sard.law. Its office and mailing address are located in Santa Ana, California.

4. Defendant The Regents of the University of California is a non-profit educational institution organized under the laws of the state of California. It can be served at its Office of the General Counsel, 1111 Franklin Street, 8th Floor Oakland, California 94607.

5. Defendants Maria Anguiano, Elaine E. Batchlor, Josiah Beharry, Carmen Chu, Michael Cohen, Gareth Elliott, Howard "Peter" Guber, Jose M. Hernandez, Nancy Lee, Richard Leib, Hadi Makarechian, Ana Matosantos, Robert Myers, Lark Park, Janet Reilly, Mark Robinson, Gregory Sarris, and Jonathan "Jay" Sures are appointed regents of the University of California system. They can be served at the Office of the General Counsel, 1111 Franklin Street, 8th Floor Oakland, California 94607. The appointed regents are sued in their official capacities.

6. Defendants Gavin Newsom, Eleni Kounalakis, Robert Rivas, Tony Thurmond, Michael V. Drake M.D., Geoffrey Pack, and Alfonso Salazar are ex officio regents of the University of California system. They can be served at the Office of the General Counsel, 1111 Franklin Street, 8th Floor Oakland, California 94607. The ex officio regents are sued in their official capacities.

7. Defendants Rich Lyons, Julio J. Frenk Mora, Howard Gillman, Sam Hawgood, Pradeep K. Khosla, Cynthia K. Larive, Gary S. May, Juan Sánchez Muñoz, Kim A. Wilcox, and Henry T. Yang are chancellors of the University of California at Berkeley; the University of California at Los Angeles; the University of California at Irvine; the University of California at San Francisco; the University of California at San Diego; the University of

California at Santa Cruz; the University of California at Davis; the University of California at Merced; the University of California at Riverside; and the University of California at Santa Barbara. They can be served at the Office of the General Counsel, 1111 Franklin Street, 8th Floor Oakland, California 94607. Each of the chancellors is sued in his or her official capacity.

BACKGROUND

8.   The University of California system discriminates on account of race when admitting students by giving discriminatory preferences to non-Asian racial minorities. This practice allows applicants with inferior academic credentials to obtain admission at the expense of rejected candidates with better academic credentials. This discriminates against large numbers of Asian-American and white applicants, who are denied admission to UC schools based on their race. And it also harms Hispanic and black students who are often placed at a significant academic disadvantage, and thus experience worse outcomes, because of the university's use of racial preferences. Students of all races are harmed by the University of California's discriminatory behavior.

9.   These racial preferences are illegal under the clear and unambiguous text of Title VI, which prohibits all forms of racial discrimination at universities that receive federal funds and make no exception for diversity-based affirmative-action programs.

10.   They also violate 42 U.S.C. § 1981, which prohibits racial discrimination in contracting and makes no exception for diversity-based affirmative-action programs.

11.   And they violate Proposition 209, a state constitutional amendment approved by California voters in 1996 (and reaffirmed by California voters in

2020) providing that "the State shall not discriminate against, nor grant pref-
erential treatment to, any individual or group on the basis of race, sex, color,
ethnicity, or national origin in the operation of public employment, public
education, or public contracting."

12.    After the voters approved Proposition 209 in 1996, the University of
California (UC) began to institute new admissions policies compliant with
the law, and applied "race-neutrality" to admissions for graduate students
matriculating in 1997 and for undergraduate students matriculating in 1998.

13.    The effects of Proposition 209 upon UC and its students were com-
plex and are still debated by academics. But several major effects are undis-
puted. First, race-blind admissions produced a sharp drop in black freshman
matriculants at UC's most competitive schools (UC Berkeley and UCLA),
but higher enrollment rates of these students at less-elite UC schools (*e.g.*,
UC Davis and UC Irvine), in part because black students who would have at-
tended UC Berkeley or UCLA with a preference were admissible at UC Da-
vis or UC Irvine without a preference.

14.    Second, black students at UC campuses post-209 were generally
closer to their peers in levels of academic preparation, grades, persistence in
STEM fields, and graduation rates—especially rates of graduation in four
years.

15.    Third, all the patterns described above for black students also affect-
ed Hispanic students, though both the reductions in admissions and the im-
provements in academic outcomes were less pronounced for Hispanics, pre-
sumably because Hispanics had received smaller ethnically based preferences
than blacks before Proposition 209.

16.    Fourth, UC launched a variety of initiatives post-209 aimed at im-

proving the high-school-to-UC pipeline for young Californians, especially for those from economically disadvantaged backgrounds. Over the years, according to UC documents, hundreds of millions of dollars were invested in these programs. These measures had a disproportionate and beneficial effect upon black and Hispanic high school students, and led to large increases in black and Hispanic applications to UC schools. For example, the total number of black, in-state applications for freshman-year admission to UC was stagnant in the years before these initiatives (2,191 in 1989, and 2,151 in 1998), but rose rapidly once the initiative began in 1999 (black applicants rose from 2,151 in 1998 to 3,307 in 2006, a greater than 50% increase.).

17. For all of these reasons, the actual number of blacks and Hispanics graduating from UC with bachelor's degrees was far higher for 2006 matriculants than for pre-209 matriculants, and there was no campus for which the number was materially lower.

18. Nonetheless, UC administrators, who had uniformly opposed Proposition 209 when it was proposed, continued to heavily criticize the restrictions it placed on their ability to increase racial diversity at UC campuses. In 2003, the UC Regents repealed their own internal measures forbidding the use of race in admissions and hiring.

19. In 2006, UCLA announced that the number of blacks matriculating as freshman at the school would fall below one hundred for the first time in many years. Although this was largely a stochastic drop, and was largely offset by a large increase in black transfers to UCLA that year, the UCLA announcement generated a large amount of critical media coverage and protests from UCLA students and faculty. UCLA's then chancellor, Norm Abrams, met with the admissions committee and urged them to overhaul the admis-

1    sions, and in particular to move to a more subjective "holistic" policy, to ad-

2    dress concerns about low black admissions numbers. One of the members of

3    that admissions committee, political scientist Timothy Groseclose, has writ-

4    ten an entire book documenting how this new policy became a subterfuge for

5    reactivating racial preferences in admissions. See Tim Groseclose, *Cheating:*

6    *An Insider's Report on the Use of Race in Admissions at UCLA* (2014). The

7    number of blacks admitted as freshmen to UCLA roughly doubled in the next

8    admissions cycle.

9    20.   Groseclose also documented that a majority of UCLA's undergradu-

10   ate admissions committee were unwilling to allow Groseclose—a member of

11   the committee—access to the admissions files or to detailed (anonymized)

12   data on applicant characteristics. As a compromise, the university agreed to

13   appoint Robert Mare, a distinguished sociologist who was sympathetic to the

14   use of racial preferences, to examine the question of whether UCLA's post-

15   2006 "holistic" policy was, in fact, making decisions partly on the basis of

16   applicant race.

17   21.   Mare completed two exhaustive studies—one completed in 2012, a

18   second completed in 2014—on UCLA's undergraduate admissions. The sec-

19   ond, larger report was not made public until disclosed in response to a Public

20   Records Act ("PRA") request in 2018. Both reports showed unambiguously

21   that UCLA had awarded many more undergraduate admissions to blacks and

22   Hispanics, and many fewer admissions to Asian-Americans, than could be

23   explained by considering all of the non-racial factors used in admissions.

24   Mare even provided numerical estimates of exactly how many student offers

25   (by race) resulted from the consideration of race. Over five years, over two

26   thousand offers were thus affected, by Mare's estimate.

FIRST AMENDED COMPLAINT                                        Page 9 of 27

22.   Meanwhile, UC administrators began to encourage other UC campuses to adopt the same "holistic" approach that UCLA had implemented. In 2011, the Regents mandated that all UC campuses utilize either "holistic" or "comprehensive" review in undergraduate admissions—in other words, that they move away from objective criteria towards more subjective assessments of the overall appeal of individual candidates. Trends in racial admissions patterns consistently show that the adoption of the holistic process favored black and Hispanic admissions and disfavored Asian-Americans and, to a lesser extent, whites.

23.   For example, in 2010, UC Berkeley's admission rate for black, in-state freshman applicants was 13%, compared to an overall admissions rate of 21%. This disparity reflected the lower average academic preparation of black applicants. By 2023, the black admissions rate at Berkeley was 10%, compared to an overall admission rate of 12%. Over this period, in other words, Berkeley moved towards a practice of aiming for a similar admissions rate for all ethnic groups, regardless of qualifications.

24.   At UC Irvine, the 2010 admissions rate for black, in-state freshmen was 24%, compared to an overall admissions rate of 45%. By 2023, the rates were, respectively, 21% and 26%. At UCLA, the 2010 admissions rate for black, in-state freshmen was 14%, compared to an overall admissions rate of 23%. By 2023, the rates were, respectively, 10% and 9%. Note that, based on the Mare report, we know that black applicants were already receiving a large admissions preferences at UCLA in 2010. At UC Santa Barbara, the 2010 admissions rate for black, in-state freshmen was 28%, compared to an overall admissions rate of 45%. By 2023, the rates were, respectively, 25% and 28%.

25.   Similar trends exist at each of the remaining UC undergraduate col-

leges. At UC San Diego, the overall in-state admissions rate was 38% in 2010, with a 19% admissions rate for blacks; by 2023, those numbers are 25% and 18%. At UC Santa Cruz, the overall in-state admissions rate was 64% in 2010, with a 41% admissions rate for blacks; by 2023, those numbers are 63% and 52%. At UC Davis, the overall in-state admissions rate was 48% in 2010, with a 31% admissions rate for blacks; by 2023, those numbers are 42% and 30%. At UC Riverside, the overall in-state admissions rate was 76% in 2010, with a 56% admissions rate for blacks; by 2023, those numbers are 70% and 57%. At UC Merced, the overall in-state admissions rate was 89% in 2010, with a 76% admissions rate for Blacks; by 2023, those numbers are 88% and 80%

26.  The degree of convergence in between the overall admissions rates and the admissions rates for blacks is highly correlated with the prestige of the school, with a bigger effect at the most elite schools, and a progressively smaller, though still detectable, effect as the eliteness of the school goes down.

27.  During this same period, UC also became notably more opaque in matters relating to race. It shut down websites that had made it possible for researchers to study the relationship between student credentials, race, and admissions, or to study aggregated changes in GPA, attrition from STEM fields, or graduation rates by race. In 2018, it refused to provide anonymized, individual-level data on student admissions and outcomes, although in 2008 it had willingly disclosed identical data covering student admissions up to 2006.

28.  One of the few types of data that the University of California does make publicly available is a website that shows, for individual California high schools, the number of freshman applicants to each UC school, the number

of admitted students, and the number of enrolled students. *See* http://bit.ly/ 4mXH83h [https://perma.cc/4K9Q-CMBG]. This data is broken down by race, though numbers are only reported if the "cell" size is at least three. (In other words, if a given high school has ten Hispanic applicants to Berkeley, of whom four are admitted and two enroll, the website will report the "ten" and the "four" but will show no data for Hispanic enrollment.) These data provide further evidence that UC schools pursue proportional racial representation despite substantial differences in academic preparation across racial groups. For example, the website reports that at Long Beach Polytechnic, 237 students applied for admission to UCLA in 2023, of whom 23 were admitted (just under 10%). Forty-one of the applicants were black, of whom 4 were admitted (again, just under 10%). Yet the average achievement level of black students at Long Beach Polytechnic on state exams was substantially lower than the achievement level for students overall (roughly one-half standard deviation). At Woodrow Wilson High School, also in Long Beach, 186 students applied for admission to UCLA, and 20 were admitted (11%). Of the 186 applicants, 33 were black, and 4 of these applicants were admitted (12%). Yet the average achievement level of black students at Woodrow Wilson High School on state exams was substantially lower than the achievement level for students overall. Similar patterns can be demonstrated for many other high schools. In other words, the tendency of UC schools to approximate racial parity in overall admissions rates cannot be explained by differences in the high schools attended by students of different races.

29. University of California law schools have been even more overt in their violation of state and federal laws prohibiting racial preferences. In 2014, the National Bureau of Economic Research published a working paper

by Danny Yagan, an associate professor of economics at UC Berkeley. Yagan found that racial preferences at UC Berkeley's Law School declined after Proposition 209 became law, but still remained quite large. The black admissions rate of 31%, Yagan found, would have fallen to 8% had the school applied the same criteria that it applied to whites. Holding credentials of individual applicants constant, Yagan found that black applicants received an admissions preference as large as 61 percentage points.

30. This pattern of discrimination continues and operates to varying degrees across UC law schools. Just as the University of California was unwilling to provide anonymized, individual-level data on undergraduate applicants after 2010, so it was unresponsive to a public records request filed by UCLA law professor Richard Sander for law school data in 2011. In 2014, Sander brought suit to enforce his request, and UC subsequently provided him admissions data for UC Berkeley Law School, UCLA Law School, and UC Davis Law School, covering many admissions cycles up through 2011. These data show significant racial preferences at all three law schools throughout this period, and confirm the general pattern documented by Yagan. The publicly-available data on UC Hastings and UC Irvine's law schools is less granular, but strongly implies the same pattern.

31. More recently, Professor Sander has obtained data from Law School Data (www.lsd.law), a website that law school applicants use to report and compare their admissions outcomes at law schools. The site contains (anonymized) data on tens of thousands of law school applicants over the past four years, including information on LSAT scores, undergraduate grades, ethnicity, the schools to which the student applied, and the admissions outcome. Analysis of the data shows that the implicit weights on various admissions

factors in the data, such as academic credentials, are very similar to the weights revealed by analysis of publicly disclosed data from law schools, suggesting that the data are highly reliable. Regression analysis of this data (see attached Table 1) and tabular presentation of the data (see attached Table 2) show a very pronounced pattern of racial preferences across all the UC law schools. In these analyses, "relative credential" is a measure of the academic Index of each applicant (LSAT and undergraduate grade point average combined) relative to the estimated median credential of students at a given law school, based on data reported by the law schools to the American Bar Association. Thus, if a law applicant has an academic index of 750, and applies to a law school with a median academic index of 800, then the applicant has a "relative credential" of –50. As Table 2 suggests, black students with low relative credentials have, at the five UC law schools analyzed collectively, about ten times the chance to be admitted as does a "non-URM" (*i.e.*, white or Asian-American) student with similar credentials.

32. The University of California's medical schools have also been giving illegal race and sex preferences to black and Hispanic applicants, and they have dramatically increased the discriminatory preferences awarded to black medical-school applicants in response to the death of George Floyd in 2020. In 2015–2016, blacks made up 7.1% of the entering medical-school class at the University of California at San Francisco. In each of the last three academic years, however, the University of California at San Francisco has boosted racial preferences for black medical-school applicants to the point that blacks make up at least 14% of the entering medical-school class, so that the black student-body percentage at UCSF equals or exceeds the percentage of blacks in the overall U.S. population. At the same time, the University of California

at San Francisco has drastically cut the number of white students attending UCSF. Before the death of George Floyd in 2020, whites consistently represented at least 33% of the entering medical-school class as UCSF. By 2024–25, however, that number had fallen to 15.3%. The number of white and black students in UCSF's entering medical-school class for the 2024–25 school year were nearly equal (105 vs. 100), even though whites far exceed blacks in the applicant pool and significantly outperform blacks on the MCAT. The following chart illustrates this trend:



33. MCAT scores by race only vary slightly from year to year, so the drop in white M.D. students at UCSF from 35.9% to 15.4% over the last ten years cannot be explained by anything other than UCSF's conscious and intentional decision to suppress white enrollment.

34. UCLA's medical school has also intentionally and consciously re-

duced its white and Asian matriculants in response to the death of George Floyd, by significantly amplifying the illegal admissions preferences that it awards to blacks and Hispanics. Between 2020 and 2023, the percentage of matriculants to UCLA's medical school who are either white or Asian fell steadily from 65.7% in 2020, 57.1% in 2021, 57.8% in 2022, and 53.7% in 2023. Jennifer Lucero, who has served as the dean of admissions at UCLA's medical school since 2020, is an outspoken advocate of racial preferences and has implemented and enforced a regime of illegal preferences for black and Hispanic applicants. The illegal acts of Lucero and UCLA's medical school admissions office are described and documented in the recently filed complaint in *Do No Harm v. David Geffen School of Medicine at UCLA*, No. 2:25-cv-04131 (C.D. Cal.), http://bit.ly/3ZmyiCg [https://perma.cc/4D5R-HZ6B], and SARD incorporates by reference all of the allegations that appear in the *Do No Harm* complaint. Lucero's shenanigans are also reported in Aaron Sibarium, *UCLA Was Poised To Launch Its Own Investigation of Medical School Admissions—But Refused To Protect Whistleblowers From Retaliation*, Washington Free Beacon (June 11, 2024), http://bit.ly/3SIz3ll [https://perma.cc/U4V6-7WBD]. SARD also incorporates by reference the allegations in the Sibarium article.

35. In 2015, in response to a public records request, two of the UC medical schools (UCLA and UCSF) made available anonymized, individual-level data on applicants and admissions. These data included information on many different applicant characteristics, including some data on socioeconomic status and personal ratings. Regression analysis showed that, even controlling for all these characteristics, both UCSF and UCLA penalized whites and especially Asian-Americans in admissions decisions.

36.   The shift to race-neutral admissions brought about by Proposition 209 benefitted black and Hispanic students both in terms of placement and outcomes. Yet the university's decision to pursue racial preferences in the teeth of Proposition 209 has willfully disregarded the interests of black and Hispanic candidates and harmed their educational outcomes.

## FACTS RELATED TO STANDING

37.   Plaintiff SARD is a voluntary membership organization founded in 2024. SARD seeks to restore meritocracy in academia and eliminate the corrupt and unlawful race and sex preferences that subordinate academic merit to so-called diversity considerations.

38.   SARD has student members who are ready and able to apply for admission to the University of California.

39.   Individual A is a member of SARD. He is an Asian-American male. Individual A recently completed his junior year of high school and will begin his senior year this fall.

40.   Individual A stands able and ready to apply for admission as an undergraduate freshman to each of the University of California's nine campuses that have undergraduate colleges. *See Carney v. Adams*, 592 U.S. 53, 60 (2020); *Gratz v. Bollinger*, 539 U.S. 244, 261 (2003); *Northeast Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993). But the pervasive and ongoing use of racial preferences prevents Individual A from competing with other applicants for admission on an equal basis. Specifically, Individual A is unable to compete on an equal basis with applicants who are black or Hispanic. This inflicts injury in fact. *See Gratz*, 539 U.S. at 261–62; *Jacksonville*, 508 U.S. at 666.

41.   Individual A intends to apply and will apply for admission to each of

the University of California's nine campuses that has an undergraduate college. Individual A will submit each of these applications in the fall of 2025. Individual A meets all of the requirements for admission as an undergraduate freshman to the University of California campuses, which are listed at http://bit.ly/4mLLR8k [https://perma.cc/H95Z-VHTW]. Specifically, Individual A has already completed 14 of the 15 of the "A–G courses" listed on the UC website, and he will complete the 15th course over the summer. Individual A also has a grade point average (GPA) of 3.0 or better in those courses with no grade lower than a C, using the GPA calculation described on the UC website. *See* http://bit.ly/4kw8Imw [https://perma.cc/SQX8-4YZS]. Individual A will maintain the required minimum grade-point average during the application process and until he graduates from high school.

42. Individual B is a member of SARD. She is an Asian-American female. Individual B is a college undergraduate.

*43.* Individual B stands able and ready to apply for admission to UCSD for a master's degree in electrical engineering. *See Carney v. Adams*, 592 U.S. 53, 60 (2020); *Gratz v. Bollinger*, 539 U.S. 244, 261 (2003); *Northeast Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993). But the pervasive and ongoing use of racial preferences prevents Individual B from competing with other applicants for admission on an equal basis. Specifically, Individual B is unable to compete on an equal basis with applicants who are black or Hispanic. This inflicts injury in fact. *See Gratz*, 539 U.S. at 261–62; *Jacksonville*, 508 U.S. at 666.

44. Individual B has already submitted her application to UCSD for a master's degree in electrical engineering. Individual B meets all of the requirements for admission to this program, including the minimum required

1    undergraduate GPA of 3.0.

2       45.   Individual C is a member of SARD. He is a white male. Individual C

3    attends a community college and wishes to transfer to one of the University

4    of California campuses.

5       46.   Individual C stands able and ready to apply for admission as an un-

6    dergraduate transfer to all nine the University of California's campuses that

7    have undergraduate colleges, and he has already submitted his transfer appli-

8    cations. *See Carney v. Adams*, 592 U.S. 53, 60 (2020); *Gratz v. Bollinger*, 539

9    U.S. 244, 261 (2003); *Northeast Florida Chapter of Associated General Contrac-*

10   *tors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993). But the perva-

11   sive and ongoing use of racial preferences prevents Individual C from com-

12   peting with other applicants for admission on an equal basis. Specifically, In-

13   dividual C is unable to compete on an equal basis with applicants who are

14   black or Hispanic. This inflicts injury in fact. *See Gratz*, 539 U.S. at 261–62;

15   *Jacksonville*, 508 U.S. at 666.

16      47.   Individual C meets all of the requirements for admission as an un-

17   dergraduate transfer student to these University of California campuses,

18   which are listed at http://bit.ly/3ZS04Xe [https://perma.cc/DB32-3BKR]

19   and http://bit.ly/4ks7xVf [https://perma.cc/FZJ5-LSTQ]. Specifically, In-

20   dividual C has taken all of the course work required to make him eligible for

21   consideration as an undergraduate transfer student from a community col-

22   lege.

23      48.   Individual D is a member of SARD. He is a white male.

24      49.   Individual D stands able and ready to apply for admission as a law

25   student to each of the University of California's five campuses that have a

26   law school: Berkeley, UCLA, Davis, Irvine, and UC Law San Francisco

(formerly known as UC Hastings). *See Carney v. Adams*, 592 U.S. 53, 60 (2020); *Gratz v. Bollinger*, 539 U.S. 244, 261 (2003); *Northeast Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993). But the pervasive and ongoing use of racial preferences prevents Individual D from competing with other applicants for admission on an equal basis. Specifically, Individual D is unable to compete on an equal basis with applicants who are black or Hispanic. This inflicts injury in fact. *See Gratz*, 539 U.S. at 261–62; *Jacksonville*, 508 U.S. at 666.

50.   Individual D intends to apply and will apply for admission to each of the University of California's five campuses that has a law school. Individual D will submit each of these applications in the fall of 2025. Individual D meets all of the requirements for admission as a law student to these University of California campuses. Specifically, Individual D has already earned a bachelor's degree from an accredited college and has taken the LSAT and received his LSAT score.

51.   Individual E is a member of SARD. He is an Asian-American male.

52.   Individual E stands able and ready to apply for admission as a medical student to each of the University of California's six campuses that have a medical school: UCSF, UCLA, Davis, Irvine, San Diego, and Riverside. *See Carney v. Adams*, 592 U.S. 53, 60 (2020); *Gratz v. Bollinger*, 539 U.S. 244, 261 (2003); *Northeast Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993). But the pervasive and ongoing use of racial preferences prevents Individual E from competing with other applicants for admission on an equal basis. Specifically, Individual E is unable to compete on an equal basis with applicants who are black or Hispanic. This inflicts injury in fact. *See Gratz*, 539 U.S. at 261–62; *Jacksonville*, 508

U.S. at 666.

53. Individual E intends to apply and will apply for admission to each of the University of California's six campuses that has a medical school. Individual E will submit each of these applications in the summer of 2026. Individual E meets all of the requirements for admission as a medical student to these University of California campuses. Specifically, Individual E has already earned a bachelor's degree from an accredited college and will take the MCAT before applying to medical school next year. Individual E has also taken all of the undergraduate courses and lab work required for admission to medical school, including one year of biology, one year of chemistry, one year of physics, and one year of organic chemistry.

54. Individual F is a member of SARD. He is an Asian-American male.

55. Individual F stands able and ready to apply for admission as a law student to each of the University of California's five campuses that have a law school: Berkeley, UCLA, Davis, Irvine, and UC Law San Francisco (formerly known as UC Hastings). *See Carney v. Adams*, 592 U.S. 53, 60 (2020); *Gratz v. Bollinger*, 539 U.S. 244, 261 (2003); *Northeast Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993). But the pervasive and ongoing use of racial preferences prevents Individual F from competing with other applicants for admission on an equal basis. Specifically, Individual F is unable to compete on an equal basis with applicants who are black or Hispanic. This inflicts injury in fact. *See Gratz*, 539 U.S. at 261–62; *Jacksonville*, 508 U.S. at 666.

56. Individual F intends to apply and will apply for admission to each of the University of California's five campuses that has a law school. Individual F will submit each of these applications in the fall of 2025. Individual F

meets all of the requirements for admission as a law student to these University of California campuses. Specifically, Individual F has already earned a bachelor's degree from an accredited college and has taken the LSAT and received his LSAT score.

57.   All of these Article III injuries are fairly traceable to the allegedly unlawful conduct of the defendants discriminating on account of race in violation of 42 U.S.C. § 1981, Title VI, and Proposition 209. And all of these injuries will be redressed by the requested relief, which will enjoin the defendants from continuing these discriminatory policies and require them to adopt colorblind student-admission policies.

58.   SARD is challenging the admissions policies and practices at the University of California's undergraduate programs, its law schools, and its medical schools. SARD is not challenging the University of California's transfer or graduate admissions in this lawsuit.

## FIRST CLAIM FOR RELIEF—VIOLATIONS OF TITLE VI

59.   Each of the defendants is violating Title VI by discriminating in favor of black, and Hispanic applicants for admission and against whites and Asians.

60.   Each of the nine UC undergraduate campuses, the five UC law schools, and the six UC medical schools to which the members of SARD intend to apply is a "program or activity" that "receives Federal financial assistance" within the meaning of Title VI.

61.   SARD therefore seeks declaratory and injunctive relief that prohibits the defendants from considering or discriminating on account of race in any way in student admissions, and that compels the defendants to select applicants for admission in a color-blind manner.

62.   SARD seeks this relief under Title VI, 42 U.S.C. § 1983, and any other law that might supply a cause of action for the requested relief, including the Declaratory Judgment Act (28 U.S.C. § 2201) and the implied cause of action recognized in *Ex parte Young*, 209 U.S. 123 (1908).

63.   SARD seeks this relief only against the institutional defendants and not the individual defendants.

64.   The text of Title VI makes no exceptions for "compelling state interests," "student-body diversity," or race-based affirmative-action programs. It prohibits *all* forms of racial discrimination at institutions that receive federal funds—regardless of whether that racial discrimination is independently prohibited by the Equal Protection Clause.

**SECOND CLAIM FOR RELIEF—VIOLATIONS OF 42 U.S.C. § 1981**

65.   42 U.S.C. § 1981(a) guarantees individuals the same right to make and enforce contracts without regard to race. *See* 42 U.S.C. § 1981(a) ("All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens").

66.   42 U.S.C. § 1981(a) protects whites (and Asians) on the same terms that it protects "underrepresented" racial minorities. *See McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 295 (1976) ("[T]he Act was meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race.").

67.   The individual defendants are violating 42 U.S.C. § 1981(a) by discriminating in favor of blacks and Hispanics in student admissions, and against whites and Asians.

68.   SARD therefore seeks declaratory and injunctive relief that prohibits

the individual defendants from considering or discriminating on account of race in any way in student admissions, and that compels the defendants to select applicants for admission in a color-blind and race-neutral manner.

69.   SARD seeks this relief under 42 U.S.C. § 1983, as well as the implied right of action that the Supreme Court has recognized to enforce 42 U.S.C. § 1981(a), and any other law that might supply a cause of action for the requested relief, including the Declaratory Judgment Act (28 U.S.C. § 2201) and the implied cause of action recognized in *Ex parte Young*, 209 U.S. 123 (1908). *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459–60 (1975).

70.   SARD seeks this relief only against the individual defendants, and not against the institutional defendants, as 42 U.S.C. § 1981 neither abrogates nor waives a state institution's sovereign immunity from suit. *See Sessions v. Rusk State Hospital*, 648 F.2d 1066 (5th Cir. 1981) ("Section 1981 contains no congressional waiver of the state's eleventh amendment immunity.").

71.   The text of 42 U.S.C. § 1981(a) makes no exceptions for "compelling state interests," "student-body diversity," or race-based affirmative-action programs. It prohibits *all* forms of racial discrimination in contracting—regardless of whether that racial discrimination is independently prohibited by the Equal Protection Clause.

**THIRD CLAIM FOR RELIEF— EQUAL PROTECTION CLAUSE**

72.   As public institutions, the University of California is subject to the commands of the Equal Protection Clause, which prohibits state universities or their components from denying to any person the equal protection of the laws.

73.   The Supreme Court has held that the Equal Protection Clause pro-

hibits race and sex discrimination by state universities in student admissions. *See Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 206 (2023).

74.   The University of California's use of racial preferences is incompatible with the Supreme Court's interpretation of the Equal Protection Clause.

75.   SARD therefore seeks declaratory and injunctive relief that prohibits the defendants from considering or discriminating on account of race in any way in student admissions, and that compels the defendants to select applicants for admission in a color-blind and race-neutral manner.

76.   SARD seeks this relief under 42 U.S.C. § 1983 and any other law that might supply a cause of action for the requested relief, including the Declaratory Judgment Act (28 U.S.C. § 2201) and the implied cause of action recognized in *Ex parte Young*, 209 U.S. 123 (1908).

77.   SARD seeks this relief only against the individual defendants, and not against the institutional defendants, as 42 U.S.C. § 1983 authorizes lawsuits only against "persons" and not states or state institutions. *See Will v. Michigan Dep't of Police*, 491 U.S. 58, 64–71 (1989) (a state is not a "person" under 42 U.S.C. § 1983).

## DEMAND FOR RELIEF

78.   SARD respectfully requests that the court:

a.   declare that each of the defendants is violating Title VI by discriminating in favor of non-Asian racial minorities in student admissions;

b.   declare that the individual defendants  are violating 42 U.S.C. § 1981(a) and the Equal Protection Clause by discriminating in favor of non-Asian racial minorities in student admissions;

c. permanently enjoin the defendants from considering race in student admissions;

d. permanently enjoin the defendants from asking or allowing an applicant for admission to reveal their race;

e. appoint a court monitor to oversee all decisions relating to the defendants' admission of students to ensure that these decisions are free from racial discrimination of any sort;

f. award the plaintiff nominal damages and punitive damages;

g. award costs and attorneys' fees under 42 U.S.C. § 1988;

h. grant all other relief that the Court may deem just, proper, or equitable.

Respectfully submitted.

Jonathan F. Mitchell*
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*admitted *pro hac vice*

Dated: June 10, 2025

 /s/ William J. Brown Jr.
William J. Brown Jr.
California Bar No. 192950
Brown Wegner LLP
2010 Main Street, Suite 1260
Irvine, California 92614
(949) 705-0081 (phone)
bill@brownwegner.com

Ryan Giannetti*
D.C. Bar No. 400153
America First Legal Foundation
611 Pennsylvania Avenue SE #231
Washington, DC 20003
(202) 964-3721 (phone)
ryan.giannetti@aflegal.org

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on June 10, 2025, I served this document by CM/ECF up-on:

DEBO ADEGBILE
Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 295-8800
debo.adegbile@wilmerhale.com

FELICIA H. ELLSWORTH
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000
felicia.ellsworth@wilmerhale.com

JOSHUA A. VITTOR
Wilmer Cutler Pickering Hale and Dorr LLP
350 South Grand Avenue Suite 2400
Los Angeles, California 90071
(213) 443-5300
joshua.vittor@wilmerhale.com

*Counsel for the Defendants*

Dated: June 10, 2025

/s/ William J. Brown Jr.
WILLIAM J. BROWN JR.
*Counsel for Plaintiff*