UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

STANLEY ZHONG and SWORD (Students Who Oppose Racial Discrimination),

PLAINTIFFS,

vs.

CORNELL UNIVERSITY, THE TRUSTEES OF CORNELL UNIVERSITY, MICHAEL KOTLIKOFF, and SHAWN FELTON, and JONATHAN BURDICK,

DEFENDANTS.

Civil Case No. 3:25-cv-00365-ECC-ML

**SECOND THIRD AMENDED COMPLAINT AND JURY DEMAND**

Style Definition: Endnote Text: Font: 10 pt, Indent: Left: 0", Hanging: 0.25"

Formatted: Font:

Formatted: Not All caps

I. INTRODUCTION ........ 3
II. PARTIES ........ 4
A. Plaintiffs ........ 4
1. Stanley Zhong ........ 4
2. Students Who Oppose Racial Discrimination (SWORD) ........ 5
B. Defendants ........ 8
III. JURISDICTION AND VENUE ........ 9
IV. FACTUAL ALLEGATIONS ........ 10
A. Asian American applicants are historically oppressed minority students ........ 10
B. Stanley demonstrated academic excellence, technical achievement, leadership, and service. ........ 11
C. Stanley applied on merit and was denied an equal opportunity to compete. ........ 14
D. Cornell pursued numerical racial objectives through its admissions practices ........ 16
1) Cornell expressly considered race in admissions before Stanley applied ........ 16
2) Cornell prescribed a numerical racial benchmark and yearly growth. ........ 19~~18~~
3) Engineering adopted racial-composition objectives before the 2022–23 cycle ........ 21
4) Cornell's officials coordinated admissions policies and their implementation. ........ 23
5) Enrollment and SAT data permit a comparison for 2018–2026. ........ 31~~30~~
Table A covers Fall 2018–2026. Figures for 2018–2025 are first-time, first-year degree-seeking enrollment disclosed in Section B2 of Cornell's Common Data Sets. ........ 32~~31~~
Table B. Estimated number of SAT takers who scored 1400–1600, by race and high-school class ........ 34~~33~~
Table C. Cornell enrollment relative to each group's high-scoring SAT takers, Fall 2018–2026 ........ 35~~34~~
E. Cornell's current admissions practices ........ 39~~37~~
1) Cornell's changes after SFFA ........ 39~~37~~
CAUSES OF ACTION ........ 45~~43~~
Count 1: Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (Stanley Zhong and SWORD against Cornell University and Cornell Board of Trustees) ........ 45~~43~~
Count 2: Violation of 42 U.S.C. § 1981 (Stanley and SWORD against all Defendants) . 46~~44~~
Count 3: Violation of the New York State Human Rights Law, N.Y. Executive Law §§ 290-301. (Stanley Zhong against all Defendants) ........ 49~~47~~
Count 4: Violation of New York Civil Rights Law §§ 40-c and 40-d (Stanley Zhong against all Defendants) ........ 50~~48~~
PRAYER FOR RELIEF ........ 52~~49~~
**JURY DEMAND** ........ 52~~50~~

## I. INTRODUCTION

1. Plaintiffs Stanley Zhong ("“Stanley"”) and Students Who Oppose Racial Discrimination (SWORD) bring this civil rights action against Cornell University, the Trustees of Cornell University, and Cornell officers Michael Kotlikoff, and Shawn Felton, and Jonathan Burdick, named Cornell officials. Plaintiffs allege intentional racial discrimination against Asian American applicants in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and New York civil rights law.

2. Plaintiffs seek to enforce the right to compete for admission as an individual, free from racial discrimination. In a selective admissions system with limited places, a racial preference for one applicant imposes a corresponding burden on competing applicants. Based on the policy documents, contemporaneous admissions disclosures, and individual circumstances set out below, Plaintiffs allege that Defendants used, and on information and belief, continue to use racial preferences to pursue what Cornell considers a preferable racial composition for Cornell's entering classes.

3. Cornell's racial preferences require Asian American applicants, including Stanley, to meet a higher admissions standard than applicants from preferred racial groups. Cornell's publications identify numerical racial-composition objectives and race-conscious selection. Engineering adopted such objectives in 2021. In February 2022, then-President Martha E. Pollack identified underrepresented-minority status as an admissions consideration, and Cornell's 2022–23 Common Data Set reported considering racial or ethnic status. During Stanley's application cycle, Vice Provost for Enrollment Jonathan Burdick publicly described the use of racial information in admissions review, as detailed below.

4. Stanley applied for admission to Cornell for Fall 2023 enrollment, and Cornell denied Stanley admission. Since that application cycle, Stanley has not enrolled full-time at an institution of higher education, but he remains ready, willing, and able to apply to Cornell.

5. Stanley and SWORD's Members seek an equal opportunity to compete without racial discrimination. Stanley and SWORD seek damages, and declaratory and injunctive relief.

**II. PARTIES**

**A. Plaintiffs**

*1. Stanley Zhong*

6. Plaintiff Stanley Zhong is a resident of the State of California and a citizen of the United States. He is a second-generation Asian American. Stanley applied to Cornell's College of Engineering through Regular Decision during the 2022–23 application cycle for Fall 2023 enrollment, with an interest in computer science. Cornell rejected his application. He suffered the denial of an equal opportunity to compete for admission and the resulting loss of educational opportunity.

7. Stanley has never enrolled full-time at any college or university. Cornell's published reapplication guidance permits a previously rejected first-year applicant to reapply if the applicant has "not enrolled full-time at another school or institution." Since his rejection in the 2023 application cycle, Stanley has worked full-time as a software engineer at Google~~, but~~ without enrolling full-time at any college or university.[1]

[1] Cornell Enrollment FAQ, ~~"~~"How do I reapply?~~"~~" (accessed Oct. 17, 2026). https://faq.enrollment.cornell.edu/kb/article/248-how-do-i-reapply/; Cornell Undergraduate Admissions, First-Year Applicants (accessed Oct. 17, 2026). https://admissions.cornell.edu/how-to-apply/first-year-applicants.

8. Stanley is presently ready and able to apply to Cornell if and when Cornell ceases its discriminatory admissions practices. He seeks an undergraduate education and a bachelor's degree through Cornell's curriculum, faculty mentorship, undergraduate research, and learning alongside other students.

*2. Students Who Oppose Racial Discrimination (SWORD)*

9. Plaintiff SWORD is a voluntary membership organization focused on stopping racial discrimination in college admissions through litigation. SWORD was established in October 2024 by individuals harmed and outraged by flagrant racial discrimination in college admissions. It is a coalition comprising prospective applicants to higher education institutions, individuals who were denied admission, their parents, and supporters of the organization's mission. Nan Zhong is the President of SWORD, and its website is available at https://sword.education. SWORD also includes younger Asian American high-school members in California and Washington who intend to apply to Cornell in future admissions cycles.

10. Members A–F identified below are ~~all~~ Members of SWORD.

11. Member A is Asian American and is the individual previously identified to the Court in this action as "Minor Son." In July 2025, he was a rising high-school junior. He is now an Asian American high-school senior in California. He has a 4.0 unweighted grade-point average and scored 1560 on the College Board's SAT college-admission test on March 11, 2026, without paid tutoring or test preparation. He was named a National Merit Semifinalist in September 2026. A varsity cross-country runner since freshman year and his team's most valuable player, he qualified for the California State Championship in November 2025, the first student from his high school to qualify in seven years. He is a national-level Rubik's Cube

competitor with an official competition solve of 6.25 seconds. He taught himself to juggle five balls and has performed at North America's second-largest annual juggling festival.

12. In September 2026, Cornell sent Member A a flyer inviting him to apply in the current application cycle. Member A is ready and able to apply to Cornell through Regular Decision for Fall 2027 enrollment and intends to do so unless he becomes bound to attend the other institution to which he has applied Early Decision. He is actively preparing his college applications, including drafting essays and requesting recommendations. He seeks an equal opportunity to compete for admission.

13. Member B is an Asian American high-school senior in California and a member of SWORD. He has earned a 3.9 unweighted GPA (4.31 weighted), achieved a perfect 36 on the ACT, and earned scores of 5 on all nine of his Advanced Placement exams. He intends to apply to Cornell through Regular Decision for Fall 2027 enrollment to pursue pre-medical studies toward a career in health care. ~~His application further reported that RGBSec, the cybersecurity team he led, ranked 63rd globally among more than 35,000 teams, including college and professional teams, in 2020. -> His application further reported that RGBSec, the cybersecurity team he co-founded, ranked 63rd globally among more than 35,000 teams in CTF contests, including college and professional teams, in 2020.~~ Member B is actively preparing his college applications, including drafting essays and requesting recommendations. Member B is ready and able to apply and seeks an equal opportunity to compete for admission.

14. Member C is an Asian American high~~-~~school senior and member of SWORD who is ready and able to apply for undergraduate admission to Cornell University and intends to apply during the 2026–2027 admissions cycle for ~~fall~~ Fall 2027 enrollment. Member C has an unweighted GPA of 3.78, a weighted GPA of 4.19, and an SAT score of 1420. Member C has

not yet selected an intended major and is considering applying as undeclared or pursuing applied mathematics. Member C’s interests include strategy games such as chess and poker.

15. Member D is an Asian American high~~-~~school senior and member of SWORD who is ready and able to apply for undergraduate admission to Cornell University and plans to apply Early Decision to Cornell’s College of Arts and Sciences during the 2026–2027 admissions cycle for ~~fall~~ Fall 2027 enrollment. Member D has an unweighted GPA of 4.0, a weighted GPA of 4.414, and an SAT score of 1560. Member D’s intended areas of study are data science and statistical science.

16. Member E is an Asian American high~~-~~school senior and member of SWORD who is half Chinese. Member E is ready and able to apply for undergraduate admission to Cornell University and intends to apply during the 2026–2027 admissions cycle for ~~fall~~ Fall 2027 enrollment. Member E has an unweighted GPA of 4.0, a weighted GPA of 4.4, and an SAT score of 1520.

17. Member F is an Asian American high~~-~~school senior and member of SWORD who is ready and able to apply for undergraduate admission to Cornell University and intends to apply during the 2026–2027 admissions cycle for ~~fall~~ Fall 2027 enrollment. Member F has an unweighted GPA of 3.97, a weighted GPA of 4.48, and an SAT score of 1530. Member F intends to pursue pre-medical studies.

18. SWORD joins this action as a party to secure an equal opportunity for its Members to compete for admission, based on their qualifications. Each Member has standing to sue in his own right on those facts. Each Member is ready, willing, and able to apply to Cornell but for Cornell~~'~~’s racial preferences that burden the terms on which their applications will be evaluated and discriminate against them on the basis of race.

**B. Defendant Cornell University, its Trustees, and Other Cornell Officers s**

19. Defendant Cornell University is a private, nonsectarian institution of higher education chartered under the laws of New York and headquartered in Ithaca. Cornell operates the College of Engineering, now named the David A. Duffield College of Engineering. It receives federal financial assistance, including federal research grants and student-aid funding. Its undergraduate admissions policies are developed and enforced through its administration and constituent colleges.

20. Defendant Trustees of Cornell University (Trustees) is the University's governing board. Cornell's bylaws vest the Board with control over the University and its colleges and academic units.[2] The Trustees are empowered to enter into contracts on behalf of Cornell, to sue, and to be sued.

21. Defendant Michael Kotlikoff is Cornell's President. During Stanley's 2022–23 admissions cycle, he served as Provost. In that position, Kotlikoff established and oversaw the central enrollment structure described below, with the vice provost for enrollment reporting directly to him. In July 2024, Kotlikoff became interim president and then eventually president of Cornell. As President, he is Cornell's Chief Executive Officer and ultimately responsible for overseeing its admissions policies. Kotlikoff resides in New York.

22. Defendant Shawn Felton served through summer 2023 as Cornell's Executive Director of Undergraduate Admissions and Deputy Chief Admissions and Enrollment Officer within Cornell's office of the Vice Provost for Enrollment. His responsibilities included admissions policy and practice, admissions data and systems, and enrollment work with the

[2] Cornell University, Board of Trustees, Governance. https://trustees.cornell.edu/.

undergraduate colleges. Felton's office directed recruitment, selection, and enrollment efforts for underrepresented students. In Fall 2023 he became Director of Strategic Enrollment Initiatives.

~~23. Defendant Jonathan Burdick served as Cornell's Vice Provost for Enrollment during Stanley's 2022–23 admissions cycle. His position reported to Kotlikoff and carried responsibility for coordination of admissions systems, policies, practices, and staff training across Cornell's colleges, including Engineering.~~

**III. JURISDICTION AND VENUE**

~~24.~~23. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the federal claims arise under the laws of the United States, including Title VI of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. This Court also has jurisdiction under 28 U.S.C. § 1343(a)(4) over this action to recover damages and secure equitable relief under Acts of Congress providing for the protection of civil rights.

~~25.~~24. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over all state-law claims. Those claims arise from the same admissions conduct and injuries as Plaintiffs' federal claims and form part of the same case or controversy.

~~26.~~25. Plaintiffs seek declaratory relief under 28 U.S.C. §§ 2201–2202 in connection with the substantive claims pleaded below, and injunctive relief and damages under the applicable civil rights statutes.

~~27.~~26. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to these claims occurred in this District and Cornell is located in Ithaca, New York. Stanley sought the opportunity to attend Cornell and use its educational facilities in Ithaca. Kotlikoff's and Felton's~~, and Burdick's~~ challenged conduct arose from their work for Cornell in New York.

## IV. FACTUAL ALLEGATIONS

### A. Asian American applicants are historically oppressed minority students.

28.27. Asian Americans are a historically oppressed minority in the United States, as demonstrated by the Chinese Exclusion Act of 1882 and the incarceration of Japanese Americans during World War II.

29.28. Unequal standards in college admissions discriminating against Asian Americans have been acknowledged within the profession of college and university admissions officers. In a 2016 *Inside Higher Ed* survey conducted with Gallup, 42% of private-college admissions directors and 39% of public-college directors admitted that institutions of higher education held Asian American applicants to higher standards and that Asian-American applicants admitted to their colleges and universities generally had higher grades and test scores than applicants of other groups. A separate question asked about admitted students at these admissions officers' own colleges: 30% of private-college directors and 41% of public-college directors reported that admitted Asian American applicants who gained admission to colleges and universities generally had to show higher grades and test scores than other admitted applicants of different races. The survey included 339 admissions directors or equivalent officials.[3]

30.29. Asian American applicants are often advised by guidance counselors and admissions consultants to downplay their achievements and interests in science, technology, engineering, and mathematics or their involvement in Asian cultural organizations. This advice

[3] *Inside Higher Ed*, "“Pressure to Build the Class: 2016 Survey of Admissions Directors”" (2016). https://www.insidehighered.com/news/survey/pressure-build-class-2016-survey-admissions-directors.

reflects the concern that readers may use racial stereotypes to treat academic and technical accomplishment as evidence of a supposedly one-dimensional personality.

**B. Stanley demonstrated academic excellence, technical achievement, leadership, and service.**

~~31.~~30. Stanley's academic record, technical accomplishments, leadership, and service made and continue to make him highly qualified for admission to Cornell Engineering.

~~32.~~31. Stanley Zhong attended Henry M. Gunn High School, a highly ranked public high school in Palo Alto, California. He earned a weighted grade-point average of 4.42 and an unweighted grade-point average of 3.97, and qualified for the University of California's Eligibility in the Local Context program. That eligibility placed him in at least the top 9% at his participating high school based on University of California-approved coursework in grades 10 and 11, although his school does not publish individual grade-point-average rankings.[4]

~~33.~~32. Stanley achieved a perfect score on the Preliminary SAT without any preparation and scored 1590 out of 1600 on his only SAT sitting after just a few nights of self-study and without any paid tutoring or test preparation. His Cornell application reported both scores.

~~34.~~33. Stanley was a National Merit Semifinalist when he applied to Cornell. He subsequently advanced to finalist and was selected to receive the National Merit $2,500 Scholarship. The essays Stanley submitted that earned him the highly coveted and competitive National Merit Scholarship were essentially the same as those he submitted to Cornell.

~~35.~~34. Stanley's excellence has extended well beyond the classroom. While still in high school, he co-founded OpenBrackets and served as its second president. His Cornell application reported that the nonprofit delivered free coding lessons to more than 200 students in

[4] Niche, Henry M. Gunn High School. https://www.niche.com/k12/henry-m-gunn-high-school-palo-alto-ca/.

underserved communities across California, Washington, and Texas; his résumé stated that he personally taught 59 students. He was awarded the President's Volunteer Service Award at its highest, Gold level. He also co-founded and led his school's competitive programming club. These activities demonstrated leadership, service, and collaboration alongside his technical accomplishments.

~~36.~~35. Stanley is a self-taught programmer whose extraordinary talent has earned him top honors in some of the world's most competitive coding contests. Stanley taught himself multiple programming languages and pursued independent programming projects. His Cornell application documented achievements in competitions open to professionals as well as results in team competitions.

~~37.~~36. His application reported a 427th-place worldwide finish in Google Code Jam's 2021 semifinals, advancement to the United States of America Computing Olympiad's Platinum Division, and Master rank on Codeforces, placing him in the top 2% of about 134,000 users. It also reported team finishes of second in MIT Battlecode's January 2021 high-school division and sixth in Stanford's ProCo; first-place team finishes at the University of Pennsylvania's PClassic, Virginia Tech's High School Programming Contest, and the Harker Programming Invitational; and qualification for the American Invitational Mathematics Examination. At PClassic, his team solved all eight problems, two more than the second-place team. Stanley co-founded RGBSec, a cybersecurity team that competed in capture-the-flag (CTF) contests. His Cornell application ~~further~~ identified him as a team leader and reported that RGBSec ~~the cybersecurity team he led,~~ ranked 63rd globally in 2020 among more than 35,000 teams, including college and professional teams~~, in 2020~~.

~~38.~~37. Stanley's skill was so advanced that in 2019, Google invited Stanley for a full-time engineering interview, unaware he was only 13 years old; the interview was canceled only after his age came to light because minors could not sign Google's employment agreement.

~~39.~~38. Stanley repeatedly demonstrated extraordinary initiative far beyond his years. After reading a National Public Radio story in April 2020 about state unemployment systems buckling under pandemic-related demand due to outdated Common Business-Oriented Language (COBOL) infrastructure, Stanley independently taught himself COBOL, published sample code to GitHub, and volunteered his help to the ~~"~~"COBOL Cowboys~~"~~" featured in the article—earning a personal phone call and words of encouragement from their chief executive officer.[5]

~~40.~~39. In 2020, Stanley launched RabbitSign, a free e-signature platform he built on Amazon Web Services, after finding existing tools unaffordable during the pandemic. His Cornell application reported about 5,000 users, described RabbitSign as the only e-signing service offering free HIPAA compliance, and stated that he had been selected to appear on *Viewpoint with Dennis Quaid* because of that work. Its development demonstrates Stanley's initiative in building a useful service. AWS's later selection of RabbitSign for a case study and the SOC 2 and ISO 27001 compliance RabbitSign now reports are not alleged to have been before Cornell's admissions readers.[6]

~~41.~~40. A few months after Cornell rejected his undergraduate application, and just before his 18th birthday, Stanley underwent Google's full-time engineering interview process. Five

---

[5] NPR, ~~""~~"COBOL Cowboys Aim to Rescue Sluggish State Unemployment Systems~~""~~" (Apr. 22, 2020). https://www.npr.org/2020/04/22/841682627/cobol-cowboys-aim-to-rescue-sluggish-state-unemployment-systems.

[6] *Viewpoint with Dennis Quaid*, RabbitSign feature. https://www.viewpointproject.com/features-postidd3e6da7a/; RabbitSign, Team. https://www.rabbitsign.com/team.html; RabbitSign, Frequently Asked Questions. https://www.rabbitsign.com/faq.html.

randomly assigned, professionally trained Google engineers devoted over ten hours to evaluating his technical skills, communication abilities, and teamwork.

~~42.~~41. The engineers recommended Stanley for a Level 4 software engineering role, and Google extended the offer in September 2023, just after his 18th birthday. The offer followed Cornell's rejection and corroborates his technical ability. He placed 329th ***worldwide*** in the Meta Hacker Cup's November 2023 Round 3.

~~43.~~42. Stanley's performance evaluation in January 2025 confirmed that he met all expectations and showed strong potential for continued growth. In Google's 2025 performance review cycle, he received an ~~"~~"Outstanding Impact~~"~~" rating.

**C. Stanley applied on merit and was denied an equal opportunity to compete.**

~~44.~~43. For enrollment in Fall 2023, Stanley applied as a first-year applicant through Regular Decision to Cornell University's College of Engineering during the application cycle beginning in 2022 and ending in 2023. His academic interest was computer science. This entering cohort is commonly called the Class of 2027.

~~45.~~44. Cornell received 67,846 first-year applications for Fall 2023, Stanley's cycle. Comparing Stanley's treatment with competing Engineering applicants within that pool requires applicant-level records in Cornell's exclusive control.[7]

~~46.~~45. Like many Asian American candidates for admission, Stanley dared to hope that, despite the barriers facing applicants who look like him, his individual merit might still prevail, and Cornell would look past his race. Despite extraordinary academic credentials and nationally

[7] Cornell University, Common Data Set 2023–2024, § C1. https://irp.cornell.edu/wp-content/uploads/2024/08/CDS_UNL2_2023_2024-v11.pdf.

and internationally recognized accomplishments, his application was rejected. He suffered loss of educational opportunity, economic injury, and reputational harm.

~~47.~~46. Stanley's story was cited in a congressional hearing in September 2023 and reported in national news in October 2023.[8]

~~48.~~47. Multiple independent college admissions experts and counselors unconnected to Cornell reviewed Stanley's application materials, including his essay, at the family's request. They identified no performance-based deficiency explaining his rejection.

~~49.~~48. Stanley Zhong, among other things, has an obvious Chinese surname. Based on this and other disclosures of his Asian American identity in his application and Cornell's race-conscious review practices, including ~~Defendant~~ Vice Provost for Enrollment Jonathan Burdick's account that racial identity reached readers through application materials beyond the race field, Plaintiffs allege on information and belief that Cornell identified Stanley's Asian American background and considered it in reviewing his application.

~~50.~~49. Stanley competed for limited Engineering places in the Fall 2023 cycle. His submitted application described independent programming projects, international contest results, OpenBrackets service, and creation of RabbitSign demonstrating initiative and contribution beyond grades and course access. Based on his application and the policies and implementation described in Section IV.D, Plaintiffs allege on information and belief that Defendants gave those achievements less admissions weight because racial preferences favored otherwise comparable competitors, imposed a higher standard on Stanley, and affected his rejection. That disadvantage

[8] Michael Zhao, Statement to the House Subcommittee on Higher Education and Workforce Development (Sept. 28, 2023), Appendix A, printed p. 4 (PDF p. 7). https://democrats-edworkforce.house.gov/imo/media/doc/mike_zhao.pdf; CBS News, ~~“~~“He was rejected by 14 colleges. Then Google hired him.~~”~~” (Oct. 20, 2023). https://www.cbsnews.com/news/stanley-zhong-google-software-engineer/.

arose even if a reader did not identify Stanley's own race. The claim concerns unequal racial treatment in discretionary review; it does not depend on a right to admission based on credentials alone.

**D. Cornell pursued numerical racial objectives through its admissions practices.**

1) *Cornell expressly considered race in admissions before Stanley applied.*

51.50. On February 28, 2022, President Pollack responded to Student Assembly Resolution SA-R35 concerning legacy admissions preferences. She expressly admitted that status as an "underrepresented minority student" was a consideration in Cornell's admissions selections.[9] This was Cornell's admissions policy statement immediately preceding Stanley's application.

52.51. Cornell's 2020–21 and 2021–22 Common Data Sets, Section C7, report "Racial/ethnic status" as "Considered" in first-time, first-year admissions. The complete v7 edition of its 2022–23 Common Data Set contains the same marking. These reports document racial consideration in the admissions policies preceding Stanley's application.[10] Bizarrely, t The 2023-2024 Common Data Set withholds data on racial/ethnic status selection criteria and, in fact,

[9] Cornell Office of the Assemblies, SA R35 (2021–2022), President Pollack's response (Feb. 28, 2022), available at https://assembly.cornell.edu/resolutions/student-assembly/sa-r35-2021-2022/acknowledged-president.

[10] Cornell University, Common Data Set 2020–2021, § C7, PDF p. 8. https://irp.cornell.edu/wp-content/uploads/2021/06/CDS_2020-2021_FINAL.pdf; Cornell, Common Data Set 2021–2022, § C7, PDF p. 8, https://irp.cornell.edu/wp-content/uploads/2022/05/CDS_2021-2022_V5.pdf; Cornell University, Common Data Set 2022–2023, full v7 edition, § C7, PDF p. 8; cover identifies 2022–2023, although the internal C7 running header retains 2021–2022. https://irp.dpb.cornell.edu/wp-content/uploads/2023/09/CDS_2022-2023_Cornell-University-v7.pdf.

Field Code Changed

does not list any selection criteria whatsoever. But there is no reason to believe Cornell changed its pattern and practice of racial selection.[11]

~~53.~~52. In a January 2023 public forum, *Race, Admissions and the Supreme Court with Jon Burdick, Cornell University*, Vice Provost for Enrollment Jonathan Burdick discussed the pending *Students for Fair Admissions* (*SFFA*) cases while Stanley's application was pending. Burdick reported directly to Kotlikoff and carried responsibility for coordination of admissions systems, policies, practices, and staff training across Cornell's colleges, including Engineering. He anticipated that the ruling would substantially change "our freedoms to use this information in our admission process." The information he was discussing was about race. His account described race as information Cornell was then free to use in review and expected the decision to restrict.[12]

~~54.~~53. Discussing removal of the race checkbox, Burdick said the effects might be modest, but "I don't think they're zero." He explained that some applicants identify their race through the box when "there's not a lot else that differentiates them in the application," giving the example of a middle-class black applicant who describes demanding classes, good grades, and activities without otherwise discussing racial identity. In other words, Cornell was hunting for racial information itself even when an applicant's other materials did not check a box.

~~55.~~54. Separately, discussing whether racial preferences disadvantage other applicants, Burdick stated that "to the extent that race does represent an important difference that students

---

[11] See https://irp.cornell.edu/wp-content/uploads/2024/08/CDS_UNL2_2023_2024-v11.pdf. This included "GPA," "recommendations," "standardized test scores," and "application essay," among other factors, which Cornell obviously considers and considered at the time. However, Cornell declined to provide "the relative importance of each … factors."

[12] Cyndy McDonald Friday Forum, Race, Admissions and the Supreme Court with Jon Burdick, Cornell University, 12:45–14:26; see also 15:09–16:40 (race checkbox) (January 2023 forum). https://www.youtube.com/watch?v=8MkS_CoPY24.

can bring to our processes and bring to our classrooms and bring to our dorms and our environments, we're still going to want to see that; we're still going to want to find that [i.e., race]."[13]

~~56.~~55. Discussing practices that he said privileged white applicants, including legacy preferences, Burdick referred to "the privileges … for Black and Latino enrollment." If those privileges were taken away, he said, "you need to take a long hard look at that too." He described a reader seeing an African American or Latino applicant as "the same and well qualified as every white or Asian applicant" and noticing with "glee" what the applicant had accomplished as "one of the very few African-Americans in a largely white high school." Burdick's "glee" and frank admission that Cornell privileged some racial profiles over others illustrate how racial identity affected admissions assessments and how preferred racial categories conveyed advantages. In Burdick's example, he described no comparable "glee" in encountering Asian applicants with superlative qualifications.

~~57.~~56. Burdick reported that school profiles, recommendation letters, and student essays were making racial identity more explicit in anticipation of the ruling. People had assumed "the demographic checkbox is doing the work for them" and "the reader is going to see it." From Cornell's standpoint, he said, "if the Supreme Court doesn't rule it out we'd like to have that better information~~[;]~~ it's really helpful to us in making good decisions," and he described ways readers could learn racial identity independently of the race field.[14]

---

13 *Id.* at 15:09–16:40, 18:11–18:~~28~~33.

14 Burdick, January 2023 admissions forum, 28:16–29:01 (legacy and enrollment preferences), 29:34–30:07 (school context and a reader's response) (¶55); 29:07–29:54, 31:45–32:08 (race and application information) (¶56). ~~*Id.* at 29:07–32:08.~~

Formatted: Font: Not Italic

Formatted: Font: Not Italic

Formatted: Font: Not Italic

*2) Cornell prescribed a numerical racial benchmark and yearly growth.*

~~58.~~57. *Cornell University at its Sesquicentennial: A Strategic Plan 2010–2015,* Appendix D set a numerical racial benchmark for entering classes: at least 20% underrepresented-minority enrollment. See attached Exhibit A. Under "Undergraduate Student Quality and Diversity," Appendix D's institutional performance measure asked: "Has the percent of underrepresented minorities in each entering class grown? Has it reached 20% or greater?" The Plan thus selected a racial outcome—20% or greater—and directed Cornell to measure each entering class against it.[15]

~~59.~~58. The Plan connected the 20% entering-class benchmark to admissions planning and yearly growth. Objective 6 directed Cornell to "develop targets and plans for enhancing diversity" in order to "increase significantly the proportion of underrepresented minorities." Its "diversity" section directed Cornell to "[s]et explicit goals for yearly growth in the proportion of underrepresented minorities among the undergraduate student population." Appendix D then measured whether each entering class had grown to "20% or greater." The Plan made student racial diversity an institutional priority, specified numerical accountability, and called for continued growth toward its stated benchmark.[16]

~~60.~~59. In September 2013, Cornell reported that its preceding three freshman classes had exceeded the University's goal of at least 20% underrepresented-minority enrollment. In the same article, Senior Vice Provost Barbara Knuth stated: ~~"~~"Compositional diversity begins with a

---

[15] Exhibit A, ~~*Cornell University at its Sesquicentennial: A Strategic Plan 2010–2015* (final version), Appendix D, Indicators for Excellence in Education,~~ item G.5, p. 51. ~~https://www.cornell.edu/strategicplan/docs/060410-strategic-plan-final.pdf.~~

[16] *Id.* at 23 (Objective 6, Action b); p. 39 (For Students, Action a); p. 51 (Appendix D, Indicators for Excellence in Education, item G.5).

student body whose demographics reflect those in the larger society."" Cornell thus publicly evaluated its results against both the numerical benchmark and population composition.[17]

61. 60. Cornell's 2011 accreditation self-study defined undergraduate underrepresented-minority status by U.S. citizenship or permanent residence and identification with one or more of four groups: African American, Hispanic American, American Indian, or Native Hawaiian/Pacific Islander. URM Asian-American identity alone did not include Asian Americans qualify an applicant as URM.[18]

62. 61. Cornell's 2011 Self-Study described separate college admissions offices centrally coordinated by the Associate Vice Provost for Admissions and Financial Aid and the Director of Undergraduate Admissions. Cornell updated its self-study in 2020. Cornell's overarching goals remained "timeless and enduring" but evolved under Pollack. Cornell's "Goal 1" was to "[e]nroll, educate, and graduate the most deserving, promising, and diverse student body possible." When discussing its commitment to "diversity," Cornell noted that "45% of the incoming class are Asian, Black, Hispanic, American Indian and multi-racial U.S. citizens." While paying lip service to "a zest for learning" and "diverse perspectives," the only thing actually counted was race. While uUnder the admissions section, Cornell described its "historic commitment to admitting and enrolling students from diverse backgrounds.," what it It reported that (for the fall Fall 2018 entering class) was 26.6% of enrolled students were underrepresented minorities and 47.8% identified as students of color. The students-of-color category included URM, "Asian (U.S.)," and multiracial non-URM students. In other words, Asian American

[17] *Cornell Chronicle*, ""Diversity hosting boosts undergrad recruitment"" (Sept. 11, 2013). https://news.cornell.edu/stories/2013/09/diversity-hosting-boosts-undergrad-recruitment.

[18] Cornell University, 2011 Self-Study, p. 107 n.22. https://irp.cornell.edu/wp-content/uploads/2011-Self-Study-FINAL.pdf.

~~didn't~~ did not qualify ~~count~~ as URM~~s~~ status. The 2020 self-study also described a Presidential Task Force on diversity and inclusion. These statements continued Cornell's focus on racial composition after the 2010–2015 Plan had sunsetted.[19]

~~63.~~62. Cornell's later publications continued to assign racial-composition objectives to admissions-related planning after the 2010–2015 Plan ended. The 2018 framework, Toward New Destinations, measured student composition through admissions and enrollment data.[20]

~~64.~~63. Engineering adopted population-based composition objectives in 2021,~~;~~ and Pollack confirmed racial consideration in February 2022. These continuing objectives, policies, and practices demonstrate that racial-composition objectives were implemented through preferences in Stanley's Engineering admissions competition.

3) *Engineering adopted racial-composition objectives before the 2022–23 cycle.*

~~65.~~64. Cornell Engineering's 2030 strategic plan stated: "Cornell Engineering envisions a future in which its student body and faculty reflect the gender, socioeconomic, and racial diversity of society." Its August 2021 Diversity, Equity and Inclusion Strategic Plan 2030 expressly addressed diversity of race, ethnicity, and gender among undergraduate and graduate students and faculty. Race and ethnicity were thus express components of Engineering's diversity objectives.

~~66.~~65. The August 2021 Engineering DEI plan aspired within ten years to exceed American Society for Engineering Education composition measures and to achieve a

---

[19] Cornell University, Self-Study Report (Aug. 31, 2020), pp. 24–25, 27, 52, 60–61 (PDF pp. 28–29, 31, 56, 64–65). https://irp.cornell.edu/wp-content/uploads/2026/04/Self-Study-submitted-August-31-2020.pdf.

[20] Presidential Task Force on Campus Climate, Final Report of the Campus Experience Subcommittee (June 8, 2018), Appendix 4, p. 80, available at https://president.cornell.edu/_files/campus-experience/Campus-Experience-Subcommittee_FINAL_posted-11s9bfg.pdf#page=80~~.~~.

**Formatted:** Indent: Left: 0", Hanging: 0.19"

demographic distribution by race in its student body that “ideally reaches the composition of the general U.S. population.” In other words, Cornell aimed to achieve quotas that matched the general United States population. The College pledged to “re-evaluate admissions and interview processes” to pursue that goal alongside recruitment, retention programming, and other retention measures. In its undergraduate discussion, the plan explained: “If we want to be true leaders in Engineering, we must start with our student composition. In numbers, this arguably means above ASEE and as close as possible to the general population.” The plan connected its desired racial composition to changes in applicant review.[21]

~~67.~~66. The Engineering plan compared approximately 21% URM enrollment among non-international Engineering undergraduates in 2020 with estimated U.S. population benchmarks of 32.2% in 2020 and 34.8% in 2030. Cornell used 2010 Census data. It compared current black enrollment of 6.6% with a 2030 population benchmark of 12.8%, current Hispanic enrollment of 13.2% with 21.1%, and Native American enrollment of 0.1% with 0.7%.[22]

~~68.~~67. Cornell’s general-population benchmarks also listed Asian shares of 5.8% for 2020 and 6.7% for 2030. The charts concerned overall undergraduate demographic/racial composition. The plan also recommended admissions-office partnerships to identify high schools producing competitive students from those demographics.[23]

~~69.~~68. The companion Undergraduate Strategic Plan 2030 stated that Engineering aimed to ~~“~~“expand its diverse class of undergraduates and ensure equal representation across all majors.~~”~~” Both plans preceded Stanley’s application. Read together with Cornell’s

---

[21] Cornell Engineering, Diversity, Equity and Inclusion Strategic Plan 2030 (Aug. 2021), PDF pp. 2, 8–9.

[22] *Id.* at PDF pp. 7–9.

[23] *Id.* at PDF pp. 7–9.

contemporaneous disclosure that it considered race, these admissions-related objectives support Plaintiffs' allegation on information and belief that Engineering used racial selection preferences to pursue general-population composition benchmarks in selecting the Fall 2023 class.[24]

70.69. Cornell Engineering's plan linked undergraduate composition benchmarks to admissions practices. In May 2021, Cornell reported centralizing authority and accountability to oversee admissions throughout Cornell and centralizing implementation of universitywide admissions priorities. In February 2022, Pollack again confirmed that underrepresented-minority status affected selection. Based on those objectives, disclosures, and assigned responsibilities, both from the top levels of the administration and at the College of Engineering level, admissions officials coordinated racial preferences during Stanley's cycle.

4) *Cornell's officials coordinated admissions policies and their implementation.*

71.70. In April 2020, Cornell suspended required SAT and ACT college-admission testing. Its April 2024 report, *The Use of Standardized Testing in Admissions: Summary of Key Findings* ("Testing Report"), identified pandemic access barriers as the principal reason, but also concerns that tests "undermine some of Cornell's admissions goals." The report once again betrayed Cornell's obsession with race-based criteria. It evaluated the racial composition and race-specific score-submission patterns.[25]

72.71. In July 2020, in the name of promoting "racial justice," Pollack announced additional initiatives, including the mandate to "think and act holistically to change structures

[24] Cornell Engineering, Undergraduate Strategic Plan 2030 (2021; original publication URL), PDF p. 9. https://strategicplan.engineering.cornell.edu/wp-content/uploads/2021/12/Cornell-Engineering-Undergraduate-Strategic-Plan-2030.pdf.

[25] Cornell University, *The Use of Standardized Testing in Admissions: Summary of Key Findings* (Apr. 2024) (""Testing Report""), p. 1. https://irp.dpb.cornell.edu/wp-content/uploads/2024/04/Test-Score-Task-Force-update-release.pdf.

and systems that inherently privilege some more than others" and to build a "just, anti-racist world," whatever that means. President Pollack described "the system that has disadvantaged our Black, Indigenous and other colleagues, students and friends of color for centuries." Cornell's SC Johnson College of Business would increase efforts "to increase the racial diversity of undergraduate and graduate programs"; Architecture, Art, and Planning would develop a diversity and equity officer position whose duties included enhancing enhance recruitment of black and other "minoritized students." The announcement placed Cornell's student-enrollment initiatives within the framework of the President's "racial justice" agenda across colleges.[26]

73.72. A coalition letter dated September 8, 2020, addressed to Pollack, Kotlikoff, and Cornell's deans, demanded elimination of SAT and ACT consideration because of ""exacerbating race/class disparities, especially given the racialized history of intelligence testing."" The letter also sought undergraduate representation of black, indigenous, and other students of color matching national high-school degree attainment. Following the April 2020 suspension of required testing, the coalition asked officials overseeing admissions to link permanent testing changes to specified racial-composition outcomes.[27]

74.73. The College of Engineering became test-optional but nevertheless continued to show had far and away the highest percentage of students enrollees submitting standardized test scores among the test-optional colleges of Cornell reported for Fall 2022 and 2023. For Fall 2023, the *Testing Report* records official scores for 30% of Engineering applicants, 61% of

---

[26] *Cornell Chronicle*, "Pollack outlines new initiatives to promote racial justice" (July 16, 2020). https://news.cornell.edu/stories/2020/07/pollack-outlines-new-initiatives-promote-racial-justice.

[27] Faculty, Graduate Students, and Staff for an Anti-Racist Cornell, "2020 Demands" (dated Sept. 8 2020), long-term demands 10–11. https://medium.com/@cornellfacultydemands/faculty-students-and-staff-for-an-anti-racist-cornell-2020-demands-b5820bdb1ee4.

acceptances, and 75% of enrollees; Fall 2022 figures were 34%, 64%, and 77%. ~~The~~ Thus, the fact that test scores were optional did not mean ~~they were~~ Cornell, especially engineering, was not ~~considered~~ considering them. Especially in engineering, test scores remained overwhelmingly important part of the admissions process. Standardized test scores thus remained relevant to comparing Stanley's academic qualifications with those of competing applicants.[28]

~~75.~~74. In May 2021, Felton described Cornell's review of applications without required entrance-exam scores. He said staff focused on transcripts, recommendations, and essays, and reported a more "diverse" applicant pool, including increases in students of color and international applicants. He said Cornell would examine changes associated with its testing policy and expanded virtual engagement in deciding what information it needed to select future classes. His account describes his direct involvement in the review process and its evaluation by admissions leadership.[29]

~~76.~~75. In September 2022, Vice Provost for Enrollment Jonathan Burdick said Cornell was conducting "whole-person reviews" with far fewer or no SAT/ACT scores and was considering testing policies' effects on assembling a diverse, qualified student body. His statement linked the treatment of academic testing information to the racial composition Cornell sought to assemble immediately before Stanley applied.[30]

---

[28] "The Use of Standardized Testing in Admissions: Summary of Key Findings," April 2024 (Cornell, Testing Report), pp. 2, 6.

[29] Lisa O'Malley, "Pandemic Has Surprising Effects on Diversity in Elite College Admissions," Insight into Diversity (now Insight into Academia), May 17, 2021. https://insightintoacademia.com/pandemic-has-surprising-effects-on-diversity-in-elite-college-admissions/.

[30] Katherine Esterl, "University will Remain Test-Optional for 2023-24 Applicants," *The Cornell Daily Sun*, Sept. 14, 2022. https://www.cornellsun.com/article/2022/09/university-will-remain-test-optional-for-2023-24-applicants.

~~77.~~76. On February 7, 2023, while Stanley's application was pending, *The Cornell Daily Sun* attributed to Burdick the achievement of increased diversity among both applicants and admitted students following the test-optional policy. He described a deliberate two-year evaluation of testing policy and explained that essays communicating readiness and intent had greater weight, alongside grades, rigorous courses, and other academic indicators. This account places increased essay weight and evaluation of class composition in the same selection cycle as Stanley's application.[31]

~~78.~~77. In March 2012, while serving as the University of Rochester's Dean of Admissions and Financial Aid, Burdick predicted that restrictions on race in admissions could lead institutions to drop the SAT and ACT because test-score evidence had been used to support discrimination suits. But dropping standardized tests would let colleges evade proof of their discriminatory practices. Burdick said, "If you take away the measurement, there's no proof, and colleges can continue to do what they know is right—admitting people in the context of their educational opportunities."

~~79.~~78. Leading Cornell's enrollment office in the January 2023 forum, ~~he~~ Burdick returned to that argument, saying standardized tests had "been part of every lawsuit" challenging racial admissions policies and that "the two things are bound together." Although he attributed the rapid move to optional testing during the pandemic, he also said that large numbers of institutions were sticking to that policy ~~and its continuation in part to institutions like Cornell's uncertainty about~~ "in part because of this new information," i.e. the forthcoming decision of

[31] Caroline Michailoff, "Test-Optional Policies Emphasize Diversity, Holistic Applications for Prospective Class of 2027," *The Cornell Daily Sun*, Feb. 7, 2023. https://www.cornellsun.com/article/2023/02/test-optional-policies-emphasize-diversity-holistic-applications-for-prospective-class-of-2027.

*SFFA* and again linked the availability of testing data to scrutiny of racial selection.[32] This was at the exact time that Stanley's application was pending.

Formatted: Font: Italic

~~80.~~79. Predictably, this compromised merit. Cornell's April 2024 Testing Report found that students admitted without known test scores tended to earn weaker semester grade-point averages, were more likely to fall out of good academic standing and were less likely to re-enroll in later semesters. The differences persisted after accounting for high-school grades and other student and school characteristics. However, among other things, Cornell's analysis confirms that Cornell used student admissions, including test scores or their absence, and academic-outcome records to evaluate the significance of standardized testing data.[33]

~~81.~~80. On December 6, 2022, Cornell announced a Presidential Task Force on Undergraduate Admissions. The first meeting was November 21, 2022. Pollack asked which applicant characteristics should be prioritized and "used as selection criteria," and which pipeline programs would have "maximum impact on undergraduate student body diversity." The Task Force included Engineering admissions director Scott Campbell. The Task Force followed a summer 2022 group led by General Counsel Donica Thomas Varner and Burdick and a 2018–2019 diversity-in-admissions committee led by Eduardo Peñalver. The charge placed the choice of applicant-level selection criteria, their use across Cornell's colleges, and evaluation of resulting class composition within a coordinated policy process that included Stanley's admitting college.[34]

[32] Leah Buletti, *Campus Times*, vol. 139, no. 6 (Mar. 1, 2012), report on the Supreme Court's review of racial preferences, p. 1. https://www.campustimes.org/wp-content/uploads/2016/02/2012-03-01_6.pdf; Burdick, January 2023 admissions forum, 45:58–46:51 (January 2023 forum).

[33] Cornell, Testing Report (Apr. 2024), pp. 6–7 & n.7.

[34] *Cornell Chronicle*, "Pollack establishes Task Force on Undergraduate Admissions" (Dec. 6, 2022). https://news.cornell.edu/stories/2022/12/pollack-establishes-task-force-undergraduate-

~~82.~~81. At the March 8, 2023 Faculty Senate meeting, Task Force member Alan Mathios reported consultations with admissions officials in each college to understand their existing practices. He described work on how to prioritize applicant characteristics systematically, use machine learning to help craft the class, and develop recruitment pipelines. He identified universitywide policy and implementation guidance for admitting units as the Task Force's objectives. These consultations examined the criteria and information used by Cornell's actual admissions offices while Stanley's application was pending. Mathios said the group was still gathering input and had not reached recommendations.[35]

~~83.~~82. Kotlikoff personally centralized enrollment in April 2018 in an administrative position encompassing admissions, financial aid, and the registrar: the Vice Provost for Enrollment, later filled by Burdick beginning in August 2019. Cornell announced that the Vice Provost for Enrollment would "report directly to Kotlikoff." It described coordination across colleges, first-year admissions, and recruitment of a "diverse" class. The reporting structure connected the officials carrying out undergraduate admissions priorities directly to Kotlikoff.[36]

~~84.~~83. In May 2021, Cornell was moving from varied admissions policies at the college level toward centralized oversight. Cornell reported that the vice provost for enrollment had "authority, responsibility and accountability to oversee admissions across Cornell" and to ensure

admissions; Cornell University, Presidential Task Force on Undergraduate Admissions Final Report (2023), p. 9 (Charge 1). https://president.cornell.edu/_files/presidential-task-force-on-undergraduate-admissions/presidential-task-force-on-undergraduate-admissions-final-report.pdf.

[35] Cornell Faculty Senate, draft meeting minutes (Mar. 8, 2023), pp. 7–8. https://live-deanoffaculty.pantheonsite.io/wp-content/uploads/draft-meeting-minutes-Mar23.pdf.

[36] *Cornell Chronicle*, "Vice provost for enrollment will 'champion the student experience'" (Apr. 11, 2018). https://news.cornell.edu/stories/2018/04/vice-provost-enrollment-will-champion-student-experience.

satisfaction of universitywide admissions priorities. This authority extended across the colleges, connecting central priorities to the college-level process in which Stanley later competed.[37]

~~85.~~84. At the January 2023 forum, Burdick said his position was intended to bring Cornell's disparate enrollment offices "under one umbrella," particularly for "systems and policies and practices and training" of professional staff. He distinguished the functions of Engineering ~~and described~~ from Arts and said Cornell wanted to "reap the benefits" of coordination and "centralization." The engineering college was a full participant in Cornell's centralized push to make race-based admission one of its main goals.

~~86.~~85. In spring 2023, Kotlikoff charged a testing task force, including Campbell, to examine admissions chances, student outcomes, and "racial/ethnic composition of admitted students."[38] Its May 2023 report remained confidential, but Cornell's April 2024 update lamented no clear diversity increase from relaxed testing. It reported that "the percentage of first year students who are Black, Hispanic and/or indigenous (BHI) increased from 23% to 27% in the five years preceding the pandemic. In Fall 2021, that percentage increased further to 28%, but has declined very slightly to 25% in Fall 2023."[39] Among 2022 survey respondents scoring above 1400, "Black students were less likely than White and Asian students to have submitted their test scores: 62% of Black students versus 74% of White students and 79% of Asian students with these high scores sent them to Cornell." Cornell thus evaluated testing against race-specific admissions and submission data.[40]

---

[37] *Cornell Chronicle*, "Functional review helps Cornell 'build back smart'" (May 13, 2021). https://news.cornell.edu/stories/2021/05/functional-review-helps-cornell-build-back-smart. See also Burdick, January 2023 admissions forum, 5:54–6:35 (centralized systems and training, discussed in ¶84).

[38] Cornell, Testing Report (Apr. 2024), p. 1.

[39] *Id.*, p. 5.

[40] Cornell, Testing Report (Apr. 2024), pp. 1–5, 7.

~~87.~~86. Felton's published professional biography identifies his pre-Fall-2023 responsibility for "admissions policy and practice" and work with Cornell's undergraduate colleges. His office led application processing, admissions data and systems, yield strategy, and "recruitment, selection, and enrollment" of specified populations, including underrepresented students. Those assigned duties concern selection and the systems supplying applicants' information to reviewers, connecting Felton to the processes through which Plaintiffs allege the racial preferences were implemented.[41]

~~88.~~87. Based on his documented creation of central enrollment oversight, its authority described in May 2021, Burdick's January 2023 account of coordinated policies and staff training including Engineering, and the testing task force he charged in spring 2023, on information and belief, Kotlikoff had full knowledge of, approved, and enforced the challenged racial preferences as part of the admissions priorities implemented through the enrollment structure reporting to him. Based on Felton's documented responsibility for admissions policy, application systems, college coordination, and underrepresented-student selection, and his public description of the review process, Plaintiffs allege on information and belief that Felton implemented those preferences through the policies, systems, and college coordination for which he was responsible during Stanley's cycle. Likewise, Burdick implemented and supervised the challenged preferences through those systems and practices during Stanley's cycle. Each thereby participated in applying unequal racial standards to the competition in which Stanley's application was rejected.

[41] Shawn Felton, professional biography, Director of Strategic Enrollment Initiatives (2024), https://resources.finalsite.net/images/v1708675385/sas/f3momt2lxnq5gy5udibh/ShawnFeltonBio.pdf.~~.~~

~~89.~~88. Plaintiffs further allege on information and belief that Cornell's consistent pattern and practice of racial preferences in admissions disadvantaged Stanley because of his race.

5) *Enrollment and SAT data permit a comparison for 2018–2026.*

~~90.~~89. Tables A, B, and C compare Cornell's universitywide first-year enrollment with the racial and ethnic composition of SAT cohorts reported by the College Board, the nonprofit entity that administers the SAT.

~~91.~~90. The tables identify differences in enrollment relative to estimated high-scoring SAT pools and provide context for Cornell's admissions policies and practices described above. The applicant-level records linking academic credentials, reader evaluations, racial information, and decisions for Stanley's Engineering admissions pool are in Cornell's exclusive control and therefore not publicly available. These data are used as a proxy ~~which is~~ correlated with Cornell's actual admissions statistics that ~~are withheld~~ Cornell withholds from public view.[42]

~~92.~~91. Cornell reported admitted-class URM shares of 33% for Fall 2018, 32% for 2019, 33.7% for 2020, 34.2% for 2021, and 32.7% for 2022. Cornell described the students admitted for Fall 2019 as follows: ~~"~~"Students accepted to Cornell's Class of 2023 are unprecedentedly diverse, with 55 percent of those admitted identifying as students of color, including both underrepresented minorities and Asian Americans – the highest percentage in university history.~~"~~" The admitted-class URM shares of 32% to 34.2%, a different measure from the

[42] Cornell Institutional Research & Planning, First-Year Admissions (accessed Oct. 17, 2026). https://irp.cornell.edu/university-factbook/undergraduate-admissions/first-year-admissions; Cornell Institutional Research & Planning, Freshman Profile Archives (accessed Oct. 17, 2026). https://irp.cornell.edu/university-factbook/freshman-profile-archives; Cornell Institutional Research & Planning, Common Data Set archive (accessed Oct. 17, 2026). https://irp.cornell.edu/common-data-set.

broader students-of-color category, remained within a narrow range and exceeded the Strategic Plan's "20% or greater" benchmark.[43]

~~93.~~92. Table A covers Fall 2018–2026. Figures for 2018–2025 are first-time, first-year degree-seeking enrollment disclosed in Section B2 of Cornell's Common Data Sets.

**~~Table A~~ Table A. Number of first-year students who enrolled at Cornell, by race, Fall 2018–2026**

| Entering class (fall) | Asian American | Black | Hispanic | White | All first-year students |
|---|---|---|---|---|---|
| 2018 | 624 | 265 | 503 | 1,125 | 3,295 |
| 2019 | 647 | 209 | 505 | 1,117 | 3,189 |
| 2020 | 731 | 258 | 530 | 1,060 | 3,249 |
| 2021 | 831 | 338 | 583 | 1,160 | 3,718 |
| 2022 | 823 | 290 | 538 | 1,071 | 3,491 |
| 2023 *(Stanley's class)* | 962 | 261 | 531 | 1,014 | 3,537 |
| 2024 | 1,020 | 150 | 335 | 1,130 | 3,525 |
| 2025 | 1,088 | 182 | 423 | 1,147 | 3,827 |
| 2026* | 1,125 | 124 | 327 | 1,141 | 3,681 |

Source: Cornell Common Data Sets, Section B2 (first-time, first-year, degree-seeking students), 2018–2025; Cornell First-Year Admissions profile, updated September 1, 2026. Hispanic students are counted as Hispanic regardless of race. The total also includes international students, multiracial students, other reported groups, and students of unknown race.

* 2026 is preliminary expected enrollment; its four race counts are U.S. students, while the total includes all reported groups.

[43] Daniel Aloi, "Class of 2022 Selected from Record Number of Applicants," *Cornell Chronicle* (Mar. 28, 2018). https://news.cornell.edu/stories/2018/03/class-2022-selected-record-number-applicants; Melanie Lefkowitz, "Accepted Class of 2023 Students Most Diverse Ever," *Cornell Chronicle* (Mar. 28, 2019). https://news.cornell.edu/stories/2019/03/accepted-class-2023-students-most-diverse-ever; Joe Wilensky, "Accepted Class of 2025 Impresses During a Year Like No Other," *Cornell Chronicle* (Apr. 7, 2021), reporting the 2021 share of 34.2% and the preceding year's share of 33.7%. https://news.cornell.edu/stories/2021/04/accepted-class-2025-impresses-during-year-no-other; Caitlin Hayes, "Expanded virtual outreach draws diverse Class of 2026," *Cornell Chronicle* (Apr. 11, 2022). https://news.cornell.edu/stories/2022/04/expanded-virtual-outreach-draws-diverse-class-2026; Exhibit A~~*Cornell University at its Sesquicentennial: A Strategic Plan 2010–2015*~~, p. 51.



Formatted: Portuguese (Brazil)
Formatted: Portuguese (Brazil)
Formatted: Portuguese (Brazil)
Field Code Changed

~~94.~~93. Table B reports SAT participation and performance by race and ethnicity for high-school graduating classes from 2018 through 2026. It shows the number of SAT takers, the published percentage scoring 1400–1600 (out of a total of 1600), and the estimated number of students within that band. Each high-school cohort in Table B is paired with Cornell enrollment for the same fall in Table A. The data ~~is~~ are obviously correlated with those students who are admitted and enroll at Cornell because Cornell reports that, for example, 93.47% of its Fall 2025 first-year enrollees who submitted SAT scores scored within this band, compared with approximately 7% of College Board's reported 2025 SAT cohort.[44]

~~95.~~94. The estimates multiply each group's SAT-taker count by its published percentage within the 1400–1600 band. The College Board counts each student once per graduating cohort using the student's latest SAT score. Published percentages are rounded to whole ~~percentage~~ numbers~~points~~. Table B rounds estimated counts to the nearest student; Table C uses unrounded products. For 2026, College Board did not numerically label the black and Hispanic 1400–1600 bands, so the corresponding estimates and ratios are reported as unavailable.[45]

---

[44] Cornell, Common Data Set 2025–2026, § C9.
College Board, 2018 Total Group SAT Suite of Assessments Annual Report, PDF pp. 3 & 5.
College Board, 2019 Total Group SAT Suite of Assessments Annual Report, PDF pp. 3 & 5.
College Board, 2020 Total Group SAT Suite of Assessments Annual Report, PDF pp. 3 & 5.
College Board, 2021 Total Group SAT Suite of Assessments Annual Report, PDF pp. 3 & 6.
College Board, 2022 Total Group SAT Suite of Assessments Annual Report, PDF pp. 4 & 7.
College Board, 2023 Total Group SAT Suite of Assessments Annual Report, PDF pp. 4 & 7.
College Board, 2024 Total Group SAT Suite of Assessments Annual Report, PDF pp. 4 & 7.
College Board, 2025 Total Group SAT Suite of Assessments Annual Report, PDF pp. 2, 4, 7 (counting method, participation, and score distributions).
College Board, 2026 Total Group SAT Suite of Assessments Annual Report, PDF pp. 8, 11.

[45] College Board, 2026 SAT Annual Report, Total Group, PDF pp. 3–4, 8, 11.

**Table B. Estimated number of SAT takers who scored 1400–1600, by race and high-school class**

| **High-school class** ~~*enters college that fall*~~ | **Measure** | **Asian** ~~**American**~~ | **Black** | **Hispanic** | **White** |
|---|---|---|---|---|---|
| 2018 | All SAT takers | 217,971 | 263,318 | 499,442 | 930,825 |
| | % scoring 1400–1600 | 24% | 1% | 2% | 8% |
| | Estimated number scoring 1400–1600 | **52,313** | **2,633** | **9,989** | **74,466** |
| 2019 | All SAT takers | 228,527 | 271,178 | 554,665 | 947,842 |
| | % scoring 1400–1600 | 25% | 1% | 2% | 8% |
| | Estimated number scoring 1400–1600 | **57,132** | **2,712** | **11,093** | **75,827** |
| 2020 | All SAT takers | 223,451 | 261,326 | 569,370 | 909,987 |
| | % scoring 1400–1600 | 24% | 1% | 2% | 7% |
| | Estimated number scoring 1400–1600 | **53,628** | **2,613** | **11,387** | **63,699** |
| 2021 | All SAT takers | 167,208 | 168,454 | 352,094 | 635,486 |
| | % scoring 1400–1600 | 27% | 1% | 2% | 8% |
| | Estimated number scoring 1400–1600 | **45,146** | **1,685** | **7,042** | **50,839** |
| 2022 | All SAT takers | 175,468 | 201,645 | 396,422 | 732,946 |
| | % scoring 1400–1600 | 27% | 1% | 2% | 7% |
| | Estimated number scoring 1400–1600 | **47,376** | **2,016** | **7,928** | **51,306** |
| 2023 *(Stanley's class)* | All SAT takers | 194,108 | 225,954 | 462,186 | 752,632 |
| | % scoring 1400–1600 | 25% | 1% | 2% | 6% |
| | Estimated number scoring 1400–1600 | **48,527** | **2,260** | **9,244** | **45,158** |
| 2024 | All SAT takers | 200,385 | 228,688 | 483,640 | 725,962 |
| | % scoring 1400–1600 | 27% | 1% | 2% | 7% |
| | Estimated number scoring 1400–1600 | **54,104** | **2,287** | **9,673** | **50,817** |
| 2025 | All SAT takers | 217,459 | 250,887 | 537,624 | 743,981 |
| | % scoring 1400–1600 | 26% | 1% | 2% | 7% |
| | Estimated number scoring 1400–1600 | **56,539** | **2,509** | **10,752** | **52,079** |
| 2026 | All SAT takers | 216,504 | 233,864 | 510,961 | 695,904 |
| | % scoring 1400–1600 | 28% | N/A* | N/A* | 7% |
| | Estimated number scoring 1400–1600 | **60,621** | **N/A*** | **N/A*** | **48,713** |

Bold counts equal SAT takers × percentage. * N/A: the 2026 black and Hispanic percentages are unlabeled; unavailable does not mean zero. Source: College Board Total Group annual reports.

~~96.~~95. Table C pairs Cornell's fall enrollment in Table A with the same year's high-school graduating SAT cohort in Table B. Its first four numerical columns divide Cornell enrollment by the estimated number of high-scoring SAT takers of the same race and multiply by 100. Its last three columns divide each group's figure by the corresponding Asian ~~American~~ figure. For Fall 2025, the Asian ~~American~~ calculation is 100 × 1,088 ÷ (217,459 × 26%), or approximately 1.92; the black calculation is 100 × 182 ÷ (250,887 × 1%), or approximately 7.25. Dividing the unrounded black figure by the unrounded Asian ~~American~~ figure yields approximately 3.77. The corresponding Hispanic and White ratios are approximately 2.04 and 1.14. These figures compare Cornell enrollment relative to each group's separately reported high-scoring SAT pool.

**Table C. Cornell enrollment relative to each group's high-scoring SAT takers, Fall 2018–2026**

| | Cornell first-year students per 100 high-scoring SAT takers of the same race | | | | Times the Asian ~~American~~ figure | | |
|---|---|---|---|---|---|---|---|
| **Entering class (fall)** | **Asian ~~American~~** | **Black** | **Hispanic** | **White** | **Black** | **Hispanic** | **White** |
| 2018 | 1.19 | 10.06 | 5.04 | 1.51 | 8.44× | 4.22× | 1.27× |
| 2019 | 1.13 | 7.71 | 4.55 | 1.47 | 6.81× | 4.02× | 1.30× |
| 2020 | 1.36 | 9.87 | 4.65 | 1.66 | 7.24× | 3.41× | 1.22× |
| 2021 | 1.84 | 20.06 | 8.28 | 2.28 | 10.90× | 4.50× | 1.24× |
| 2022 | 1.74 | 14.38 | 6.79 | 2.09 | 8.28× | 3.91× | 1.20× |
| 2023 *(Stanley's class)* | 1.98 | 11.55 | 5.74 | 2.25 | 5.83× | 2.90× | 1.13× |
| 2024 | 1.89 | 6.56 | 3.46 | 2.22 | 3.48× | 1.84× | 1.18× |
| 2025 | 1.92 | 7.25 | 3.93 | 2.20 | 3.77× | 2.04× | 1.14× |
| 2026* | 1.86 | N/A* | N/A* | 2.34 | N/A* | N/A* | 1.26× |

How to read: 1.92 means 1.92 reported Cornell enrollees per 100 separately reported high-scoring SAT takers of the same race. The last three columns divide each group's figure by the Asian ~~American~~ figure. * 2026 uses preliminary Cornell enrollment. N/A means the ratio cannot be calculated because the corresponding SAT-band percentage is unavailable. Sources: Tables A and B. For 2018–2025. Assuming the published percentages were rounded to the nearest percentage point, and using the endpoints least favorable to Plaintiffs, gives minimum Black-to-Asian and Hispanic-to-Asian ratios of approximately 2.28 and 1.44.

~~97.~~96. The differences recur across the reported years. From 2018 through 2025, the black-to-Asian ratio ranged from 3.48 to 10.90, and the Hispanic-to-Asian ratio ranged from 1.84 to 4.50. For Fall 2023, Stanley's entering class, the ratios were 5.83 and 2.90. For the first entering class after *SFFA*, they declined to 3.48 and 1.84 in Fall 2024, then rose to 3.77 and 2.04 for Fall 2025.

~~98.~~97. Plaintiffs rely on this recurring pattern together with Cornell's contemporaneous admissions disclosures, Pollack's identification of underrepresented-minority status as an admissions consideration, and Engineering's racial-composition objectives for its student body, and proposed changes to applicant review. Taken together, these facts support the allegation that racial preferences prejudiced Stanley's opportunity to compete. A direct comparison of competing Engineering applicants' academic and nonacademic qualifications, racial information, reader assessments, and admission decisions requires the applicant-level records in Cornell's exclusive control.

~~99.~~98. From Fall 2023 to Fall 2024, Cornell's first post-*SFFA* entering class, total enrollment changed from 3,537 to 3,525; black enrollment fell from 261 to 150, Hispanic enrollment from 531 to 335, and Asian enrollment rose from 962 to 1,020. From Fall 2024 to Fall 2025, black enrollment rose to 182 (up 21.3%), Hispanic enrollment to 423 (up 26.3%), and Asian enrollment to 1,088 (up 6.7%), while total enrollment rose to 3,827 (up 8.6%). Table A's preliminary Fall 2026 figures were 124 black, 327 Hispanic, and 1,125 Asian students among 3,681 expected enrollees. Engineering remained test-optional for Fall 2024 and Fall 2025; required testing returned for Fall 2026.[46]

---

[46] Cornell, First-Year Admissions, Entering Fall 2026 (Sept. 1, 2026), PDF p. 1; The Cornell Daily Sun, "Cornell Waives Standardized Testing Requirement for First-Year Applications Through Fall 2024" (Sept. 22, 2021) (Engineering).

~~100.~~99. Cornell's September 2024 account published the following chart of incoming first-year U.S. citizens, counting each by disclosed racial identity separately. ~~Its known-race populations were 3,001~~ Cornell reported 3,184 US citizens in Fall 2023 and 3,194~~2,880~~ in Fall 2024, after ~~excluding~~ including 183 and 314, respectively, whose race or ethnicity was ~~students with~~ unknown ~~race or ethnicity, respectively~~. Black representation fell from 11.7% to 7.7%, Hispanic representation from 16.7% to 10.5%, and Asian representation rose from 36.3% to 38.5%. These are multiple-response percentages, distinct from Table A's single-category counts.

~~101.~~100. Nishii described the shifts as "not unexpected" and said self-reported race and ethnicity had not been considered in that admissions review cycle. Importantly, this short-term impact of *SFFA* only appeared in the statistics the year after Stanley applied and was rejected.[47]

---

https://www.cornellsun.com/article/2021/09/cornell-waives-standardized-testing-requirement-for-first-year-applications-through-fall-2024; *Cornell Chronicle*, "Cornell to reinstate standardized test requirements for fall 2026" (Apr. 22, 2024), continuation of optional policies for Fall ~~2024 and Fall~~ 2025; required tests for Fall 2026. https://news.cornell.edu/stories/2024/04/cornell-reinstate-standardized-test-requirements-fall-2026.

[47] *Cornell Chronicle*, "Q&A: Cornell releases demographic data for 'exceptional' incoming class" (Sept. 25, 2024). https://news.cornell.edu/stories/2024/09/qa-cornell-releases-demographic-data-exceptional-incoming-class.

**Figure 1. Cornell's incoming first-year undergraduates, ~~fall~~ Fall 2023 and Fall 2024**




Source: *Cornell Chronicle*, September 25, 2024; chart credit: Caitlin Cook/Cornell University. The original chart is reproduced. Students may appear in more than one racial category, so the percentages total more than 100%.

~~102.~~101. On January 22, 2026, Senator Bill Cassidy, Chair of the U.S. Senate Committee on Health, Education, Labor, and Pensions, sent President Kotlikoff a written inquiry citing the University of California, San Diego's public November 2025 admissions report. He requested Cornell's entering-student math placements for each Fall 2019–2025 cohort, course descriptions, placement criteria, mathematics or quantitative graduation requirements, and changes in testing requirements, with a response due February 5. The inquiry identifies specific Cornell records concerning academic qualifications in cohorts that include Stanley's application year.[48] ~~This~~ These data clearly exist~~s~~ but is withheld currently from public scrutiny.

~~103.~~102. Cornell's November 2025 federal-agreement FAQ (frequently asked questions) states that it agreed to provide ~~"~~"anonymized undergraduate admissions data~~"~~" quarterly for three years and had already supplied similar data in government inquiries. The

[48] Senator Bill Cassidy, Chair, U.S. Senate Committee on Health, Education, Labor, and Pensions, letter to President Michael Kotlikoff (Jan. 22, 2026), pp. 1–2. https://www.help.senate.gov/imo/media/doc/Cornell%20University%20Math%20Inquiry.pdf.

agreement specifies data broken down by college or school, race, grade point average, and standardized-test performance, in a form permitting statistical analysis. On information and belief, ~~this~~ these data reveal~~s~~ racial disparities in admissions and enrollment at Cornell.[49]

**E. Cornell's current admissions practices**

*1) Cornell's changes after SFFA*

~~104.~~103. Before *SFFA* was decided, Vice Provost for Enrollment Burdick~~'s~~, speaking at a January 2023 forum, urged counselors to tell minority students that universities, expressly including Cornell, still wanted them despite anticipated limits on explicit consideration of race. "Please, please, please understand that this is what colleges still and always will want to do.… Cornell University, they all [admissions offices] want you, want you, want you as much as ever." In discussing application information identifying students as African American, Hispanic, or Native American, he said it was "still going to matter to elite, selective places." In Burdick's own words, Cornell intended to continue identifying and considering applicants' racial backgrounds after the expected *SFFA* decision.[50]

~~105.~~104. On June 29, 2023, the day *SFFA* was decided, President Pollack stated that Cornell was "disappointed." She defended "an individualized and holistic application review process" as a means of creating a broadly diverse student body, while stating that Cornell would follow the law. The subsequent changes to admissions practices are described below.[51]

---

[49] Cornell University, Federal Agreement Frequently Asked Questions (Nov. 17, 2025), Terms of the Agreement. https://info.cornell.edu/executive-orders/federal-agreement/; Agreement Between Cornell University and the United States (Nov. 7, 2025), §§ II.2, II.9. https://statements.cornell.edu/2025/documents/cornell-settlement-agreement.pdf.

[50] Burdick, January 2023 admissions forum, 52:24–54:11.

[51] *Cornell Chronicle*, "President Pollack message on Supreme Court decision" (June 29, 2023). https://news.cornell.edu/stories/2023/06/president-pollack-message-supreme-court-decision.

~~106.~~105. On September 14, 2023, Cornell's Task Force ~~identified~~ recommended a new Common Application question about applicants' "experiences as part of a community ~~experiences~~" and indicated implementation had begun. Pollack assigned Kotlikoff and Nishii responsibility to "begin implementing a broad-ranging set of best practices and guidelines." The announcement connects a concrete change in the information sought from applicants with named officials responsible for Cornell's post-*SFFA* admissions practices. Read with Burdick's and Tan's accounts, these changes support Plaintiffs' allegation that Cornell sought to identify applicants' racial backgrounds through their application materials.[52]

~~107.~~106. In a January 23, 2024, open letter to Cornell leadership, trustee emeritus and Counselor to the President Jon A. Lindseth called for Pollack's and Kotlikoff's resignations and criticized identity-based admissions preferences and the subordination of merit to equal outcomes.[53] But in a November 22, 2024, Black Students United town hall attended by ~~(at that time~~ then-Interim President Kotlikoff, Director of Undergraduate Admissions Pamela Tan, and Vice Provost for Undergraduate Education Lisa Nishii, an audience member asked how Cornell would "rebuild to pre-SCOTUS [Supreme Court of the United States] numbers." Tan identified the universitywide community essay and applicants' descriptions of their communities, explaining that "I could look at it there," referring, in context, to applicants' race.[54]

---

[52] Susan Kelley, Task force recommends new undergraduate admissions practices, Cornell Chronicle, September 14, 2023, available at https://news.cornell.edu/stories/2023/09/task-force-recommends-new-undergraduate-admissions-practices.

[53] Jon A. Lindseth, "Open Letter Recommendations to the Cornell University Board of Trustees" (Jan. 23, 2024). https://ivyexcellence.org/news/open-letter-cornell-board-of-trustees.

[54] *The Cornell Daily Sun*, "More Concern Expressed Than Answers Given: Black Students United Holds Town Hall with Top Administrators" (Nov. 23, 2024). https://www.cornellsun.com/article/2024/11/more-concern-expressed-than-answers-given-black-students-united-holds-town-hall-with-top-administrators; *The Cornell Daily Sun*, "Cornell Removes Universitywide Essay Question for Fall 2027 Applicants" (Aug. 20, 2026).

~~108.~~107. Reporting on Tan, a contemporaneous Sun article stated: "Tan explained that even though applicants have the option to register their race on the application, the admission office cannot see it. So admissions officers instead rely on indicators including the newly instituted community essay, students' membership in affinity organizations and clubs and Questbridge scholar status to target underrepresented student populations."[55]

~~109.~~108. Tan's response linked identity-related application information with concerns about racial representation.

~~110.~~109. ~~At the time of filing,~~ Cornell's Fall 2027 application cycle is currently open. Cornell requires SAT or ACT scores for first-year applicants, a requirement restored beginning with Fall 2026 entry.[56]

~~111.~~110. In August 2026, Cornell removed its 350-word universitywide community essay for Fall 2027 while retaining college-specific essays, which Tan indicated sufficiently assessed "fit." She said this was the only application change in the 2026-2027 application cycle. But eliminating one vehicle for identifying applicants' racial backgrounds does not eliminate the remaining vehicles described below or establish that Cornell stopped using that information to confer racial preferences.[57]

~~112.~~111. Cornell's current Duffield Engineering application requires two essays of up to 200 words and four responses of up to 100 words. One ~~requires a~~ short~~-~~response prompt

---

https://www.cornellsun.com/article/2026/08/cornell-removes-universitywide-essay-question-for-fall-2027-applicants.

55 *The Cornell Daily Sun*, "More Concern Expressed Than Answers Given: Black Students United Holds Town Hall with Top Administrators" (Nov. 23, 2024).

56 Cornell Undergraduate Admissions, Standardized Testing Policy (accessed Oct. 17, 2026). https://admissions.cornell.edu/policies/standardized-testing-policy.

57 *The Cornell Daily Sun*, "Cornell Removes Universitywide Essay Question for Fall 2027 Applicants" (Aug. 20, 2026).

asksto the prompt, what the applicant would contribute to the Engineering "community" beyond the rest of the application and asks: "What unique voice will you bring?" Another asks about a meaningful activity, organization, work or volunteer experience, or family responsibility. IOn its Duffield Engineering applicant webpage, the College of Engineering sets out character criteria and asks that applicants' essays reflect how they "embrace diverse perspectives" and "contribute to your communities." It also asks prospective students to include "community engagement." In other words, the universitywide essay was repackaged as an essay requirement at the college level, and for the same purpose: to continue collecting information for racial preferences to go around *SFFA*. These questions and criteria retain the community and affiliation information that Tan discussed in the context of removing the universitywide essay. That is Cornell's college-level essays yield the same information, including applicants' race. Cornell also considers community-related information outside Engineering. On information and belief, this simply pushed Cornell's ongoing racial profiling of student applicants from the centralized level down to the level of the colleges.

113.112. The College of Arts and Sciences, the College of Agriculture and Life Sciences (CALS), and the College of Human Ecology offer paths relevant to Members of SWORD's intended pre-medical studies that Members of SWORD intend to pursue. The College of Arts and Sciences identifies community engagement, extracurricular activities, work experience, and family responsibilities among its review considerations. CALS requires applicants to discuss experiences and goals informing their intended major and the learning, community, or impact opportunities that draw them to the college. Human Ecology requires an

essay connecting students with extracurricular, community-engagement, or work experience addressing community needs and the applicant's intended major.[58]

114.113. Tan's comments response to a question about restoring representation, the and reported use of identity-related indicators, andas well as Cornell's retention of application questions, review criteria, coupled with as well as Cornell's express vision and goals indicate that Cornell will continue to infer applicants' racial identities into the Fall 2027 cycle. Rather than a checkbox, this Now, Cornell will be gleaned racial identity from essays, activities, and affiliations to give favorable selection weight to membership in preferred racial groups (and less weight to disfavored racial groups) apart from applicants' individual qualities and merits.

115.114. As of October 27, 2026, Cornell's official Undergraduate Education webpage for the College of Engineering's undergraduate academic advising webpage for the College of Engineering continued to publish the "Vision, Mission, & Values." a vision statement: "Cornell Engineering envisions a future in which its student body and faculty reflect the gender, socioeconomic, and racial diversity of society."[59] This cannot change the fact that

---

58 Cornell Undergraduate Admissions, First-Year Duffield Engineering Applicants, Writing Prompts and Preparing Your Application (accessed Oct. 17, 2026). https://admissions.cornell.edu/first-year-duffield-engineering-applicants; Cornell Undergraduate Admissions, First-Year Arts & Sciences Applicants (accessed Oct. 20, 2026), Preparing Your Application. https://admissions.cornell.edu/first-year-arts-sciences-applicants; Cornell Undergraduate Admissions, First-Year Human Ecology Applicants (accessed Oct. 20, 2026), CHE Application Writing Prompt. https://admissions.cornell.edu/first-year-human-ecology-applicants; Cornell Undergraduate Admissions, "What are the essay questions for the Fall 2027 application?" (accessed Oct. 27, 2026), College of Agriculture and Life Sciences. https://faq.enrollment.cornell.edu/kb/article/479-what-are-the-essay-questions-for-the-fall-2027-application/; Cornell Undergraduate Admissions, "Preparing for Pre-Professional Fields" (accessed Oct. 27, 2026), Pre-Health. https://admissions.cornell.edu/academics/colleges-schools-and-academic-areas-interest/preparing-for-pre-professional-fields.

59 Cornell Undergraduate Education, College of Engineering, College Academic Advising, available at https://www.undergrad.cornell.edu/students/advising/college-academic-advising/college-engineering.

**Formatted:** Indent: Left: 0", Hanging: 0.13"

Cornell continues to count race as "diversity"—indicating little had changed. In addition, Cornell's strategic-plan URL redirected to revised material, and the current Engineering 2030 webpage described the plan as "Launched in 2021 and refined in 2026."[60] The advising page's continued expression of that racial-composition vision supplies context for the current application materials and post-*SFFA* practices.[61] "Cornell Engineering envisions a future in which its student body and faculty reflect the gender, socioeconomic, and racial diversity of society."[62] What is true of engineering is simply a manifestation of policies that have been spread throughout all Cornell colleges, which will affect all future applicants, including Members of SWORD.

116.115. Cornell assigned post-*SFFA* admissions implementation to Kotlikoff and Nishii in September 2023. Racial preferences continue to burden the Members of SWORD in the application process. Cornell speaks out of both sides of its mouth. For example, a November 2025 federal-agreement FAQ states that a settlement Cornell's agreement with the federal government concerning racial discrimination required no policy changes and affirms compliance with antidiscrimination law. Separately, Kotlikoff stated in his 2025 State of the University

[60] Cornell Engineering 2030, Our Vision and Mission, former webpage, redirect checked Oct. 18, 2026; Cornell Duffield Engineering, Duffield Engineering 2030 (accessed Oct. 17, 2026), https://www.duffield.cornell.edu/duffield-engineering-2030/.

[61] Engineering academic advising webpage; Cornell Engineering 2030, Our Vision and Mission, former webpage, redirect checked Oct. 18, 2026; Cornell Duffield Engineering, Duffield Engineering 2030 (accessed Oct. 17, 2026). https://www.duffield.cornell.edu/duffield-engineering-2030/.

[62] Available at https://www.undergrad.cornell.edu/students/advising/college-academic-advising/college-engineering.

Formatted: Indent: Left: 0", First line: 0", Space After: 0 pt

Address that Cornell changed admissions policies to comply with the 2023 Supreme Court decision in *SFFA*.[63]

**CAUSES OF ACTION**

**Count 1: Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (Stanley Zhong and SWORD against Cornell University and the Trustees of Cornell University)**

~~117.~~116. Plaintiffs here incorporate by reference all preceding paragraphs as if fully restated in this paragraph.

~~118.~~117. Plaintiffs bring this claim under Title VI of the Civil Rights Act of 1964, which prohibits any program or activity receiving federal financial assistance from subjecting individuals to discrimination on the basis of race.

~~119.~~118. Cornell receives federal financial assistance.

~~120.~~119. Members of SWORD are discouraged from applying to Cornell because of its current and past discrimination on the basis of race, and Members of SWORD seek to hide their academic achievements and racial identity due to Cornell's discrimination on the basis of race.

~~121.~~120. Cornell rejected Stanley Zhong's application because he belongs to a protected class, Asian American. But for his race, which is not a racial group that Cornell prefers as "diverse," Stanley would not have been rejected.

~~122.~~121. For decades Cornell has used racial selection preferences based on quotas and benchmarks, including in its College of Engineering, calculated to achieve a composition of

[63] Cornell University, Federal Agreement Frequently Asked Questions (Nov. 17, 2025); Michael Kotlikoff, 2025 State of the University Address, June 7, 2025 (~~given at~~ R~~r~~eunion 2025), available at https://president.cornell.edu/public-remarks/2025-state-of-the-university-address/.

each class based on race that mirrors the demographic racial composition of the U.S. population. These racial preferences, as applied by Cornell, cause Cornell to admit applicants with far less merit than Stanley Zhong simply because they have a preferred skin color or ethnicity, for example black or Hispanic. Nothing should be interpreted to argue that all blacks or Hispanics admitted to Cornell lack merit or qualifications; or that blacks or Hispanics as a demographic group in the United States do not produce prospective students of superlative quality, just as any other racial group. However, Cornell discriminates on the basis of race by making preferred racial characteristics themselves selection criteria, regardless of merit.

~~123.~~122. Defendant Cornell's acts and omissions have caused Members of SWORD to expect certain rejection at Cornell University due to Defendants' intentional discrimination against Asian Americans.

~~124.~~123. Cornell has established patterns, practices, and policies of intentional discrimination on the basis of race.

~~125.~~124. Stanley Zhong seeks compensatory damages for economic loss and missed educational opportunities due to ~~his rejected~~ Cornell's rejection of his application ~~from Cornell~~.

~~126.~~125. Stanley Zhong and SWORD on behalf of its members seek declaratory and injunctive relief protecting ~~its~~ SWORD's Members from discrimination in admissions at Cornell.

~~127.~~126. In the alternative, Stanley Zhong and SWORD also seek nominal damages.

**Count 2: Violation of 42 U.S.C. § 1981**
**(Stanley Zhong and SWORD against all Defendants)**

~~128.~~127. Plaintiffs here incorporate by reference all preceding paragraphs as if fully restated in this paragraph.

~~129.~~128. 42 USC § 1981(a) of the Civil Rights Act provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

And 42 USC § 1981(b) provides:

> . . . the term 'make and enforce contracts' includes . . . the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship

~~130.~~129. 42 USC § 1981 guarantees all persons in the United States the right to make and enforce contracts on equal terms, regardless of race. The right to make and enforce contracts includes the opportunity to enter, on equal terms, the contractual relationship for educational services offered by a private university such as Cornell. The equal right to make contracts includes equal opportunities to present or receive offers and negotiate terms.

~~131.~~130. Stanley Zhong is Asian American and therefore a member of a protected racial class within the meaning of § 1981.

~~132.~~131. Members of SWORD are Asian Americans who are ready, willing, and able to apply to Cornell but are discouraged and dissuaded because of Cornell's intentional patterns and practices of discrimination on the basis of race.

~~133.~~132. Through its policies, patterns, and practices of racial preferences and quotas pegged to the racial composition of the general United States population, Cornell intentionally discriminates against Asian Americans on the basis of race in the name of euphemisms like "diversity" and "community."

~~134.~~133. By discriminating on the basis of race, Defendants acted with malice, evil motive, recklessness, and callous indifference to Plaintiffs' federally protected rights.

~~135.~~134. Under New York law, the fundamental relationship between a student and an institution of higher education is contractual in nature.

~~136.~~135. Stanley Zhong applied to Cornell to obtain a contract for educational services.

~~137.~~136. Cornell declined to enter into a contract with Stanley Zhong on the basis of race. Instead, Cornell admitted other, individual students with far less merit based on the categories of race that Cornell prefers, for example black and Hispanic students. Cornell, acting through its admissions personnel, including but not limited to Defendants Kotlikoff and~~,~~ Felton~~, and Burdick~~, denied Stanley Zhong the ability to contract with Cornell on the basis of race.

137. Defendants Kotlikoff and ~~,~~Felton~~, and Burdick~~ personally and intentionally implemented and enforced the admissions practices on the basis of race that disadvantaged Stanley Zhong. Their conduct, collectively and individually, had an affirmative causal connection to the unequal, race-based terms on which Stanley Zhong competed for but was denied the opportunity to contract for educational services with Cornell.

138. But for Cornell's intentional discrimination against Asian American applicants, Cornell would have admitted Stanley to its College of Engineering for Fall 2023. But for his race, Stanley Zhong would have competed on equal terms for the opportunity to contract with Cornell for educational services.

139. Members of SWORD are deterred from applying to Cornell and entering into contracts for educational services because of Cornell's decades long, intentional discrimination on the basis of race.

140. Defendant Kotlikoff continues to intentionally and personally implement and enforce race-based admissions policies that will discriminate against Members of SWORD and Stanley Zhong should they apply to Cornell in the future.

141. Stanley Zhong and SWORD seek compensatory and punitive damages in an amount to be proven at trial as well as injunctive relief preventing Cornell from continuing its discriminatory practices.

142. In the alternative, Plaintiffs seek nominal damages as a declaration that Cornell and all Defendants discriminate against students on the basis of race in admissions.

**Count 3: Violation of the New York State Human Rights Law,**
**N.Y. Executive Law §§ 290-301~~.~~**
**(Stanley Zhong against all Defendants)**

143. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth here.

144. Cornell is an educational institution within the meaning of ~~Section~~ § 292 (40) of the New York State Human Rights Law (NYHRL).

145. Section 296(4) of the NYHRL makes it unlawful for such an educational institution to deny the use of its facilities to an otherwise qualified person because of race.

146. Stanley Zhong and the Members of SWORD are Asian American and members of a protected class within the meaning of the NYHRL, § 292(37). They are all otherwise qualified—indeed ~~over-qualified~~they possess superlative qualifications—to attend, gain admission to, and apply for admission to Cornell.

147. Cornell denied Stanley Zhong use of its facilities and educational experiences because of his race. All other Defendants aided, abetted, incited, compelled, or coerced the institution to discriminate on the basis of race, in particular causing Stanley Zhong to be rejected when he applied to Cornell. Because of Defendants' acts, omissions, and intentional

discrimination on the basis of race, Stanley Zhong and Members of SWORD, who are ready, willing, and able to apply to Cornell, are now discouraged and dissuaded from applying to Cornell.

148. Cornell is liable under NYHRL § 296(4).

149. Defendants Kotlikoff~~,~~ and Felton~~, and Burdick~~ are liable under NYHRL § 296(6).

150. ~~Plaintiffs~~ Plaintiff Stanley Zhong is ~~are~~ therefore entitled to compensatory and injunctive relief under NYHRL § 297 and reasonable attorney's fees and costs under NYHRL § 297(10).

**Count 4: Violation of New York Civil Rights Law §§ 40-c and 40-d**
**(Stanley Zhong against all Defendants)**

151. Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth here.

152. Section 40-c(2) of the New York Civil Rights Law provides, "No person shall, because of race, creed, color, national origin~~, [or] sex~~ … be subjected to any discrimination in his or her civil rights, or to any harassment, as defined in section 240.25 of the penal law, in the exercise thereof, by any other person or by any firm, corporation or institution, or by the state or any agency or subdivision of the state."

153. Section 40-d authorizes a civil action for any person aggrieved by a ~~for~~ violation~~s~~ of § 40-c to recover a statutory penalty of ~~up~~ $100 to $500 for each violation.

~~153.~~154. ~~It~~ The law further requires that "at or before the commencement of any action under this section," the plaintiff serve written notice on the New York Attorney General. Plaintiffs have complied with that notice requirement on August 5, 2025 by serving a stamped

copy of the original Amended Complaint in this Civil Action on the Office of the Attorney General ~~contemporaneously with filing on August 5, 2025~~.

~~154.~~155. Cornell University is an "institution" within the meaning of § 40-c and offers educational programs to the public in the State of New York. The individual defendants, Michael Kotlikoff and~~,~~ Shawn Felton~~, and Jonathan Burdick~~ are "persons" subject to liability because they personally participated in, aided, and abetted the discriminatory conduct alleged herein.

~~155.~~156. Stanley Zhong ~~Plaintiffs are and the Members of SWORD are~~ is Asian American and therefore a member~~s~~ of a protected class. By denying Stanley admission, Defendants discriminated and continued to discriminate against ~~Plaintiffs~~ Stanley Zhong in the exercise of ~~their~~ his civil right to pursue higher education ~~on equal terms~~ free from discrimination on the basis of race.

~~156.~~157. As detailed above, Defendants intentionally discriminated against Plaintiff Stanley Zhong on the basis of race when evaluating his application (and will discriminate against him on his prospective applications) for admission to Cornell, thereby denying him equal civil rights in violation of § 40-c.

~~157.~~158. Defendants' conduct was willful and knowing. They maintained race-conscious policies, disguised as ~~"~~"holistic~~"~~" review, with the specific purpose and predictable effect of suppressing Asian-American enrollment.

~~158.~~159. As a direct and proximate result of Defendants' violations of §§ 40-c and 40-d, Plaintiff Zhong suffered—and, absent injunctive relief, will continue to suffer—irreparable harm, loss of educational opportunity, emotional distress, and other damages.

~~159.~~160. ~~Pursuant to § 40-d,~~ Zhong seeks: (a) a statutory penalty of ~~at least~~ $500 ~~per~~ for each violation ~~per plaintiff~~ under § 40-d; (b) permanent injunctive relief prohibiting Cornell and its officers, employees, and agents from considering race—whether directly or by proxy—in undergraduate admissions; (c) any additional compensatory damages the Court deems just and proper; (d) where permitted, punitive damages, (e) reasonable attorneys' fees, and (f) costs and such other equitable relief as the Court may deem just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Stanley Zhong and SWORD respectfully request that this Court:

i. Declare Cornell University's admissions practices in violation of Title VI of the Civil Rights Act of 1964;

ii. Declare Defendants in violation of 42 USC § 1981;

iii. Declare Defendants in violation of the New York Human Rights Law, NY Executive Law §§ 290-301;

iv. Declare Defendants in violation of the New York Civil Rights Law §§ 40-c and 40-d;

v. Enjoin all Defendants from racially discriminating in undergraduate admissions practices;

vi. Order all Defendants to take all necessary steps to eliminate the effects of past discrimination in admissions;

vii. Order Defendants to pay punitive damages;

viii. Order Defendants to pay monetary damages in an amount to be proven at trial in addition to Plaintiffs' reasonable attorney's fees and costs;

ix. Order, in the alternative, nominal damages in the amount of $1;

x. Grant such other and further relief as this Court deems just and proper.

**JURY DEMAND**

**PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Dated: October 30, 2026

Respectfully submitted,

Formatted: Highlight

Michael Thad Allen (435762)
ALLEN HARRIS PLLC
PO Box 404
Quaker Hill, CT 06320
(860) 772-4738
mallen@allenharrislaw.com

*For Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

# EXHIBIT A

**Formatted:** Font: 28 pt